# ATTACHMENT D

# CITIED PORTIONS OF ROSA ROSERO'S

# OCTOBER 31, 2007 DEPOSITION TRANSCRIPT

# Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

```
--------------------------x
KIN S. CHHAN                 )

        Plaintiff,      )Civil No.

      v.                 )1:07cv01180(HHK)

HILTON HOTELS CORPORATION  )

        Defendant.      )

--------------------------x
```

Vienna, Virginia

Wednesday, October 31, 2007

Deposition of:

ROSA G. ROSERO

called for examination by counsel for Plaintiff pursuant

to notice, at 8614 Westwood Center Drive, Suite 950,

Vienna, Virginia 22182, before Joseph Kanahele, Jr. of

Capital Reporting Company, a notary public in and for

the Commonwealth of Virginia, beginning at 2:42 p.m.,

when were present on behalf of the respective parties:

# Capital Reporting Company

8  (Pages 26 to 29)

Page 26

1    Q    Did she ask whether any other witnesses
2    might have heard what was said?
3    A    I don't know.
4    Q    Did she ask you or Mustapha whether either
5    one of you thought the remarks were directed at either
6    one of you?
7    A    She didn't ask me that?
8    Q    Did anyone suggest that they thought Mr.
9    Chhan was referring to Hernan Vasquez's wife?
10   A    I don't know, exactly; I can't say that.
11   Q    You can't say it because you don't remember
12   it, or that it was never suggested?
13   A    Well, no, I don't know because when I heard
14   it, he was in the kitchen.  I don't know what problems
15   they have but there was nobody there.
16   Q    No, my question is, did Ms Sterrett, Robin
17   Sterrett, question either Hernan or Mustapha about
18   whether Mr. Chhan was referring to somebody's wife?
19   A    She didn't ask us that -- just to repeat
20   what we had heard.
21   Q    Okay.  And what did Mr. Vasquez say?
22   A    I don't know, I didn't hear what he talked

Page 27

1    with her about.
2    Q    What did Mustapha say?
3    A    The same, the words that he heard him say.
4    Q    Okay.  So Ms. Robin Sterrett was questioning
5    all three -- Hernan Vasquez, Mustapha and you -- about
6    you all heard that day.  You don't remember what Hernan
7    Vasquez said?
8    A    I didn't hear anything; I don't know what he
9    said.
10   Q    So far as you recall, he didn't say
11   anything?
12   A    He didn't say what to whom?
13   Q    To Ms. Sterrett?
14   A    I told everything that I heard to her and
15   that's all, no more.
16   Q    I'm asking what you overheard Mr. Vasquez
17   tell Ms. Sterrett?
18   A    I said, no, I didn't --
19   Q    Did he say anything to Ms. Sterrett?
20   A    I didn't hear, I didn't hear.
21   Q    You didn't hear anything?
22   A    No.  I just got -- but I had heard and I

Page 28

1    told her and that's all, it finished.
2    Q    I thought you said you heard Mustapha
3    describe what he heard?
4    A    Well, yes, because he and I were together;
5    but I didn't hear anything from Hernan.
6    Q    Okay.  But you did hear Mustapha tell Robin
7    Sterrett what he heard?
8    A    Yes.
9    Q    Are you friendly with Hernan Vasquez?
10   A    Just a co-worker like him.
11   Q    And how about Mustapha?
12   A    The same.
13   Q    You said co-worker.  Did you ever hear Mr.
14   Vasquez accuse Mr. Chhan of being a thief?
15   A    No.
16   Q    Did you ever hear Mr. Vasquez refer to Mr.
17   Chhan as not having a woman?
18   A    No, nothing.
19   Q    Did you ever hear Mr. Vasquez suggest that
20   Mr. Chhan was gay or a maricon?
21   A    No.
22   Q    Did you ever hear Mr. Vasquez refer to Mr.

Page 29

1    Chhan as Chino?
2    A    No.
3    Q    Did you ever hear Mr. Vasquez refer to Mr.
4    Chhan as cheap?
5    A    No.
6    Q    Did you ever hear anyone else use the four-
7    letter word, fuck, while you were employed with the
8    Hilton?
9    A    No.
10   Q    Never heard it?
11   A    I don't hear those words as far as I'm
12   concerned.
13   Q    You don't hear them because you choose not
14   to hear them?
15   A    Maybe that's the case.
16   Q    As you testify today, do you have any
17   understanding of why Hernan Vasquez was in Ms.
18   Sterrett's office?
19   A    Well, now I'm just being made aware that
20   maybe there was a problem between them.
21   Q    Okay, at the time you didn't understand?
22   A    No.

# ATTACHMENT E

# CITED PORTIONS OF MUSTAPHA ABOUHOUDA'S

# OCTOBER 12, 2007 DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

       Plaintiff,

   v.                          Civ. No.: 1:07cv01180 (HHK)

HILTON HOTELS CORPORATION,

       Defendant.

---

                                    Friday, October 12, 2007

Deposition of
MUSTAFA ABOUHOUDA

a witness, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at 1:00 p.m. in the offices of Kestell & Associates, 1012 14th Street, N.W., Suite 630, Washington, D.C., 20005, before Jerry McKenzie of Court Reporting Services, Inc., when were present on behalf of the respective parties:

12

1    Q    In other words, you are in between Kin Chhan and

2    Rosario?

3    A    Um-hmm [affirmative].

4    Q    She's one away from Kin Chhan.

5    A    But she was there too.  She was standing by.

6    She was right there.

7    Q    My questions are very neutral.  They're just

8    attempting to place people in --

9    A    Yes.  I understand.

10    Q    You understand my role is to make certain Mr.

11    Chhan gets his day in court and gets justice from this.

12    You understand that?

13         MS. ARIAIL:  Objection.  Objection.

14         BY MR. KESTELL:

15    Q    So, I'm simply asking were people --

16    A    Sir, only reported what I heard, the F word that

17    Mr. Kin Chhan was using.

18    Q    Okay.

19    A    Nothing more, nothing less.

20    Q    Okay, I'm going to ask you now, what was it

21    precisely you heard?

22    A    Kin Chhan says, bring your wife, I'll fuck her

23    for you.  Excuse my French.  I can fuck very good.  You

24    don't know how, what a good fuck I am.  Oh, fuck her.

13

1    Whatever.  That's not a normal, you know, conversation.

2         Q    Okay, was he looking at anyone as he was saying

3    these words?

4              MS. ARIAL:  Objection.  Asked and answered.

5              THE WITNESS:  I looked at him, as a matter of

6    fact, when I heard his voice.  I don't know what he was

7    looking at.

8         Q    When you looked at him, did he appear to be

9    looking straight as he was retrieving his items, or was he

10   looking at Rosario, or was he looking the other way?

11        A    Looking at the Queen Mary.  When you pick up you

12   got to see what you are doing.

13        Q    Okay, so he's looking at the Queen Mary to pick

14   up his items?

15        A    We were all looking at the Queen Mary.

16        Q    Did you see a Mr. Chen by himself?

17        A    Mr. who?

18        Q    Let me get the spelling, because I don't know if

19   I'm pronouncing it correctly. Chan.  It's spelled the say

20   way as Kin and San.

21        A    Oh, you mean --

22        Q    Peter.  Peter Chan.

23             [Side conversations.]

24             MS. ARIAL:  Objection.  Can you ask your client

1    me.

2        Q    Okay.  Did you ever provide a statement about

3    what you observed on the morning of July 19th?

4        A    I'm sorry?

5        Q    Did you ever provide a statement to anyone

6    concerning what you've observed?

7        A    Oh, yes, I did, to personnel.  Yes, I did.

8        Q    And who were you talking to?

9        A    To the woman at personnel.

10       Q    Ms. Sterrett?

11       A    Sterrett, yes.

12       Q    Robin Sterrett?

13       A    Robin, Robin.  I recall now.

14       Q    Were you ever asked to provide a statement to

15   the union?

16       A    To the union?

17       Q    Yes.

18       A    I don't think so.  I mean they asked me, but it

19   wasn't a statement, it was just like questions and

20   answers.

21            MR. KESTELL:  I want to ask the witness about

22   this, I'll make copies.

23            MS. ARIAIL:  It's an exhibit already.

24            MR. KESTELL:  Is it?



703-548-3334        **Court Reporting Services, Inc.**        1-800-848-4007
                    201 North Fairfax Street, Suite 21
                    Alexandria, Virginia  22314

# ATTACHMENT F

# CITED PORTIONS OF PETER CHAN'S

# JANUARY 10, 2008 DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

       Plaintiff,

   v.                        Civ. No.: 1:07cv01180
                                   (HHK)

HILTON HOTELS CORPORATION,

       Defendant.

---

                        Thursday, January 10, 2008

Deposition of
PETER CHAN

a witness, called for examination by counsel for
Plaintiff, pursuant to notice and agreement of counsel,
beginning at 10:15 a.m. in the offices of Kestell &
Associates, 1012 14th Street, N.W., Suite 630, Washington,
D.C., 20005, before Jerry McKenzie of Court Reporting
Services, Inc., when were present on behalf of the
respective parties:

2

1    A    I was left at Hilton during the 1975 and go back
2    to 1991.
3    Q    And came back in 1991?
4    A    Until this day.
5    Q    From 1991 until this day?
6    A    Yes.
7    Q    And what is your position?
8    A    Right now, I'm a banquet server.
9    Q    And how long have you been a banquet server?
10   A    Since 1999.
11   Q    What is your national origin?
12   A    I'm Chinese.
13   Q    And you've been in U.S. how long?
14   A    I came to this country 1969, August.
15   Q    And shortly thereafter, you quickly started at
16   the Hilton?
17   A    Yes.
18   Q    And was that as a server also, or not?
19   A    At that time I worked at Capital Hilton at 16th
20   and K Street as a restaurant waiter.
21   Q    Restaurant waiter?
22   A    Yes.
23   Q    You're familiar with Kin Chhan, are you not?
24   A    Since I transferred from Capital Hilton to

28

1      Q   When you eventually talked to Robin Sterrett

2   from human resources, do you remember telling her that Kin

3   Chhan said, "I can do it in front of you, I want to show

4   you how good I am"?

5      A   Yes.

6      Q   "I can do any woman I want"?

7      A   Yes.

8      Q   Okay.  And Peter confirmed that Kin used the

9   word "fuck."  Can you, when you're telling Ms. Sterrett, I

10   can do it in front of you, are you really telling her that

11   what he was saying, Kin Chhan was saying was, I can fuck

12   in front of you?  Is that what he was saying?

13      A   I can fuck your wife front of you and show you

14   how strong I am.  That's what I told Robin.

15      Q   Okay.  Have you ever served as a witness before

16   involving Robin Sterrett?

17      A   No.

18      Q   So you've never been asked to serve as a witness

19   in any other disciplinary case?

20      A   No, this is the first time.

21      Q   Have you ever been disciplined yourself for any

22   reason?

23      A   What?

24      Q   Have you received discipline yourself for any

# ATTACHMENT F

# CITED PORTIONS OF PETER CHAN'S

# JANUARY 10, 2008 DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____

KIN S. CHHAN,

        Plaintiff,

    v.                        Civ. No.: 1:07cv01180
                                     (HHK)

HILTON HOTELS CORPORATION,

        Defendant.

_____

Thursday, January 10, 2008

Deposition of
PETER CHAN

a witness, called for examination by counsel for
Plaintiff, pursuant to notice and agreement of counsel,
beginning at 10:15 a.m. in the offices of Kestell &
Associates, 1012 14th Street, N.W., Suite 630, Washington,
D.C., 20005, before Jerry McKenzie of Court Reporting
Services, Inc., when were present on behalf of the
respective parties:

2

1      A    I was left at Hilton during the 1975 and go back

2   to 1991.

3      Q    And came back in 1991?

4      A    Until this day.

5      Q    From 1991 until this day?

6      A    Yes.

7      Q    And what is your position?

8      A    Right now, I'm a banquet server.

9      Q    And how long have you been a banquet server?

10     A    Since 1999.

11     Q    What is your national origin?

12     A    I'm Chinese.

13     Q    And you've been in U.S. how long?

14     A    I came to this country 1969, August.

15     Q    And shortly thereafter, you quickly started at

16   the Hilton?

17     A    Yes.

18     Q    And was that as a server also, or not?

19     A    At that time I worked at Capital Hilton at 16th

20   and K Street as a restaurant waiter.

21     Q    Restaurant waiter?

22     A    Yes.

23     Q    You're familiar with Kin Chhan, are you not?

24     A    Since I transferred from Capital Hilton to

---

28

1        Q    When you eventually talked to Robin Sterrett

2    from human resources, do you remember telling her that Kin

3    Chhan said, "I can do it in front of you, I want to show

4    you how good I am"?

5        A    Yes.

6        Q    "I can do any woman I want"?

7        A    Yes.

8        Q    Okay.  And Peter confirmed that Kin used the

9    word "fuck."  Can you, when you're telling Ms. Sterrett, I

10   can do it in front of you, are you really telling her that

11   what he was saying, Kin Chhan was saying was, I can fuck

12   in front of you?  Is that what he was saying?

13       A    I can fuck your wife front of you and show you

14   how strong I am.  That's what I told Robin.

15       Q    Okay.  Have you ever served as a witness before

16   involving Robin Sterrett?

17       A    No.

18       Q    So you've never been asked to serve as a witness

19   in any other disciplinary case?

20       A    No, this is the first time.

21       Q    Have you ever been disciplined yourself for any

22   reason?

23       A    What?

24       Q    Have you received discipline yourself for any

**ATTACHMENT G**

**CITED PORTIONS OF ROBIN STERRITT'S**

**JANAURY 10, 2008 DEPOSITION TRANSCRIPT**

**(STERRETT TR. 2)**

U

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

       Plaintiff,

  v.                        Civ. No.: 1:07cv01180
                                (HHK)

HILTON HOTELS CORPORATION,

       Defendant.

---

Thursday, January 10, 2008


Deposition of
ROBIN STERRETT

a witness, called for examination by counsel for
Plaintiff, pursuant to notice and agreement of counsel,
beginning at 11:40 a.m. in the offices of Kestell &
Associates, 1012 14th Street, N.W., Suite 630, Washington,
D.C., 20005, before Jerry McKenzie of Court Reporting
Services, Inc., when were present on behalf of the
respective parties:

4

1    A    Six.

2    Q    Okay, so the first six pages refer to an

3  incident involving allegation of sexual harassment?

4    A    Yes, it does.

5    Q    Now, it appears from the first page of this that

6  it started out as an incident involving some verbal

7  altercation between two employees?

8    A    Yes, it did.

9    Q    And was the employee disciplined for the

10  altercation?

11    A    Yes, she was ultimately disciplined with a five

12  day suspension for violation of our violence in the

13  workplace policy.

14    Q    And what was the allegation that, what conduct

15  had she engaged in?

16    A    For the suspension, or for the harassment claim?

17    Q    What led to her suspension?

18    A    That's a separate document in here.

19    Q    Oh, okay, do you want to bring our attention to

20  that, then?

21    A    It is document HHC-0436.

22    Q    And what nationality was this female employee?

23    A    African-American.

24    Q    Okay.  And the allegation here was discourtesy

8

1    A    Okay.

2         MS. ARIAIL:  Can we identify that by Bates

3    number?  Well, your copy doesn't have one.

4         THE WITNESS:  Yes, I think it fell off when it

5    got xeroxed.

6         [Side conversations.]

7         MR. KESTELL:  Can we go off the record?  Maybe

8    we can mark all our copies the same.

9         [Discussion off the record.]

10        MR. KESTELL:  Back on the record.

11        BY MR. KESTELL:

12   Q    Ms. Sterrett, we were just talking about the

13   January 2005 incident that's -- what is the first Bates

14   stamp on that page?

15   A    That is number HHC-0425.

16   Q    And this involves another employee now, does it

17   not?

18   A    Yes, actually, this is the same employee as

19   involved in the previous sexual harassment allegation and

20   the discourtesy towards a team member who was suspended

21   for five days.

22   Q    The same African-American?

23   A    Yes.

24   Q    Okay, and this is a subsequent incident?

---

9

1          A     Yes, this is about two months later.

2          Q     There's some writing in the upper part.  Is that

3     your writing?

4          A     Yes, it is.

5          Q     Can you make it out?

6          A     It's my attempt to reach the individual, to

7     bring closure to the investigation.  And I tend to

8     document the dates that I called and left messages.  I

9     think I left at least two messages.  And then on the final

10    page, I should say on the second page, 0426, I think I

11    noted that the individual never called back.  And so we

12    closed it out.

13         Q     So this was a possible witness you were seeking

14    to call?

15         A     No, no, no.  This is the individual who the

16    claim of discourtesy was against.

17         Q     The African-American female?

18         A     Yes, right.  And after we had completed the

19    investigation, these are just my notes of when I tried to

20    call her to bring it to closure.  And she never responded

21    back.  However, the decision was to terminate or remove

22    her from the rolls based on the situation and based on her

23    prior record.

24         Q     Basically, what was your finding concerning this

11

1       Q       You just don't remember?

2       A       Yes.

3       Q       And what is the outcome for this employee?

4       A       Was removed.  This individual was an overflow

5    banquet server, started just about two months prior to

6    this situation.  And so he was removed from the list.

7       Q       Okay.  Basically a new employee?

8       A       Um-hmm [affirmative].

9       Q       Do you have a probationary period?

10      A       Yes, we do.  We do have a probationary period.

11   The overflow, as well as the A list, obviously it's a

12   slightly different, more loose relationship.

13      Q       Okay.  Turning to 0430, is that involving a

14   different employee?

15      A       Yes, it is.

16      Q       How many pages are associated with that

17   incident?

18      A       One.

19      Q       Okay, and that's something that occurred in May

20   of 2002?

21      A       Yes.

22      Q       What was the allegation made against this

23   employee?

24      A       Violation of the harassment-free workplace

14

1    other disciplines, the ones that you and I just discussed?

2    Because all I see is the counseling record itself.  Do we

3    still have notes and stuff like we have for some of the

4    other ones?

5         A    I don't know.  I don't know.  This is what I

6    have.

7         Q    In other words, you would, you gave us

8    everything you have relating to these incidents, you don't

9    know --

10         A    Yes, because it was --

11         Q    At the time you had witnesses to the incident,

12    but you don't have them any more?

13         A    Yes.

14         Q    Okay.  And what was the discipline that was

15    issued for this employee?

16         A    This employee I believe was terminated.

17         Q    I mean, am I supposed to know this from reading

18    0432?

19         MS. ARIAIL:  That's why we provided supplemental

20    responses.

21         BY MR. KESTELL:

22         Q    Wouldn't there have been a termination notice?

23         A    Yes, but again, if it was back in `02, I

24    wouldn't necessarily have it any more.

15

1      Q    Okay, so this is all you've got relating to that

2    incident?

3      A    Yes.   Yes.   I don't even remember who the team

4    member is.   I honestly don't even remember who the team

5    member --

6      Q    Turning to 0433, this is an incident that

7    occurred in April of `03?

8      A    Yes.

9      Q    And do we know what the discipline was for this

10   one?

11     A    Termination.

12     Q    Okay, and what was the allegation involving this

13   employee?

14     A    Violation of Hilton's violence in the workplace

15   policy, specifically, put his hands around somebody's

16   throat in a threatening manner.

17     Q    So a verbal altercation, went into something

18   physical where the individual actually accosted his co-

19   worker by putting his hands around his throat?

20     A    Yes.   And this situation was actually arbitrated

21   and the decision was upheld.

22     Q    Okay.   The next incident is 0434?

23     A    Yes.

24     Q    And that occurred in November of `03?

16

1     A   Yes, it did.

2     Q   And what was the outcome of this one?

3     A   Termination.

4     Q   Had these two employees had a prior romantic

5 relationship or something?

6     A   Yes, they were actually married, were divorced,

7 unfortunately there were domestic issues and restraining

8 orders in place.

9     Q   I see.

10    A   This was just the last straw.

11    Q   And in this case, there was actually a threat

12 made to kill her, kill the co-worker?

13    A   Well, to push her down the stairs.

14    Q   Well, the last two lines of the explanation, he

15 would kill her.

16    A   Yes, and the other person she was involved with.

17 But also, she was concerned because he had pushed her

18 forward as she was walking down the stairs.

19    Q   I see.  Turning to 0439, is this still another

20 incident?

21    A   Yes.

22    Q   That occurred in June 23rd of `05?

23    A   Yes, it did.

24    Q   What was the discipline meted out in this one?

1    A    Termination.

2    Q    And the allegation was that --

3    A    Yes, that, against the Hilton's violence in the

4    workplace policy, specifically saying, I am going to get

5    my brother to blow his head off.  Four four zero is the

6    actual termination.

7    Q    It's related to 39?

8    A    Yes.

9    Q    And 0441?

10    A    Yes.

11    Q    That's another incident relating to something

12    occurring on March 1st, `06?

13    A    Yes.

14    Q    What's the allegation here?

15    A    Again, a violation of the violence in the

16    workplace policy, specifically a verbal argument where one

17    of the team members picked up a lead pipe and turned and

18    held it toward the individual.

19    Q    And what was the discipline that was meted out?

20    A    Termination.  This was actually caught on video

21    tape.  The union looked at it and did not dispute it.  The

22    next sheet, 442, is the actual paperwork processing,

23    termination.

24    Q    And once again, this is one that you checked