UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------------------------

KIN S. CHHAN,

        Plaintiff,

    v.                          Civ. No.:  1:07cv01180(HHK)

HILTON HOTELS CORPORATION,

        Defendant.

--------------------------------------------------

PLAINTIFF'S MEMORANDUM OF LAW IN  OPPOSITION TO
DEFENDANT'S MOTION FOR  SUMMARY JUDGMENT

Plaintiff is hereby filing its opposition to Defendant's motion for summary judgment.   Attached to this memorandum is Plaintiff's response to Defendant's Statement of Material Facts Not in Dispute.  Plaintiff summarizes below the salient material facts that are genuinely in dispute.

**GENUINE AND MATERIAL ISSUES IN DISPUTE**

1.  The witnesses to the 7/19/06 termination incident are in dispute as to whether Hernan Vasquez stated that he "hated this motherfucker" upon seeing Plaintiff as Mr. Vasquez was exiting the kitchen and Plaintiff was entering the kitchen that morning. San Chhan testified that he heard him make the statement very clearly. Pl Exh. 2, para 22.;  Vasquez denies it, but cannot explain why he would think Kin Chhan would be upset with him and direct remarks to his wife. Pl Exh. 7, Tr. 2-6..

2.  Several witnesses, including James Hunt (Pl. Exh 3), Mr. Peng Yow (Pl Exh. 4), both Chhan brothers (Pl Exh. 1 & 2), and Peter Chhan (Pl Exh. 5) provided sworn statements  that Hernan Vasquez repeatedly would taunt the Chhan brothers  by calling them as "chino" "maricone" "fried lice", "eggroll" and call them other disparaging names. Vasquez denies doing that.  Pl Exh. 7, pp. 2-6.

3.  Ms. Sterrett claims that defendant has a practice of regularly suspending employees pending an investigation for serious complaints of misconduct. Def. Statement of Undisputed Facts, para 18.  However,  San Chhan testified that defendant follows this practice against him and his brother, but not against favored employees not belonging to his protected class. San Chhan Declaration,  Pl. Exh. 2, paragraphs 18-22.

4.  Defendant claims that they uniformly enforce their workplace harassment policies.  Def. Statement of Facts Not in Dispute, para 31.   Plaintiff and his brother point to the fact that the very employees who reported Plaintiff as spilling coffee on the hand of a coworker were openly referring to him as "chino" and "oriental guy" when describing their complaints to Ms. Sterrett and no corrective or disciplinary action was taken against them.  Pl. Exh. 2, paragraphs 10-11.

5.  Human Resource Director Sterrett claims that she investigates both sides of any employee altercation.  Pl Exh. 2, Attachment 4., Tr.   .  However, the Chhan brothers maintain that their complaints of taunting and provocation were never investigated seriously and no action was ever taken even when employees openly admitted to calling the Chhans "chino" and "oriental guy" even in her presence.  Pl Exh.  2 paragraphs 10-11.

**SUMMARY OF ARGUMENT**

Defendant predicates its entire defense on the premise that its Human Resource Director, Robin Sterrett, believed the employees who complained about Plaintiff's use of foul language in the kitchen and did not believe Plaintiff's denial that he did not say the offensive words and did not believe Plaintiff's assertion that he was provoked into his angry response because his coworker, Hernan Vasquez, had called him vulgar names just before the incident, causing him to emote in the way that he did.   Plaintiff maintains that Defendant engaged in the classic pattern of disparate treatment by charging and immediately suspending Plaintiff even before doing an investigation and never seriously investigating whether Vasquez had made remarks to Plaintiff that provoked his angry verbal reaction.  Even after Vasquez, who never was a witness to any of Plaintiff's alleged comments, repeatedly claimed that Plaintiff was directing his offensive comments to his wife--suggesting that there was some animosity between the two--Defendant still did no more than inquire with Vasquez whether he had said anything to Plaintiff earlier that morning.   HR Director Sterrett admitted that she was aware that San Chhan was a witness to the event,  but she declined to ask what he might have observed because he was a family member and would be biased and non-objective.   Yet,  Mrs. Sterrett  took two statements from Vasquez, verbally on 7/19/06 and again when she reduced his statement to writing on 7/27/06, even though he was not a first hand witness to anything and even through he was alleged by Plaintiff  to be the provocateur of the entire incident.

Plaintiff will produce substantial evidence involving several incidents over the past several years where they were taunted and humiliated by coworker comments about their ethnicity "chino", "oriental guy" , "fried lice",  "eggroll", and similar disparaging

comments, but in every occasion, Defendant would investigate the complaints of their coworkers, but would not do anything to investigate or correct the hostile work environment in the unit.  During an incident in March 1999, the employees freely referred to Plaintiff as "chino" and "oriental guy" even as they were meeting with Ms. Sterrett. She made note of the disparaging references and put them in quotes in her notes, but took no identifiable corrective action.   In nearly every one of the incidents, Plaintiff and/or his brother would be suspended, while the Defendant investigated only the charges filed by the coworkers.

Plaintiff maintains that he has produced more than sufficient evidence to demonstrate that Defendant engaged in a pattern of disparate treatment and condoned an environment that was so hostile to him because of his ethnicity so as to allow a reasonable jury to determine that he was discriminated against because of his race and ethnicity.

 BRIEF STATEMENT OF FACTS

Plaintiff is a 23 year employee of defendant. Pl Exh. 1, para 3.  He started working for defendant in 1983 as a restaurant busperson. Plaintiff Declaration, Exh. 1, paragraph 2.  Three years later he was promoted to restaurant waiter and in 1995 he was promoted to banquet server.  Id.   Plaintiff's brother, San Chhan, has worked for the defendant for more than 25 years-- since 1990, as a banquet waiter. San Chhan Declaration, Pl Exh.  2, para. 3.  Plaintiff has been tested as having a verbal IQ of only 57, but has not displayed difficulty performing the type of manual tasks required of a banquet waiter.  See  Pl Exh. 2 , Attachment 1.

Defendant terminated Plaintiff on July 27, 2006. Kin Decl. Pl Exh. 1, para 12. There were 38 regular full time banquet servers at the time and he was the only one fired dating back to at least 1990.[1]  San Chhan Dec., Pl Exh. 2, p. 3, fn. 1.  Defendant's stated reason for terminating Plaintiff was "for violation of company policy and discourtesy towards team members."  7/27/06 Termination letter.  Pl. Exh. 1, Attachment 2.  Banquet Manager Kevin O'Shea admitted that normally he issues verbal counselings for employees using foul language such as four letter words.  Pl Exh. 11, O'Shea Depo 1/28/08, Tr. 9.  Instead, Plaintiff was suspended pending investigation and was terminated on 7/27/06.  Pl Exh. 1, para 10.

**A.  Defendant Conducts One Sided Investigation of Incident Regarding Termination**

Specifically, the counseling form given to Plaintiff on 7/19/06 accuses Plaintiff of the following conduct at the time he was suspended pending investigation:

> "Two banquet servers reported that as they were setting up the ballroom, made the following statement "m-F, I can F … their wives, I give good f….  I am good at f …"   This statement is against company policy."

See Exh. 1, attach 1.        .

The sequence of events that led up to Plaintiff's suspension that morning is very much disputed.  Plaintiff denied using the four letter word during his agitated state that morning, but asserted that he was reacting to an offensive remark made by coworker Hernan Vasquez earlier that morning. Pl Exh. 1, para 10.  Plaintiff's brother, San Chhan, was only a few feet behind Plaintiff entering the kitchen and heard Hernan Vasquez say

---

[1] Defendant also maintains list of other employees who are banquet servers, but they are subject to different terms and conditions of employment and have lesser benefits.  There are approximately 60 employees on the "A" list, who can only be called after the full time list of 38 has been exhausted.  Defendant maintains another list of on-call employees, who have no contractual rights, and who can only be called after the regular full time list and "A " list employees have been exhausted.  Usually, on call employees only get contacted for really large functions where more than 100 servers may be needed.

to his brother, "I hate this motherfucker". [2] Pl Exh. 2, para 22.  Both Chhan brothers state

that Herman Vasquez had frequently taunted them and called them names in the past,

including "chino",  "eggroll", "fried lice", "cheap chinese" and "maricone[3]". Id. at para.

12; Pl Exh. 1, para 10.   This was further confirmed by coworkers James Hunt (Pl Exh.

3), Peng Yow (Pl Exh. 4) and Peter Chan (Pl Exh. 5).

Defendant's Human Resource Director, Robin Sterrett, never took either a verbal

or written statement from San Chhan regarding the incident even though she quickly

learned that he was a first hand witness. Pl Exh. 2, Attachment 4, Sterrett Depo 10/12/07

Tr. 26.   Her explanation:  "San is Kin's brother.  You know it would not be objective,

understandably so." Pl. Exh. 2, Attachment 4, Sterrett depo 10/12/07, Tr. 26, ls. 13-14. [4]

She took statements from Hernan Vasquez, who originally reported the incident[5] to

Banquet Manager Kevin O'Shea, Rosa Rosario and Mustafa Abouhouda, and later from

Peter Chan also.  Id.   Kin Chan alleged that Vasquez had been taunting him earlier that

---

[2] Plaintiff's brother, San Chhan, describes observing the following on 7/19/06:  He was
following his brother and Mustafa Abrohouda into the kitchen that morning when he saw
Hernan Vasquez leaving the kitchen through the adjacent exit door. (Pl Exh. 6,  San
Chhan 10/31/07 depo, Tr. 40).   I saw Mr. Vasquez see my brother entering the kitchen
and [Mr. Vasquez] say to him, "I hate this motherfucker" and continue on to the ballroom
with his supplies. Id.  When he entered the kitchen, San Chhan could see his brother was
upset and he heard Mr. Abrohouda say to him "take it easy boy; take it easy boy.  The last
time they took you to personnel."  (Pl Exh. 6,Tr. 42)  He heard his brother say,  Why this
guy call me motherfucker and why he call me maricon and why he call me thief.  I'm not
a maricon. I like woman, I'm not gay. … I can make love to a woman."  (Pl Exh. 6,Tr. 43-
44)

[3] "The term "maricone"  is intended to suggest homosexual or gay.

[4] Ms. Sterrett testified that she would normally talk to both sides of an altercation and any witnesses that
either side identified.  Exh. 4, Tr. 8, ls 4-11.

[5] Ms. Sterrett testified it was Mr. Vasquez who "expressed a complaint" to Banquet Manager, Kevin O'Shea
who then asked her to get involved.  Sterrett Depo, 10/12/07,  p. 21, line 21.  Mr. Vasquez claimed from the
outset that he believed that Plaintiff was referring to his wife, but he could not explain why.

morning, but he was never suspended pending investigation, and was treated by Sterrett as an objective witness.

When asked if she felt that Hernan Vasquez was an objective witness, she responded in the affirmative. Pl Exh. 2, Attachment 4 at Tr. 26, lines 23-24. She felt that he was objective even though he had not been present when the remarks were made and even though he believed, without any explanation, that Plaintiff was making the remarks about his wife. Ms. Sterrett testified that she did specifically question Mr. Vasquez about Plaintiff's allegations that Mr. Vasquez had been calling Plaintiff names earlier that morning when she met with Mr. Vasquez the second time to confirm the written notes that she took from him during the original meeting on 7/19/06. Ms. Sterrett testified when she met with Mr. Vasquez the second time some days later and asked him if her notes were an accurate reflection of what Mr. Vasquez reported to her originally, and he offered that,

"he thought Kin had been talking about his wife. And that's when I then said, you know, had asked him about whether he had had any comments or conversations with Kin earlier in the day."

Id. at Tr. 32, ls 17-22.

Mr. Vasquez's version of events is substantially different from both Mustafa Abouhouda and Rosa Rosario. According to Mr. Vasquez, this is what happened the morning of 7/19/06:

"One of the trips when I go into the ballroom, he [Plaintiff] come out from the ballroom and we meet in the door. He said something to me, I don't pay attention, and I just keep going. But there were two waiters behind him, I think it was Rosa Rosario and Mustafa was behind him. And they called me in the kitchen and say, you know about this, Mustafa and Rosa, you know this guy say something about you? I say I hear something, but I don't understood what he say to me.

And they say, you know what he say to you?  No.  He say you are something, some mean name.  I don't know.  I don't remember.  And then he say he want to fuck your wife.  I say what"?  He want to fuck my wife?  I said, why he going to screw my wife.  I say he, she going to like it.  I say what?  You know at that moment, I didn't realize what he say to me.  I say let it go.  Let the guy do whatever he wants to say, let him go.  And I come back to the ballroom and do my job.

And later Mustafa call me and say we are going to take this to personnel.  I say you want to take it to personnel then do it.  I didn't take it to personnel.  They did.  And they call me into personnel and say, Mr. Vasquez, the same question you are asking me now.  I explained to them what happened that morning.

Pl. Exh. 7, Vasquez, 10/12/07 Depo, pp. 3-4.   .

Mrs. Rosario adamantly denied talking to Hernan Vasquez until seeing him in the HR office and also denied that she suggested to Mr. Vasquez that Plaintiff was referring to his wife. Pl. Exh. 8, 10/31/07, Tr. 12, ls 5-7.   Mr. Vasquez's sworn assertion that he was a reluctant complainant is further contradicted by both Mr. O'Shea's and Ms. Sterrett's testimony. Pl Exh. 2, Attachment 4, Tr. 21, line 21: O'Shea Depo, Pl Exh. 11, Tr. 18.

**B.  Defendant Condoned Employees Disparaging Plaintiff Because of National Origin**

Both Plaintiff and his brother describe a long history of defending themselves against bogus charges filed by coworkers, many of whom were the same coworkers who would taunt them by referring to them as "chino" or "oriental guy".  These complaints were frequently  investigated by defendant's Human Resource Director,  Robin Sterrett, who would invariably suspend Plaintiff or his brother while doing the investigation of the accusations, but would take no action against those who did the taunting.  San Chhan Decl, Pl Exh 2, para 9.

**March 1999 Incident Where Plaintiff Suspended After Admittedly Being Referred To As "Chino" and "Oriental Guy" by Coworkers**

Plaintiff was suspended for 5[6] days in March 1999 for allegedly spilling coffee on a Hispanic coworker, Sylvia Flores.   The same Mustapha Abouhouda who was involved in reporting Plaintiff on the termination incident was Union Steward at the time and reported Plaintiff as spilling coffee on his Hispanic coworkers, Sylvia Flores.  Pl Exh. 9, 10/12/07 Abouhouda depo at Tr.  20.   Ms. Robin Sterrett investigated that complaint and testified that Plaintiff was upset about being bypassed by the Chief Steward (Raul Archer (Hispanic)) responsible for dispensing coffee who he heard say something to coworker Ms. Flores (Hispanic)-- who was taking instructions from him on who to give the coffee carafes to--in Spanish where he referred to Plaintiff as "chino" and observed that he was not given his coffee carafe in normal rotation.   Plaintiff then took it upon himself to take his carafes of coffee to serve to his assigned tables.  Later, Mr. Abouhouda was involved in explaining how Plaintiff had spilled coffee on Ms. Flores while taking the carafes. Id.  Ms. Sterrett investigated the complaint against Plaintiff and suspended him immediately pending investigation.  She later issued him a 3 day suspension.  However, she never investigated Plaintiff's complaint that the Chief Steward, Raul Archer, was taunting him by referring to him as "chino" and was purposely bypassing him for his rotation in getting coffee carafes with which to serve his table.

Ms. Sterrett admitted that Mr. Raul Archer referred to Plaintiff as "chino" and "oriental guy" even as he was describing the incident to her and her contemporaneous notes show that she put his comments in quotations.  See Pl Exh. 2, Attachment 4, Tr. 53-

---

[6] Mrs. Sterrett testified it was a 3 day suspension, but she was not counting the time he served on suspension during the investigation.

54.   Ms. Flores also referred to Plaintiff as "chino" when describing the incident to Ms. Sterrett.  Id.   Even though Ms. Sterrett admitted that the references to Plaintiff were "offensive and inappropriate"--Pl Exh. 2, Attachment 4, Tr. 55, ls 14-15--she had no recollection whether she took any action against the individuals who acknowledged referring to Plaintiff in this manner.   Ms. Sterrett admitted that she could locate no records that would indicate that these employees were even counseled about their offensive and inappropriate conduct.

Ms. Sterrett does admit that the suspension that was issued to Plaintiff for this incident was later reduced to a warning because there was no evidence that Plaintiff intentionally spilled the coffee on Ms. Flores hand and the evidence showed that she did not even file a workers compensation incident report until a week later.  Pl Exh 2, Attachment 4, Tr. 52-59.[7]   Ms. Sterrett admitted that there was never any investigation about Plaintiff's claim that his coworkers were belittling and taunting him by referring to him as "chino" or "oriental guy" and he was being denied coffee in his regular rotation. Id.

### Plaintiff Repeatedly Written Up for Alleged Offenses That Others Not Cited For

Plaintiff cites two examples of being written up by Banquet Manager, Kevin O' Shea, for allegations that were pretextual and disparately applied.  Pl Exh. 1, para 7. The first occurred on 7/2/04, when Plaintiff was written up for poor service because a patron reported to him that the buffet table was short of silverware.   At the time, he was assigned responsibility for a different area and he immediately reported the shortage of silverware to coworker, Ms. Segovia, who was responsible for the buffet table.   Later the

---

[7] Employees are instructed to file incident reports immediately to avoid fraud and to preserve evidence. Id.

patron complained about the delay in getting the silverware.  Only Plaintiff was written

up for poor service, despite the responsibility being that of Ms. Segovia.  Further

evidence of Mr. O'Shea's disparate treatment is revealed when Plaintiff's brother received

a complaint that Ms. Segovia refused to obtain skim milk for a patient when she was

responsible for coffee service, stating that the supplies on the table was all that was

available.   Plaintiff's brother, San Chhan, who was responsible for dispensing popcorn,

immediately apologized to the patron and went to the kitchen to obtain skim milk.  He

later reported the incident to Kevin O'Shea, but again Ms. Segovia was not written up for

this clear breach of poor service even though there was no question about her

responsibility.  Id., para 7, fn. 1.

        The second incident occurred on 3/19/05, when Kevin O'Shea suspended Plaintiff

for a day for allegedly hiding soup so that he could eat it after the function.   According to

Plaintiff, it is customary for waiters to set aside soup left over from the first course served

that will otherwise be thrown away.   That particular day, as he was returning left over

soup tureens to the kitchen, he set aside one that had soup remaining in it.  At the end of

the function, he ate some of this soup in the same area that other named Hispanic waiters

were eating leftover soup.  Mr. O'Shea charged only Plaintiff with hiding soup.  When

Plaintiff objected that he had done nothing different than what others were permitted to

do, and why was he being singled out, Mr. O'Shea responded that it was none of his

business what other coworkers were doing. Pl Exh. 1, p. 3-4, para 7.

### October 2005 Incident Where Defendant Disciplined Both Chhans Pretextually and Disparately

        In October 2005, both Channs were disciplined by Banquet Manager Kevin

O'Shea when their coworkers complained about San Chhan calling them dogs.  Pl. Exh.

2, para 14. According to San Chhan, he was running late that morning because of traffic

congestion on 395 and he dropped his brother Kin Chhan first about 4 minutes late and he

was 10 minutes late after parking the car. San Chhan also observed Mr. Vasquez appear

about the same time that he appeared, about 10 minutes late.  Id. When San Chhan

returned to the ballroom from parking his car, he observed several of his coworkers

taunting his brother for always being late, which San Chhan felt was untrue because they

were rarely late. Id.  However, nobody was accusing Mr. Vasquez of being late all the

time, even though he was frequently late. Id.   San Chhan observed Plaintiff getting

agitated with the taunting, and he urged the coworkers to stop the harassment and

accused them of acting like a bunch of dogs or hyenas, going after a wounded prey.  Id.

Captain Greg Hinds (African American) took both Chhan brothers to the Banquet

Manager, Kevin O'Shea's, office.  Mr. O'Shea told San Chhan that 16 waiters were upset

about being called "dogs" by him.  San Chhan denied calling them "dogs" but admitted to

saying that they were acting like dogs in the way they were going after his brother. Id. at

para. 15. (Banquet Manager admitted that he understood that San Chhan explained it that

way. O'Shea Depo, Pl Exh. 13, Tr. 27, lns 3-7. Mr. O'Shea then accused Plaintiff of

always being late for work. Pl Exh. 2, para 14. San Chhan countered that Hernan

Vasquez arrived the same time he did and he was not being hauled to the office and

questioned despite being late on many occasions. Id.   Mr. O'Shea said what somebody

else was doing was none of our business. Id.  After some further discussion, Mr. O'Shea

sent  Plaintiff home for the remainder of the work day and so noted on the counseling

form. Pl Exh. 13, Tr. 50.    A couple of days later, Mr. O'Shea issued both Chhan brothers

counseling for allegedly leaving the meeting after they were directed to remain. Id  San
Chhan was also issued a separate counseling form for allegedly calling his coworkers a
bunch of dogs.  Id.

San Chhan states that within a week or two after he and his brother were
disciplined, he witnessed one of the two Union Stewards who represented the 16
employees who complained--Santosh Rego-- appear 45 minutes late for work.  San
Chhan states that he reminded Captain Greg Hinds that he too saw Mr. Rego appear so
late for work and reminded him that he frequently comes late.   Despite San Chhan's
bringing it to the same Captain's attention, no investigation was conducted and no
discipline was issued to Mr. Rego.  Id. at para 19.

### Plaintiff Issued 5 day Suspension 3/5/06 Despite His Supervisor Recommending That No Discipline Was Warranted

Plaintiff was issued a 5-day suspension for allegedly telling a coworker, Mustafa
Allame, that he wanted to fight him.  Plaintiff adamantly denies making the remarks
alleged.  Pl Exh. 1, para 9.  Plaintiff's supervisor, Lolo Villagomez (Hispanic) testified
that he had recommended no action be taken because the type of argument the two
employees got into was not prolonged, and because Plaintiff returned to work and timely
performed the duties that he was directed to do. Pl Exh. 2, Attachment 7, pp. 14-15.  Mr.
Villagomez testified that he had seen many disputes between employees over work
assignments, and so long as they returned to work, he does not report them or take
disciplinary action. Id.

Despite his recommendation, Plaintiff was promptly suspended pending an
investigation.  He was later issued a 5 day suspension. Pl Exh. 1, para 9.

**Defendant Continues Its Pattern of Disparate Treatment Even After Plaintiff's Termination.**

San Chhan continues to observe the same type of offensive conduct by Mr. Hernan Vasquez and Mustapha Aboulhouda that he and his witnesses described in their sworn testimony and declaration. directed against him and other employees.

Mr. Aboulhouda (Morocco), who was one of the employees who complained to management about my brother the morning of 7/19/06, engages in much worse conduct in the workplace without any action being taken against him. As recently as 2/10/08, San Chhan ,along with several coworkers, witnessed Mr. Aboulhouda strike the face of coworker Mr. Gerard December (Haiti) three times in a fit of anger. I later asked Mr. December what led to the assault, and he told me that he had teased Mr. Aboulhouda by calling him a name that he did not like and he struck him across the face repeatedly. He told me that he was very angry with Mr. Aboulhouda over the incident. Pl Exh. 2, para 27.

A couple weeks later, on 2/23/08, San Chhan was working a function with Hernan Vasquez (Hispanic). As San Chhan arrived for work that morning, he was going to the locker room to change and as he was passing the banquet office, he saw Mr. Vasquez kissing a coworker, Mrs. Segovia, on the lips. Mrs. Segovia is a married woman and I could tell that she did not appreciate his aggressive action toward her. Later the same day, San Chhan was in line to drop off his work function ticket for the day, he observed Mr. Hernan Vasquez drop his ticket off and then turn around, look at San Chhan and say audibly, "chino pendejo". Mr. Chhan thought it was a slur directed at him but did not know what "pendejo" meant until he later asked some Hispanic coworkers. They informed Mr. Chhan that it meant prick, asshole or somebody who was

worthless.   Mr. Chhan had done nothing to provoke this comment from Mr. Vasquez.  Pl Exh. 2, paragraph 28.

Three days later, on 2/26/08, Mr.  San Chhan  was working a breakfast function in the exhibit hall, and in the midst of several people he  heard Mr. Vasquez say "Chinese bitch".  I was standing close to him when he made the comment so I believe again he was referring to me and was attempting to intimidate and provoke me.  Id.

 On 3/3/08, with the assistance of  Plaintiff's attorney,  Mr. San Chhan wrote a summary of these incidents and gave them to union steward Norman Bakhshi--the same fellow who reported Mr. Vasquez's and Mr. Aboudhouda's accusations of foul language against my brother on 7/19/06.-- that led to his termination.  See Pl. Exh. 2, Attachment 9.  Ironically, Mr. Bakhshi's response was that he was going to talk to Mr. Vasquez and Mr. Aboudhouda about the allegation.  Mr. Chhan  told Mr. Bakhshi that he was not an investigator and he did not ask my brother what happened before he reported him to Assistant Banquet Manager Chuck Atkins.  Mr. Chhan told him he wanted him to treat his written charges in the same serious manner that he dealt with Mr. Vasquez and Mr.Aboudhouda's accusations against his brother.   Mr. Bakhshi then said that he would report them to Kevin O'Shea.   Mr. Chhan  waited a couple days and when nobody contacted him he took it upon himself to bring the charges directly to defendant's HR office. Pl Exh. 2, para 30.

Mr. Chhan spoke to Peter Hill on 3/6/08, who is the current Human Resource Director, and presented him with similar documentation to that which he gave to Mr. Bakhshi.  (See Pl Exh. 2,  Attachment  10).   Mr. Chhan asked him whether Mr. O'Shea had reported the incidents that he presented to Mr. Bakhshi in writing earlier and he

admitted that he had heard nothing.  Mr. Chhan then I asked him to investigate the

allegations on his summary.  Mr. Hill assured Mr. Chhan  he would and that he would get

back to him.   Mr. Chhan  found out that Mr. December had acknowledged to another

coworker, James Hunt, that Mr. Aboudhouda slapped him repeatedly in anger and he

provided this name to Mr. Hill also on 3/18/08 (See Attachment 11). Id.

Mr. San Chhan states that despite the seriousness of the charges and the number

of witnesses that he identified, nobody has been suspended pending an investigation and

he believes that nothing will happen to the Mr. Vasquez or Mr. Aboulhouda because they

are part of the golden boys favored by management.

## ARGUMENT

Summary judgment is proper only if "there is no genuine issue as to any material

fact and … the moving party  is entitled to judgment as a matter of law". *Tao v. Freh*, 27

F.3d 635, 638 (D.C. Cir. 1994); Fed R. Civ. P. 56(c).  In examining the record, the

reviewing court must view all inferences in a light most favorable to the non-moving

party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and "assume the truth of

the non-movant's evidence." *Bayer v. U.S. Dept. of Treasury*, 956 F.2d 330, 333 (D.C.

Cir. 1992); *Langdon v. Dept. of Health and Human Services*, 959 F.3d 1053, 1058 (D.C.

Cir. 1992).

The Supreme Court has specified the standards for reviewing employer's motions

for summary judgment in employment discrimination cases by holding that the reviewing

court should review all of the evidence in the record.  *Reeves v. Sanderson Plumbing*, 530

U.S. 133, 140 (2000).   "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of the

judge." *Id.* at 143 (internal quotation marks omitted ). "Thus, although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Id.* (emphasis supplied). "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted). The Court may not grant the motion unless there is "abundant and uncontroverted independent evidence that no discrimination occurred." *Id.* at 148.

The DC Circuit has recently held that McDonnell Douglas prima facie analysis is irrelevant in a disparate treatment case where an employer has articulated a legitimate, non-discriminatory reason for the adverse action:

"Rather in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin."

**Brady v. Office of Sergeant of Arms, US House of Representatives**, Docket No. 06-5362 (DC Cir. 3/28/08).

The DC Circuit has repeatedly emphasized in disparate treatment cases that the "central focus of the inquiry" in such cases "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin."  **George v. Leavitt**,  407 F.3d 405  (DC Cir. 2005), citing **Furnco Construction v. Waters**, 438 U.S. 567 (1978).

Plaintiff will demonstrate below that the defendant repeatedly subjected plaintiff

to disparate treatment in the manner in which it investigated and prosecuted complaints of misconduct against him as compared to how they treated his coworkers.

I. PLAINTIFF PRODUCED SUBSTANTIAL CIRCUMSTANTIAL EVIDENCE OF DEFENDANT'S DISPARATE TREATMENT IN THE CONDUCT OF ITS INVESTIGATIONS OF HIM

The defendant claims that Plaintiff was fired because of his use of offensive language in the workplace in the presence of coworkers. Defendant admits that there was no evidence that Plaintiff was directing his remarks at anyone in the kitchen who may have been in a position to hear them, but simply relies on the facts that the offensive language was heard by coworkers who were offended by the language.

However, defendant's primary decisonmaker here, Ms. Sterrett admits that she was aware of Plaintiff's claim that a coworker, Hernan Vasquez, had referred to him as a thief earlier that morning and was also aware that Plaintiff's brother heard Mr. Vasquez say "I hate this motherfucker", referring to Plaintiff just before he entered the kitchen. Sterrett's only explanation for not asking plaintiff's brother, San Chhan for a statement was that he was a member of the same family and therefore would not be objective.

However, what is significant here is the one-sided investigation that was conducted. There is evidence that two employees were both using foul language on the morning of 7/19/06, with Mr. Vanquez's comments directed at Plaintiff being no less foul and offensive, and certainly more likely to provoke a fight because directed at plaintiff personally and in his presence, and yet Defendant only investigated the alleged offensive comments that were made by plaintiff which all concerned admit did not appear to be directed at anybody in particular. This is the very heart of disparate treatment. As the Supreme Court noted in **Reeves v. Sanderson Plumbing**, 530 US 133; 197 F. 3d 688

(2000), when two employees have nearly identical rates of productivity, conducting an efficiency study of only complainant's line and placing him only on probation for productivity, is powerful circumstantial evidence of disparate treatment.  Here two workers were both alleged to have used offensive remarks in the presence of others, but Defendant decided to investigate only the charges brought by one of the two employees.

Ms. Sterrett certainly had evidence that there was some animosity between Mr. Vasquez and Plaintiff that morning because Mr. Vasquez, who was not even in the kitchen in a position to hear Plaintiff's alleged remarks, was one of those lodging a complaint against Plaintiff with the union steward and management.  Vasquez explained that the two witnesses who heard the alleged offensive remarks (Mustafa Aboulhouda and Ms. Rosario) had come to him directly on the ballroom floor and told him that they thought plaintiff was directing his allegedly offensive remarks at him.  Vasquez Depo, Pl Exh. 7  at Tr. 5.

However, the only witnesses who testified that any offensive remarks were made between Plaintiff and Mr. Vasquez as they were walking past each other just outside the kitchen door  was Plaintiff and his brother, San Chhan.  Both testified that it was Mr. Vasquez who made the remarks and, according to San Chhan, Mr. Vasquez stated audibly as he was looking at his brother Kin and walking by him,  "I hate this motherfucker".   There would apparently be no other explanation why both Mr. Abouhouda and Ms. Rosario thought Plaintiff's comments were directed at Mr. Vasquez in the absence of any other exchanges between them that morning.  Both testified that they understood that Plaintiff's remarks were not directed at them personally.   Both

denied however knowing who they were directed at, despite Mr. Vasquez's testimony that they told him the remarks were directed at him.

Ms. Sterrett was well aware that Plaintiff and his brother were both claiming that Mr. Vasquez provoked his alleged venting comments by referring to him with offensive language, but she intentionally only sought to investigate Plaintiff's allegedly offensive remarks. Ms. Sterrett's explanation for not seeking to hear what San Chhan observed because he was family with Plaintiff is unconvincing. Certainly Hernan Vasquez, who only interest in the matter was to keep his own provocative involvement under wraps, was not an objective witness, but he provided two statements to Mrs. Sterrett--even though he witnessed nothing, according to him.

## II.  PLAINTIFF PRODUCED SUBSTANTIAL EVIDENCE OF A HISTORY  OF TAUNTING BY COWORKERS CONDONED BY MANAGEMENT

Plaintiff produced several declarations from coworkers who traced the history of taunting by coworkers against Plaintiff and his brother and referring to them in disparaging and humiliating terms as "chino", "oriental guy",  "fried lice", "eggroll". According to these witnesses, most of the worst taunting was generated by Mr. Hernan Vasquez, who was one of those who went to management claiming Plaintiff's use of foul language on 7/19/06.    San Chhan provided compelling evidence that Mr. Hernan Vasquez continues to taunt him to this day with disparaging names and though he promptly reported same to management and HR, still there has been no corrective action.

Most revealing was the evidence dating back to 1999, coming from Ms. Sterrett's own notes.   She suspended Plaintiff for three days based on accusations by Hispanic coworkers that he became angry while obtaining coffee carafes and intentionally spilled

hot coffee on one of the Hispanic servers, Sylvia Flores.  Mrs. Sterrett  immediately suspended Plaintiff even though he denied spilling the coffee and claimed that those accusing him had referred to him as "chino" and were intentionally not giving him coffee.

Even though Ms. Sterrett was supposed to be investigating the competing accusations by the employees, the Hispanics who were accusing Plaintiff of misconduct were opening referring to Plaintiff as "chino" and "oriental guy" as they were narrating their allegations to her.   She admitted the remarks were offensive and demeaning, but took no corrective action other than suspend Plaintiff for 3 days.   (Later she reduced the suspension to a warning when the evidence did not support the charge.).   Under the circumstances, Ms. Sterrett did not even have to investigate to know that the Hispanic coworkers were using offensive language against Plaintiff openly.   But these employees were not suspended or counseled or disciplined, and Plaintiff, who was the victim, was the one written up.   It is hard to conceive of better evidence of one sided investigations and biased administration of discipline.

Plaintiff provided several other examples where a Hispanic coworker would make an accusation against him and he would be written up or suspended, even if the failure to perform originated with the very person making the accusation.  San Chhan describes incidents where they were both written up after Hispanic coworkers complained against them, even though the Hispanics were the same individuals taunting them.  `

CONCLUSION

Plaintiff has presented sufficient evidence to demonstrate that Defendant was on notice that  Plaintiff and his brother were being regularly taunted because of their ethnicity.   Not only did their Human Resource Director have evidence of that when she

interviewed Plaintiff's Hispanic accusers in 1999, but she was aware that Plaintiff and his brother were complaining about the hostile atmosphere ever since.   Despite this evidence of ethnic taunting, a reasonable jury could find that whenever there were competing accusations involving either the Plaintiff or his brother, defendant invariably took prompt action against Plaintiff and/or his brother and would not even investigate Plaintiff's allegations relating to taunting by his coworkers.   A reasonable jury could easily conclude that Hernan Vasquez made some offensive remarks  to Plaintiff  moments before Plaintiff  began making the remarks that led to his termination, but that Defendant chose to engage in a one sided investigation, as they did in the past, and only looked at the unwitting victim's emotive response to the provocation.   While Mr. Vasquez's offensive comments provoking Plaintiff on 7/19/06 were no less  serious and egregious, and clearly would have been viewed as mitigating, defendant never investigated Plaintiff's allegation and therefore chose the same pattern of condoning offensive behavior against Plaintiff.

A reasonable jury could well find that Defendant engaged in blatant and one sided favoritism of some employees vis-à-vis Plaintiff and his brother that extended all the way up management to Human Resources and that the termination incident, and the Defendant's failure to investigate the competing accusation, was further evidence of this pattern of discrimination against Plaintiff.

FOR THE PLAINTIFF,
KIN CHHAN

/s/JAMES L. KESTELL

----------------------------------------------

James L. Kestell
DC955310
Kestell & Associates
209 Midvale Street
Falls Church, VA 22046
(703) 237-2912
(703) 237-4321
jlkestell@cox.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIN S. CHHAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )     Civ. No.:  1:07cv01180 (HHK) |
| | ) |
| | ) |
| HILTON HOTELS CORPORATION, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL
UNDISPUTED FACTS**

Plaintiff will respond to each of defendant's asserted statement of facts not in dispute by either admitting or denying them (with explanation) in seriatim below in **bold**:

A.    **Hilton Prohibits Offensive Conduct and Harassment in the Workplace**

1.    Hilton Hotels Corporation is a hospitality company that operates the Hilton Washington, a hotel located in Washington, D.C.   (Sterrett decl. ¶ 2).   **Admit.**

2.    In 1983, Hilton hired plaintiff Kin Chhan as a busperson in the hotel restaurant at Hilton Washington.  (Chhan Tr. at 10, 13).  In 1995, Hilton promoted Chhan to Banquet Server. (Chann Tr. at 16).  Chhan worked as a Banquet Server until his termination.  (Chhan Tr. at Exh 1, p. 5).  Chhan is an Asian male who self-identifies as Chinese and Cambodian.  (Chhan Tr. at 44). **Admit.**

3.      In 1996, Robin Sterrett became Director of Human Resources for Hilton Washington.  (Sterrett Tr. I at 2).  **Admit.**

4.      Hilton employees are required to adhere to Hilton's Harassment-Free Workplace policy, which prohibits employee "behavior or conduct that could be interpreted as harassment." (Sterrett decl. ¶ 3).  A copy of the policy is included in the Team Member Handbook, and all employees receive periodic harassment training. (Sterrett decl. ¶ 3; Chhan Tr. at Exh 3, p. 18-19).  **Admit.**

5.      Hilton employees are also required to adhere to Hilton's Standards of Conduct policy.  (Sterrett decl. ¶ 4).  A copy of the policy is included in the Team Member Handbook. (Sterrett decl. ¶ 4; Chhan Tr. at Exh 3, p. 61-68).   A section of the Standards of Conduct Policy, titled "Examples of Prohibited Team Member Conduct," lists examples of prohibited conduct, including:

- "Offensive or disruptive behavior, including fighting with or threatening team members or guests";

- "Harassing, threatening, intimidating, coercing or unlawfully discriminating against others";

- "Violation of the Hilton Harassment-Free Workplace Policy";

- "Using abusive language or profanity";

- "Discourtesy or inappropriate conduct with guests or team members."

(Chhan Tr. at Exh 3, p. 66).  **Admit.**

6.      An employee who violates the Harassment-Free Workplace or Standards of Conduct policy is subject to discipline.  (Sterrett decl. ¶ 5, Chhan Tr. at Exh 3, p. 19, 61). Depending on the nature of the violation, the employee may receive a warning, a suspension

from 1-5 days, or may be terminated.  (Sterrett decl. ¶ 5).  The type of discipline an employee may receive also depends on the employee's past disciplinary record.  (Sterrett Tr. I at 9). **Admit.**

7.    Chhan received a copy of the Team Member Handbook containing these policies. (Chhan Tr. at 30; Exh 4).  Chhan admitted he reviewed the handbook and understood its contents.  (Chhan Tr. at 30; Exh 4).  **Admit.**

8.    Chhan also admitted he understood Hilton's Harassment-Free Workplace Policy. (Chhan Tr. at 31.)  On October 31, 2005, Chhan participated in Hilton's Harassment-Free Workplace training.  (Chhan Tr. at 42, Exh 6).  **Admit.**

9.    Chhan also testified he was specifically aware of the "Examples of Prohibited Team Member Conduct" included in the Standards of Conduct policy.  (Chhan Tr. at 31-33). Chhan testified he knew engaging in conduct prohibited under Hilton's Standard of Conduct policy was grounds for discipline, including termination.  (Chhan Tr. at 33-39)  **Admit.**

**B.    Hilton Investigated Allegations That Chhan Threatened a Coworker**

10.    As Director of Human Resources, Sterrett's duties included investigating employee violations of Hilton policies. (Sterrett decl. ¶ 6).   After completing an investigation, Sterrett was responsible for determining what, if any, discipline would be given to an employee who was found to have violated a Hilton policy. (Sterrett decl. ¶ 6).  **Admit.**

11.    In early March 2006, Sterrett learned there had been an incident on March 5, 2006 between Chhan and a Banquet Houseperson, Mustafa Allame.  (Sterrett Tr. I at 40).   Sterrett investigated the incident. (Sterrett Tr. I at 40).  **Deny that Mr. Allame was a Banquet Houseperson.   His position was that of Meeting and Exhibit Staff, who is responsible for**

**performing duties relating to meetings and exhibits, but not for banquets.   Declaration of San Chhan, Pl. Exh. 2, paragraph 21; Kin Chhan declaration, Pl Exh. 1, at paragraph p. 9.**

12.     In the course of Sterrett's investigation, she spoke with Hilton employees Mustafa Allame and Lolo Villagomez.  (Sterrett Tr. I at 43).  Both employees told Sterrett they had witnessed Chhan say "I want to kick your M-F ass" to Allame.  (Sterrett Tr. I at 42-43).  Both employees also told Sterrett that Chhan started to take off his jacket as though he was ready to start a fight with Allame.   (Sterrett Tr. I at 42-43).  **Deny that Sterrett was given this information.**

13.     As part of the investigation, Sterrett spoke with Chhan.  Chhan denied making the statement or acting in a way that would have led Allame and Villagomez to believe he wanted to fight.  (Sterrett Tr. I at 46).  **Admit.**

**C.     Chhan Was Suspended for Five Days for Threatening a Co-Worker**

14.     Sterrett was not aware of any reason why Allame or Villagomez would provide false information about Chhan.  (Sterrett decl. ¶ 7).  Based on the two witness accounts, Sterrett concluded Chhan had violated Hilton's policy against threatening co-workers.   (Sterrett decl. ¶ 8).  Sterrett suspended Chhan for five days for violating Hilton policy.  (Chhan Tr. at Exh. 7). **Admit that Chhan given 5 day suspension.   Deny Sterrett's reasons for disciplining Complainant since supervisor Villagomez insisted throughout that he did not feel any discipline was warranted.  Villagomez depo 1/10/08, Pl Exh. 2, Attachment 7, Tr. 14-15.**

15.     Chhan admits he does not know who Sterrett spoke with during the course of  this investigation or what information was provided to her.   (Chhan Tr. at 52).  **Admit.**

16.     Chhan admits Sterrett suspended him only because she believed the other employees' version of events relating to the March 5, 2006 incident.  (Chhan Tr. at 58-59).

**Admit.**

**D.    Three Coworkers Reported that Chhan Made Sexually Offensive Statements**

17.    On July 19, 2006, employees Hernan Vasquez, Mustafa Abouhouda and Rosa Rosero complained to Sterrett that Chhan had made obscene sexual statements earlier that morning.  (Sterrett Tr. I at 19).  **Admit.**

18.    It is a common practice for Hilton employees to be placed on leave pending an investigation of a policy violation.  (Sterrett Tr. I at 45).   Accordingly, Sterrett placed Chhan on leave pending investigation. (Sterrett Tr. I at 25).    **Admit that management so claims. However, Plaintiff demonstrates that favored Hispanic and non-Chinese employees are not placed on suspension during an investigation.  Declaration San Chhan, paragraphs 14, 27.**

19.    In the course of her investigation, Sterrett interviewed Vasquez, Abouhouda, Rosero and employee Peter Chan about what, if anything, they had heard Chhan say the morning of July 19.  (Sterrett Tr. I at 19, 25).  **Admit.**

20.    Sterrett determined Vasquez had not witnessed Chhan's conduct and did not have personal knowledge of the incident. (Sterrett Tr. I at 20). Since Vasquez was not a witness, Sterrett did not consider any information provided by Vasquez in reaching her conclusion about Chhan's behavior the morning of July 19. (Sterrett Tr. I at 33).  **Admit.**

21.    Rosero told Sterrett she heard Chhan make offensive statements to the effect that he could "fuck their wives" and that he "give good fuck."    (Sterrett Tr. I at 34).   Sterrett observed Rosero was upset about Chhan's comments.  (Sterrett Tr. I at 33).    **Admit that Sterrett's notes seem to so indicate.**

22.    Rosero testified that, at the time she was interviewed by Sterrett, Rosero told her everything she had heard Chhan say on July 19.   (Rosero Tr. at 27).  **Admit.**

23.    Abouhouda also testified he heard Chhan making sexually offensive statements on July 19, 2006.  (Abouhouda Tr. at 12-13).  Abouhouda testified he told Sterrett about the statements he heard Chhan make.  (Abouhouda Tr. at 26).  **Admit.**

24.    After interviewing Abohouda, Sterrett concluded he had heard Chhan make offensive statements to the effect that he could "fuck their wives" and that he "give good fuck." (Sterrett Tr. I at 34).  Sterrett also observed Abouhouda was upset about Chhan's comments. (Sterrett Tr. I at 33).    **Admit that Sterrett's notes would so indicate.**

25.    Peter Chan testified he told Sterrett he also heard Chhan make sexually offensive comments:

> Q.    When you eventually talked to Robin Sterrett from human resources, do you remember telling her that Kin Chhan said "I can do it in front of you, I want to show you how good I am?"
>
> A.    Yes.
>
> Q.    "I can have any woman I want?"
>
> A.    Yes.
>
> Q.    Okay.  And Peter confirmed that Kin used the word "fuck."  Can you, when you're telling Ms. Sterrett, I can do it in front of you, are you really telling her that what he was saying, Kin Chhan was saying was, I can fuck in front of you?  Is that what he was saying?
>
> A.    I can fuck your wife in front of you and show you how strong I am. That's what I told Robin.

(Chan Tr. at 28).  **Admit.**

26.    After interviewing Chan, Sterrett concluded he had heard Chhan say "I can do their wives, I'm good at doing it, I can do it in front of anyone" and that Chhan had used the "F-word."  (Sterrett Tr. I at 28).  **Admit that she so testified.**

27.    Peter Chan is Chinese.  (Chan Tr. at 2).  **Admit.**

28.     Sterrett also interviewed Chhan as part of the investigation.  (Chhan Tr. at 61). He denied making sexually offensive statements the morning of July 19.   (Chhan Tr. at 114). **Admit.**

29.     Chhan admits he does not know what Vasquez and Abouhouda told Sterrett about what they observed or who else Sterrett interviewed: **Admit.**

> Q.     And you don't know what Hernan [Vasquez] said to Robin, right?
>
> A.     I don't know.
>
> Q.     You don't know what Mustafa [Abouhouda] said to Robin, right?
>
> A.     I don't know.
>
> Q.     You don't know if Robin talked to any other witnesses, right?
>
> A.     I don't know.

(Chhan Tr. at 116).

## E.     Hilton Terminated Chhan for Committing a Serious Violation of Hilton Policy for the Second Time in Less Than Five Months

30.     Sterrett concluded the information provided by Rosero, Abouhouda and Chan was credible because she was not aware of any reason Rosero, Abouhouda or Chan would give her false information about Chhan.  (Sterrett decl. ¶ 10).   Sterrett believed Chhan had a reason to deny the allegations because he did not want to be subject to discipline.  (Sterrett decl. ¶ 10). **Admit that she so testified.**

31.     Relying on these three witness accounts, Sterrett concluded Chhan had violated Hilton's Harassment-Free Workplace Policy by engaging in "conduct that could be interpreted as harassment."  (Sterrett decl. ¶ 11).   Sterrett concluded Chhan also violated Hilton's Standards of Conduct policy by engaging in "discourtesy or inappropriate conduct" with his co-workers.

(Sterrett decl. ¶ 11).  **Deny that Sterrett charged Plaintiff with violation of harassment-free policy or that Plaintiff was harassing anybody.**

32.     Due to the nature of Chhan's policy violation, and because it was the second time Chhan had committed a serious violation of Hilton policy within a five-month period, Sterrett decided to terminate Chhan's employment.  (Sterrett decl. ¶ 12).  **Deny that Plaintiff's venting to himself after being provoked by coworker calling him thief and "motherfucker" was a "serious" violation justifying termination.  Pl Exh. 1 and 2.**

33.     Sterrett informed Chhan's supervisor, Banquet Manager Kevin O'Shea, of her investigation findings and her decision to terminate Chhan.  (Sterrett decl. ¶ 13).   Sterrett and O'Shea informed Food and Beverage Director, Gordon Marr, and General Manager, Frank Otero, of the termination decision.  (Sterrett decl. ¶ 13).  **Admit.**

34.     On July 27, 2006, Sterrett and O'Shea met with Chhan and told him Hilton was terminating his employment because the investigation had determined Chhan had made offensive statements in violation of Hilton policy.  (Chhan Tr. at 119-120). **Admit.**

35.      Chhan testified the only reason he believes he was terminated is because Sterrett believed the other employees' accounts of his conduct on  July 19:   **Admit that Plaintiff so testified, but Plaintiff continues to maintain that Sterrett did a one sided investigation where she refused to take statements from witnesses supporting the fact that his venting comments were provoked by coworker Hernan Vasquez remarks calling him a "motherfucker" and thief.  Pl Exh. 1, para 10.**

> Q.     Robin told you she was terminating you for violating the harassment policy, right?
>
> A.     Yes.

> Q.    And she decided you were violating the harassment policy because of the accusations that were reported to her on July 19, right?
>
> A.    Yeah.
>
> Q.    So you have testified that those accusations are untrue, right?
>
> A.    That's untrue, yeah.
>
> Q.    But Robin believed the accusations, right?
>
> A.    Yeah.
>
> Q.    And so that's why she terminated you, right?
>
> A.    Yeah.
>
> Q.    And that's the only reason why she terminated you, right?
>
> A.    Yeah.

(Chhan Tr. at 122).

36.    Chhan testified he did not know why Sterrett believed the other employees she interviewed instead of him.  (Chhan Tr. at 120).  **Admit.**

**F.    Chhan Was Not Replaced**

37.    Hilton did not hire a Banquet Server or other employee to replace Chhan. (Sterrett decl. ¶ 14).  **Deny that other employees are not performing those duties after Plaintiff was terminated, even if not hired off the street.**

38.    Chhan admits he does not know if anyone was hired to replace him. (Chhan Tr. at 124).  **Admit.**

**G.    Hilton Has Terminated Employees Outside Plaintiff's**
**Protected Class for Similar Policy Violations**

39.    During the time Sterrett was Hilton Washington's Director of Human Resources, Chhan was the only employee who violated the Harassment Free-Workplace and Standards of

Conduct policies less than five months after being suspended for another serious violation of Hilton policy.   (Sterrett decl. ¶ 12).   **Deny that Plaintiff violated that policy by venting to himself and note that he was not cited for violating that policy.   See counseling form and termination letter.  Pl Exh. 1, Attachments 1 and 2.**

40.     However, in January 2005, Sterrett terminated an employee for calling a co-worker a "bitch" in violation of Hilton's Standards of Conduct policy.   This occurred approximately two months after the employee was suspended for violating Hilton policy by being discourteous to a coworker. (Sterrett Tr. II at 8- 9; Sterrett decl. ¶ 16, exh. 1).   The employee was African-American. (Sterrett Tr. II at 9).   **Admit, but deny that this is comparable since the employee was not a regular full time employee subject to the same contractual rights as Plaintiff.  Indeed, Plaintiff is the only regular full time employee who defendant has fired from the banquet department at least since 1990.   San Chhan declaration at paragraph 25.   Also not comparable because there was no evidence of provocation by coworker.**

41.     The employee was subject to the same disciplinary procedure as Chhan. (Sterrett decl. ¶ 16).   Like with Chhan, Sterrett suspended the employee for five days for her first policy violation.  (Sterrett Tr. II at 4).  Like with Chhan, Sterrett placed the employee on leave while she investigated the second policy violation.  (Sterrett Tr. II at 8- 9, exh. 1).  Like with Chhan, after Sterrett had completed her investigation and determined the employee had violated Hilton policy for a second time, Sterrett terminated the employee.  (Sterrett Tr. II at 9).  **Deny that the situations were similar since Plaintiff did direct his remarks at any of his coworkers, as even Sterrett acknowledged.**

42.    Sterrett has also terminated several other employees of different races and national origins than Chhan for engaging in offensive conduct in violation of Hilton policy even though the employees had no record of discipline in the prior five months:  **Deny these are comparable situations involving long term full time regular employees in situations involving provocation by coworker.**

- In May 2002, Sterrett terminated a Hispanic Banquet Server for violating Hilton's Harassment-Free Workplace policy. (Sterrett Tr. II at 11; Sterrett decl. ¶ 17, exh. 2). The employee had no record of previous discipline.  (Sterrett Tr. II at 11).

- In September 2002, Sterrett terminated an African American employee for violating Hilton policy for threatening a coworker.  (Sterrett Tr. II at 14; Sterrett decl. ¶ 17, exh. 3).  The employee had no record of discipline in the prior five months.  (Sterrett decl. ¶ 17).

- In May 2003, Sterrett terminated a Hispanic employee for violating Hilton policy by threatening a coworker. (Sterrett Tr. II at 15; Sterrett decl. ¶ 17,  exh. 4). The employee had no record of discipline in the prior five months.  (Sterrett decl. ¶ 17).

- In June 2005, Sterrett terminated an African-American employee for violating Hilton policy by threatening a coworker. (Sterrett Tr. II at 16-17; Sterrett decl. ¶ 17, exh. 5).  The employee had no record of discipline in the prior five months.  (Sterrett decl. ¶ 17).

- In March 2006, Sterrett terminated a Hispanic employee for violating Hilton policy by engaging in a verbal altercation with and threatening a coworker.

(Sterrett Tr. II at 17; Sterrett decl. ¶ 17, exh. 6).  The employee had no record of discipline in the prior five months.  (Sterrett decl. ¶ 17).

43.    Chhan admitted he does not know if Hilton has terminated other employees for making sexual or offensive comments in the workplace.  (Chhan Tr. at 123).  **Admit.**

FOR THE PLAINTIFF,
KIN CHHAN

/s/JAMES L. KESTELL
-----------------------------------------------
James L. Kestell
DC955310
Kestell & Associates
209 Midvale Street
Falls Church, VA 22046
(703) 237-2912
(703) 237-4321
jlkestell@cox.net

INDEX OF PLAINTIFF'S EXHIBITS

1. Kin Chhan Declaration

    Attachment 1 -- 7/19/06 Counseling Memo

    Attachment 2-- 7/27/06 Termination letter and final counseling form

2. Feung San Chhan Declaration

    Attachment 1 -- 9/27/06 Dr. Paul Fedio's Report

    Attachment 2 -- 4/8/99 Sterrett contemporaneous (3 pp) notes from investigation

    Attachment 3 -- 4/16/99 Sterrett note to file, reducing suspension to w/w

    Attachment 4 -- 10/12/07 Deposition of Robin Sterrett, pp. 1- 32, 52-59

    Attachment 5 -- 10/3/05 Counseling Forms issued to Chhans

    Attachment 6 -- 10/6/05 Counseling Form to San Chhan

    Attachment 7 -- 1/10/08  Lolo Villagomez Depo, pp.  14-15

    Attachment 8a -- 7/31/06 San Chhan first statement to union

    Attachment 8b -- 8/9/06 San Chhan second statement to union

    Attachment 9  --  San Chhan 3/3/08 Summary given to Norman Bakshi

    Attachment 10 -- San Chhan 3/6/08 summary to Mr. Peter Hill

    Attachment 11 -- San Chhan 3/18/08 note to Mr. Hill

3. James Hunt Declaration

4. Peng Loong Yow Declaration

5. Peter Chan Deposition, 1/10/08 pp. 20-21

6. San Chhan 10/31/07 Deposition  pp. 40-44

7. Hernan Vasquez 10/12/07 Deposition, pp. 2-6

8. Rosa Rosario 10/31/07 Depo, pp.  5-7; 11-14

9. Mustapha Aboulhouda, 10/12/07, p. 20.

10.  Sterrett  notes dated 7/27/06,  4 pp.

11.  O'Shea Depo 1/28/08, pp. 1-50

PLAINTIFF'S EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------------------------

KIN S. CHHAN,

        Plaintiff,

    v.                            Civ. No.:  1:07cv01180(HHK)

HILTON HOTELS CORPORATION,

        Defendant.

--------------------------------------------------

**DECLARATION OF KIN CHHAN**

1.  My name is Kin Chhan and I am the plaintiff in the above captioned case.  I am 48 years old and was born, raised and educated in Cambodia.   My parents were both Chinese.

2.  I immigrated to US in 1980 and became a citizen about 6 years later.  I started working as a busperson for defendant Hilton in March 1983.  I was promoted to restaurant waiter about three years later.  I was promoted to banquet server in 1995.

3.  I worked for the Hilton 23 plus years up to my termination in July 2006.

4.  After 1995, when both my brother San Chhan and I were working as banquet servers, we were frequently assigned to work the same functions and would drive to and from work together.

5.  I have experienced a great deal of taunting over the years relating to my

1

ancestry (Chinese).   Many employees refer to me as "chino", and have called me more

disparaging names such as "cheap chinese", "eggroll", "fried lice", "marikon" to name

just a few.

6.  I have complained to management about being called these names, but nothing

has ever been done about it.   In March 1999,  I was accused of spilling coffee on a

Hispanic coworker and was initially suspended for 5 days.  I explained to Ms. Sterrett,

who was Human Resource Director, that the Chief Steward, Raul Archer (Hispanic) had

directed Sylvia, my coworker, not to provide "chino" a pot of coffee, referring to me, but

instead provide coffee to other Hispanic servers in line behind me.   I told Mr. Archer and

Sylvia that I could not serve my tables if I could not get coffee and would report them.

Then reluctantly they provided me two pots of coffee and I left to serve my tables.  Later

I learned that Mr. Raul's supervisor, Mr. Eloy Blanco, Executive Steward, reported that I

spilled coffee on Sylvia, who handed me the coffee pots, and I was issued a 5 day

suspension.  I had not spilled any coffee and the accusation was false.  The suspension

was later reduced to a letter of warning because there was no evidence that I spilled any

coffee on anybody.   No action was ever taken against the Chief Steward for referring to

me as "chino" or for directing my coworker not to give "chino" a pot of coffee.

7.  I was frequently issued write ups for alleged offenses that were either bogus or

I was singled out for alleged misconduct when several people engaged in the same

activity.   A couple of examples: (a) Banquet Manager, Kevin O'Shea (Irish), issued me a

written warning on 7/2/04 for allegedly providing poor service when a guest asked for

silverware as she was standing near the buffet table as I was passing by to carry my

assigned responsibilities for the evening..  I assured the guest that I would inform the

2

banquet server assigned to that area, who was Ms. Segovia (Hispanic), to bring out silverware for her assigned buffet table. I immediately went to Ms. Segovia and reported that there was no silverware on the buffet table that she was responsible for tending and that she should bring silverware out. It was very clear to me that she heard me and understood what I was saying. We each have assigned areas of responsibility and I would be responsible for bringing the silverware out only if I could not promptly locate the person assigned to the area. Even though I did what I was required to do, I was written up for it and Ms. Segovia, whose responsibility it was to maintain the buffet table, was not written up.[1]

(b) Another example of disparate treatment involved the one day suspension that Mr. O'Shea issued me on 3/19/05 for allegedly hiding soup to eat after the function was completed. What actually happened was that soup is the first course we normally serve. When we remove the soup terrine from each table in preparing for the next course, the soup is leftover and will be thrown out. Banquet servers, and any other staff interested, are permitted to eat any food that will be otherwise thrown out. I set aside one such left over terrine which still had some soup in it so that I could eat a bowl when the function was over. I retrieved the terrine at the end of the function and was eating a bowl of soup when Mr. O'Shea accused me of hiding the soup. I had placed the tureen aside in an open area and it was not hidden. Other employees were eating leftover soup at the same time-- including Urbano Saa (Hispanic) and Olger Benavides (Hispanic)-- that I was and nothing was said to them. I was the only one suspended for this incident. When I asked

---

[1]   My brother had a guest complain about Ms. Segovia in August 2007 for not providing the guest skim milk and for telling the guest that she did not have skim milk and it was not her job to get skim milk. My brother was assigned to dispense popcorn elsewhere, but he immediately went to get the guest skim milk. He reported the incident to Mr. O'Shea, who is the same manager who wrote me up, but no action was taken against Ms. Segovia for providing poor service to a guest making a reasonable request.

3

Mr. O'Shea why I was being singled out, he responded that it was none of my business what other employees were doing.

8.  In October 2005, both my brother and I were written up after we appeared for work a few minutes late because traffic was backed up on 395.  I was only 4 minutes late, and there was at least one other employee later than my brother who was 15 minutes late. Mr. O'Shea wrote both my brother and I up for the incident but not for being late. (Employees are late for just about every function, but we don't punch a time clock and it is therefore hard to document who is late for what functions.)  Mr. O'Shea wrote me up for this incident claiming that we were insubordinate in leaving the disciplinary meeting after he specifically directed us to remain.   However, we only left after he told us that we were being sent home for the day.   He would have fired us if we had walked out when he directed us to remain.   His accusation was bogus.   Only my brother and I were written up when all my brother did was attempt to get the other employees from verbally berating me.

9.  On March 5, 2006, I was suspended for 5 days for allegedly threatening physical harm to Mustafa Allame (Morocco).   I never threatened Mr. Allame nor did I take off my coat as if to fight.   Mr. Allame worked for the Meeting and Exhibit Department and I was assigned to be server for the reception.   The tables in question were being dressed with linen for the meeting part of the function which was being held before the reception.  Normally, the Meeting and Exhibit Department would have responsibility for dressing the tables for meeting functions.   I was present when Meeting and Exhibit Department Manager, Eroll Spence (African American), directed Mr. Allame to get the linens from the meeting and exhibit storeroom.   A short time later Mr. Allame

4

returned accompanied by my supervisor, Lolo Villagomez (Hispanic), without bringing the linen.  I questioned Mr. Allame as to why he did not get the linens and there was some argument between us about whose responsibility it was.   However, I never threatened Mr. Allame or took off my jacket threatening to fight him.   My supervisor, Mr. Villagomez, requested me to dress the tables and I reluctantly did so even though it should not been the responsibility of the banquet staff.   I later learned from my brother that Mr. Villagomez had asked him to help me dress the tables, but I was finished by the time he appeared.  Even Mr. Villagomez admitted that he did not believe that I should be disciplined because I did as directed.

10.    On July 19, 2006, about 9:45 am, my brother and I were serving a brunch function along with about 35 other banquet servers.   My brother and I were taking left over items back to the kitchen from having completed table preparation.   As I was entering the kitchen, I observed Hernan Vasquez leaving the kitchen through the exit door that was adjacent.

Mr. Vasquez is a very verbally abusive person and had been taunting me for some time because he does not like me.   He had repeatedly referred to me as "chino", "Marikon", "cheap Chinese".   Earlier that same morning he called me a thief shortly after I reported to work. It was nearly two hours later that I next saw him coming out of the kitchen.   As he was leaving the kitchen, I heard him say  "I hate this motherfucker" as he looked at me and walked by me.   I was upset at being called these vulgar names in the presence of my coworkers but I did not say anything to him and continued into the kitchen.  I was still upset at his vulgar remarks directed to me, and I made some comments about the fact that I was not a marikon, that I like women and that I could

make love to a woman.   I do not believe that I used the four letter word when making these comments to myself.  I was basically venting over being humiliated by Mr. Vasquez.   Nobody said anything to me in the kitchen about my comments except my brother who told me to calm down and get a glass of water and relax, which is what I did.

11.   Nothing was said to me about my "venting" until shortly after noon when my brother and I were turning our function tickets for credit to Captain David Vargas.  Mr. Vargas told me that I could not turn in my ticket yet because I had to go to Assistant Banquet Manager Atkin's office.   I went to his office as directed and I was then referred to Human Resources to talk to the Human Resource Director, Ms. Sterrett.   Kevin O'Shea was present and Union Steward Norman Bakhshi was also present.  Ms. Sterrett accused me of  saying several variations of the "F" word and asked me if I had used such language.  I denied using the "F" word and explained that I was upset over being called vulgar names earlier that morning by Mr. Vasquez.   Ms. Sterrett handed me the counseling form, which was already completed and on her desk even before she asked me questions regarding the incident.  Ms. Sterrett asked me to leave the building immediately and  that I was being suspended pending an investigation.   See Attachment 1.

12.  My brother and I met with the union representative within a day or two of my being suspended  to see if they would help us demonstrate that I had not engaged in any misconduct.   We provided statements as to what happened and made clear that Mr. Vazquez was the one who was continually taunting me because he does not like me and that I had not used the "F" word, and had not directed my remarks at anybody in the kitchen.   About a week later, Ms. Sterrett called me to come to the office and she told me that I was terminated but did not give me any termination documentation. I did not

actually see the termination notice till much later when I received it from the union (See Attachment 2, which included 7/27/06 termination letter and final counseling form ).

13. I believe that my termination is discriminatory because I have had to put up with taunting from coworkers for many years with nothing ever being done about it. I have learned that my coworkers even referred to me as "chino" and "oriental guy" in the presence of Ms. Sterrett and no action was taken against them for their disparaging references to me. Mr. Vasquez has been taunting me and my brother for several years, but nobody ever disciplines him for his provocative and slanderous comments. I have been particularly singled out for the worst treatment by Mr. O'Shea. For whatever reason, he likes Mr. Vasquez and he is one of the golden boys who are favored by management and can do no wrong.

I have carefully reviewed the above and swear it is true and correct under penalty of perjury.

Kin Chhan                April 3, 2008

ATTACHMENT 1



# TEAM MEMBER COUNSELING FORM

**Hilton**
**Washington**

Team Member Name: _hin Chann_

Department/Position: _Banquet Server_     Date of Incident: _7-19-06_

## PRIOR COUNSELING

| INCIDENT | ACTION TAKEN | DATE |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## NATURE OF INCIDENT

The above mentioned team member has displayed the following misconduct and has been warned that this misconduct will be entered in his/her Personnel File.

[ ] Leaving Work without Permission
[✓] Violation of Hotel Policies & Procedures/Department Rules/Safety Rules
[ ] Refusal to Carry Out Supervisor's Instructions
[ ] Irregular Attendance
     (Specify number of absences within past 18 months _____ )
[ ] Frequent Tardiness
[ ] Poor Service

[ ] Performance Below Standards
[ ] Discourtesy Towards a Guest
[✓] Discourtesy Towards a Fellow Team Member
     (Mention other team member below)
[ ] Attitude
[ ] Other_____

Explanation (Be specific. Include dates, what policy was not followed, and state exactly where, when, what, etc.):

_Two banquet servers reported that as they were setting up the ballroom, made the following statement "M-F, I can F... their wives, I give good f..., I am good at f..." This statement is against company policy_

## ACTION TAKEN

[ ] Verbal     [ ] Written     [✓] Suspension (check all that apply):     [ ] 1 day     [ ] 3 day     [ ] 5 day
Suspension Date: _7-19-06_ Return to Work Date:_____     [✓] Pending Investigation

Plan for future to avoid similar problem:

_____

_____

**Any further violations of hotel policies and procedures will lead to further disciplinary action, up to and including termination.**

This matter was discussed with the above team member on (date): _____ _7-19-06_ _____

## TEAM MEMBER COMMENTS

_____

_____

## SIGNATURES

| | | |
|---|---|---|
| Team Member: | _Refused to sign_ | Date: _7-19-06_ |
| Supervisor: | _Kevin SHEA_ | Date: _7-19-06_ |
| Witness (if applicable): | _Billy Asbury_ | Date: _7-19-06_ |
| Human Resources: | _Kat Stinett_ | Date: _7-19-06_ |

_Team leader- Norman Bakshi_

ATTACHMENT 2

2027975750          WASHINGTON HILTON ·                    12 23 27 p m     07 27 2006          2 /2



**Hilton**
Washington

July 27, 2006

Ms. Linda Martin
H.E.R.E., Local 25
1003 K St NW
Washington, DC  20001

Re: Mr. Kin Chhan

Date of Hire: March 19, 1983

Dear Linda:

    Mr. Kin Chhan, banquet server, was suspended pending investigation on July 19, 2006 for violation of company policy and discourtesy towards team members. At the end of the investigation, it was concluded that a violation did, in fact, occur. The suspension pending investigation has been converted to a termination. Mr. Chhan was informed of the decision on July 27. Business representative Sandy Beckman was present.

    Per Article XVI, section 16.1; please consider this letter your official notification of the Hotel's decision.

    Please call if you have any questions.

Cordially,

Robin Sterrett,
Director of Human Resources

# Hilton
**Washington**

# TEAM MEMBER COUNSELING FORM

Team Member Name: _kin Chann_

Department/Position: _Banquet Server_

Date of Incident: _7-19-06_

## PRIOR COUNSELING

| INCIDENT | ACTION TAKEN | DATE |
|---|---|---|
| | | |
| | | |
| | | |

## NATURE OF INCIDENT

The above mentioned team member has displayed the following misconduct and has been warned that this misconduct will be entered in his/her Personnel File.

[ ] Leaving Work without Permission
[✗] Violation of Hotel Policies & Procedures/Department Rules/Safety Rules
[ ] Refusal to Carry Out Supervisor's Instructions
[ ] Irregular Attendance
      (Specify number of absences within past 18 months_____)
[ ] Frequent Tardiness
[ ] Poor Service

[ ] Performance Below Standards
[ ] Discourtesy Towards a Guest
[✗] Discourtesy Towards a Fellow Team Member
      (Mention other team member below)
[ ] Attitude
[ ] Other_____

Explanation (Be specific. Include dates, what policy was not followed, and state exactly where, when, what, etc.):
_Two banquet servers reported that as they were setting up the ballroom, made the following statement "M-F, I can f... their wives, I give good f... I am good at f..." This statement is against company policy_

## ACTION TAKEN

[ ] Verbal     [ ] Written     [✗] Suspension (check all that apply):     [ ] 1 day     [ ] 3 day     [ ] 5 day

Suspension Date: _7-19-06_  Return to Work Date:_____  [✗] Pending Investigation

Plan for future to avoid similar problem:
_7-27-06 suspension pending converted to termination. Team member informed. Local 25_

Any further violations of hotel policies and procedures will lead to further disciplinary action, up to and including termination.
_Business representative Sandy Beckman present._

This matter was discussed with the above team member on (date): _7-19-06_

## TEAM MEMBER COMMENTS

_____

## SIGNATURES

| | | Date: |
|---|---|---|
| Team Member: | _Refused to sign_ | _7-19-06_ |
| Supervisor: | _SHEA_ | _7-19-06_ |
| Witness (if applicable): | | _7-19-06_ |
| Human Resources: | | _7-19-06_ |

Distribution:     White - Team Member  •  Canary - Team Member File  •  Pink - Department Head

PLAINTIFF'S EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------

KIN S. CHHAN,

       Plaintiff,

   v.                           Civ. No.:  1:07cv01180(HHK)

HILTON HOTELS CORPORATION,

       Defendant.

-------------------------------------------------

## DECLARATION OF FEUNG SAN CHHAN

1.   My name is Feung San Chhan.  I am the brother of Plaintiff in the above referenced case.  I am 50 years old and understand the oath that I am taking to tell the truth under penalty of perjury.

2.   I was born and raised in Cambodia but my parents were Chinese.  I immigrated to this country in April 1980.

3. I started working for the defendant Hilton in September 1982 as a restaurant busperson.  I was later promoted to room service server for a few years and then was promoted to Banquet Server, which I believe occurred in September 1990.   I continue to be employed as Banquet Server and have held that position for nearly 20 years.   I have worked at the Hotel for more than 25 years.

1

4.  My brother, Plaintiff Kin Chhan, started working at defendant Hotel in early 1983, and also started as restaurant busperson.  After about 3 years he was promoted to waiter and then in 1995 he also received a promotion to Banquet Server.

5.  My brother has learning disabilities that are not readily apparent.  However, he was recently seen by physicians and he was verbal IQ tested at 59 and performance IQ tested at 87.  (See Attachment 1)   However the same physician determined that he had good motor skills and was able to function quite highly despite the low native intelligence score as demonstrated by the many years that he worked as server for the Hilton..

6.  Since 1995, when my brother was promoted to banquet server also, I have frequently been assigned to work with my brother for many functions.  From young on I have been very protective of my brother because of his learning disabilities.

7.  Both my brother and I still live at home with our mother who is 89 years old. When we are assigned to work functions, my brother and I will frequently drive to work together and will eat lunch together.   Both of us tend not to socialize much with the rest of the banquet servers because they have different interests--whether it relates to partying, gambling or sports.   My brother and I don't drink, gamble or follow sports so we have little in common.

8.  My brother and I have always experienced some taunting by coworkers for being Chinese while working for defendant Hilton.  I observed that employees frequently tease each other by referring to coworker's national origin in some derogatory way. But the taunting of my brother and I became more severe after we both became banquet servers in the mid-90s.   We were frequently called "Chino", "eggroll", or "fried lice", "cheap Chinese" and other derogatory names by coworkers, many of whom were

Hispanic. Hispanics vastly outnumbered any other nationality in the banquet server position (about 50 percent, including 3 out of 5 Hispanic supervisors.) [1] This taunting was done in such a manner as to be a put down. During this period in the mid 1990s we did not complain to the human resources office about the taunting because we did not want to be accused of being "snitches" by coworkers and feel further estranged.

9. However, starting in 1999 we both did start complaining about the petty bullying from coworkers. I recall my brother Kin being suspended for 5 days in March 1999 for an incident where two Hispanic managers (Raul Archer and Eloy Blanco) claimed that Kin intentionally spilled hot coffee on one of their staff (Sylvia Flores). Kin adamantly denied spilling coffee on the employee and explained that the Chief Steward who was in charge of all stewards, Raul Archer, had directed the coffee dispenser (Ms. Flores) not to provide the "chino" "oriental guy", referring to Kin, with a pot of coffee. (See HR Director Sterrett's notes, Attachment 2, p.1 last line and continuing p. 2) Kin explained that he could not perform his duties unless he was provided coffee and that he did take two of the coffee pots to serve his tables. Kin denied that any coffee was spilled while he was present. Kin was initially issued a 5 day suspension, which was later reduced to a written warning when human resources could not find evidence that Kin was responsible for spilling coffee on his coworker. (See Attachment 3)

10. The Hispanic coworkers who taunted my brother with "chino" and who tried to bypass him in line were not disciplined at all, nor was the supervisor, Raul Archer -- who was responsible for all the stewards and who directed Ms. Flores to bypass my

---

[1] Out of a total banquet server full time group of 38, 17 were Hispanic, 9 South Asian, 5 African American, 3 Chinese; 2 Laotans; 1 Caucasian, 1 from Moroccan

brother-- and who openly referred to my brother as "chino" and "oriental guy" when presenting his narration to Ms. Sterrett.   I only recently learned that these same employees openly referred to my brother as "chino" even when they were talking to the Human Resource Director, Robin Sterrett.   Her own contemporary notes (See Attachment 3 ) refer to supervisor Raul Archer, Utility Steward, as stating.

"Raul stated that the "oriental guy, chino", Chann [sic] brother started to take pots down from the "queen mary" (big cart used for transporting items) and place them on the table...."

11.   During her 10/12/07 deposition, Ms.Sterrett admitted that Mr. Archer made these derogatory references about my brother Kin Chhan during her investigation, just as he alleged, but no action was taken against him.  (See Attachment 4, pp. 54-55)   Only my brother was singled out for discipline despite the most demeaning remarks against my brother as "chino" and "oriental guy".   Ms. Sterrett's explanation is that she was only investigating the allegations against my brother.

12.   Despite Kin specifically objecting to being referred to in this manner, I am aware of no efforts by management to warn employees about using disparaging names against us.   Several employees continued to refer to my brother and I as "chino", "oriental guy", "eggroll" and "fried lice", "Chinese with chinky eyes", "lazy Chinese", "cheap Chinese", Marikon" (which refers to us as being homosexual)  to this day. Coworker Hernan Vasquez would frequently call us these names, both in the locker room and in the presence of other employees while working.

13.   My brother and I are not particularly social with our coworkers and tend to stay to ourselves to avoid trouble.   We eat by ourselves and generally do not get involved

4

in the vulgar jokes, teasing and back slapping that so many of the other coworkers engage in.   We view our jobs as places to work and not to socialize.   Many of our coworkers seem to bully us because we stay to ourselves.   However, my family fled from Cambodia during the time that the Communists killed one third of the population and we are particularly sensitive to being bullied in this manner by the dominant group.

14.   In October 2005, only my brother and I were disciplined for an incident that I believe was provoked by the taunting of our coworkers.   My brother and I were running a little late for work because of traffic congestion on Highway 395 as we were coming to work.   I dropped my brother off about 4 minutes after the time that we should have been at work (8:15 AM start time), and I parked the car and arrived about 15 minutes late. There was another coworker (Oscar Vasquez) who appeared for work the same time I did.   However, when I appeared in the balcony of the ballroom center, I observed some of the  workers accusing my brother Kin of arriving for work late "all the time", which I knew was a gross exaggeration because we were rarely late.   I noticed that these same workers were not saying anything to Mr. Vasquez who appeared for work several minutes after my brother and about the same time that I appeared.   I told those taunting my brother to stop the taunting and to leave my brother alone.   They continued verbally going after my brother who I could tell was getting frustrated and I made the comment to those taunting him that they were acting "like a bunch of dogs or hyenas" picking on my brother the way they were doing (because it reminded me of predators going after a wounded prey).   Supervision (Greg Hinds (African American), Captain of Banquet Department) said nothing to those taunting my brother, but my brother and I were called

into the office to face charges.   Greg Hinds was the Captain of the crew or front line supervisor and Kevin O'Shea (Caucasian) was the Banquet Manager at the time.

15.   Mr. Hinds told my brother and I that Mr. O'Shea wanted to see Kin and I in the office.   When we got to the office, there were two union stewards already there who apparently brought the complaint to Mr. O'Shea's attention-- Santosh  Rego (Bangledesh) and Norman Bakhshi (Pakistan).[2]  Mr. O'Shea started the meeting by saying that 16 waiters accused me of calling them "dogs".  I explained what happened and told Mr. O'Shea that I told those taunting my brother that they were acting like "a pack of dogs" in the way they were picking on my brother.  He insisted that I had to apologize to the 16 waiters.  I refused because I did not call them dogs.[3]  Mr. O'Shea then accused my brother, Kin, of being late all the time.  Kin responded that he was only a few minutes late and there were others who were much later, but nobody is accusing them of being late "all the time" even though they were late more often.   He then asked why he was being singled out for these accusations.  Mr. O'Shea told us that he was finished with us and was sending us home for the rest of the day.  I recall making a comment that other employees appeared late for work often and were not being picked on such as we were. Mr. O'Shea stated that what other employees did was none of my business and that we had to show up for work on time.   Tensions were high and Mr. O'Shea stated he was finished and that he was sending us home for the rest of the day.

---

[2] These union stewards appeared to be the ones bringing the complaint because they argued against us during the meeting and were clearly not representing us during the meeting.  I remember arguing with Mr. Bakhshi that other employees were coming to work later than my brother and I more often, but why was he only accusing us of being late all the time.   I felt that he was protecting his Hispanic coworkers who were the ones picking on my brother.

[3]   There were only about 8 or 9 employees in the area that were picking on my brother when I referred to them acting like a bunch of dogs, but Mr. Bakhshi apparently was referring to the entire service team assembled for the morning.

16.  A couple days later, Mr. O'Shea issued both Kin and I counseling forms (See Attachments  5 ) for leaving the meeting after he allegedly instructed us to remain and checked the box for suspension..  That was a complete fabrication because we were never directed to remain in the office.  I was also issued a separate counseling form, recording a written reprimand, for calling a group of waiters "a bunch of dogs".  (See Attachment 6`)  I never called them a bunch of dogs;  I accused them of acting like a bunch of dogs.

17.  Later, on 10/31/05, after these same employees complained to human resources about the incident, an assistant from human resources read to us a statement relating to Harassment Free Workplace and required that we sign it.  The reading took about 10 minutes.  (This is referred to in paragraph 8 of defendant's statement of material facts not in dispute).

18.  To me this was just another example of the discrimination my brother and I faced on a daily basis because we were not part of the favored majority group that hung around and socialized together.   Any fair and objective manager would have realized that we were being singled out because we were the outcasts from the group, but Mr. O'Shea appeared to view his role as rubberstamping whatever the majority group wanted, regardless of whether it dealt with us in a disparate manner.

19.  Within a matter of a week or so after being disciplined, I observed one of the two union stewards who were present-- Santosh Rego--appearing for work 45 minutes late and I brought it to Captain Greg Hinds attention at the time.[4]  Later the other union steward who was also present during the earlier disciplinary meeting with my brother and I--Norman Bakhshi --told me I was "sick" for reporting Mr. Rego to management.  He

---

[4] Normally I would not report a coworker in this manner, but Mr. Rego was responsible for accusing my brother of being late during the earlier incident which led to our being disciplined.

accused me of retaliating against Mr. Rego for his reporting my brother as he had done. I recall saying something to the effect that why should my brother and I be the only ones singled out for discipline. If there are rules, they should be applied to all in the same manner. I reminded Bakhshi that he saw Mr. Rego come in 45 minutes late also that morning. Mr. Rego frequently came to work late and on some occasions, would come very late, as was true of other employees also. I specifically refer to Mr. Rego because he was one of the main accusers during the prior meeting with Mr. O'Shea. Mr. Rego was never disciplined for his being very late despite my report of the incident. To me this was another example of disparate treatment.

20. Another example of Mr. O'Shea favoring other employees relates to his issuing a written warning to my brother on 7/2/04 for allegedly refusing to provide silverware for the buffet table after a guest requested these items. Ms. Segovia had responsibility for the buffet table that day and once my brother brought her attention to the missing silverware promptly after it was brought to his attention by a patron, he performed his responsibility. Ms. Segovia should have been held responsible for not keeping her work station properly attended and furnished. However, only my brother was disciplined for this incident.

In August 2007, I had a guest come to me and complain that Ms. Segovia had refused to obtain skim milk for coffee, after she requested same. I personally ran to the kitchen to get the skim milk for the patron and apologized for my coworker. The guest was so appreciative that she gave me her business card in case I wanted to get recognition for my efforts. I reported this incident to Banquet Manager, Kevin O'Shea, because this was clearly an example of providing poor service to patrons. Ms. Segovia should have

been written up for this incident, but to my knowledge she never was.  To me this was another example of disparate treatment.

21.  My brother was suspended on March 5, 2006 for 5 days for allegedly trying to fight with coworker Mustafa Allame (Moroccan), who is a meeting and exhibit department staff member[5]  while dressing tables in the International Ballroom East. I was a witness to some events that evening which disprove that my brother engaged in the conduct alleged.   Mr. Lolo Villagomez (Hispanic), who was our supervisor that day, came to me at one point that evening asking me to assist my brother in putting linens on the tables for that function.   As the two of us were returning to International Ballroom East, we ran into the Meeting and Exhibit Supervisor, Eroll Spence (African American) and Mustafa Allame (Moroccan), in the area behind the ballroom.   Mr. Allame was complaining to Mr. Spence and Mr. Villagomez that my brother was bothering him over it being his responsibility to dress the tables.   Mr. Spence told him to calm down and Mr. Villagomez also told him that the work was being done so what was the big deal that he was so agitated.   Mr. Allame did not say anything about my brother threatening him. When Mr. Villagomez and I got to the ballroom, my brother had already completed dressing all the tables and there was nothing that I could do to help.  Mr. Villagomez has repeatedly told me that he did not believe that any disciplinary action was warranted for this incident.  He also so testified during his deposition. (Attachment 7, 1/10/08 depo, Tr. 14-15:  I told my supervisor, Mr. Atkins, "I thought the problem was over, it was all right" lls 3-6 because after he instructed my brother to stop, he performed his duties as directed.  Id.  "You quieted things down and there was no further problem so far as you

---

[5] He is not a "banquet houseman", as asserted by defendant in their Statement of Material Facts Not in Dispute at paragraph 11.

could tell? Exactly. "  Id.   He further admitted that "Many times" he has had to intervene in employee verbal disputes, but so long as the employee calmed down afterward he would not discipline them. Id. at Tr. 15.

22.   I recall the incident leading to my brother's termination very clearly.  On July 19, 2006, my brother and I were working in the International Ballroom Center serving a brunch along with several other employees.   I believe it was around 9:45 am when my brother and I were entering the kitchen to return items left over from the set up of the tables that morning. Kin was ahead of me, Mustafa Aboulhouda (Morocco) was next in line, and I was third in line to enter the kitchen.   As we were entering the kitchen, I observed Hernan Vasquez leaving the kitchen from an adjacent door.  As he was exiting, I observed Mr. Vasquez say to my brother in an audible voice , "I hate this motherfucker" and continue on into the ballroom.  I could tell that my brother was upset by Mr. Vasquez's remark because he was talking aloud to himself after he entered the kitchen.  I heard him say, "Why this guy call me a motherfucker and why he call me a maricon and why he call me a thief.  I am not a maricon.  I like woman.  I'm not gay.  I can make love to woman.  I can make love for all of them to see.   I observed him getting sufficiently upset that I recall telling him to go get himself a drink of water and to calm himself down.  Kin did as I suggested because we were done with our duties in setting up tables.

23.   When the event was over and we were finished serving the group brunch, I believe it was about noon that my brother and I went to see Captain David Vargas'  to turn in our ticket (which identifies the function that we worked so that we can later get paid for the function).  Mr. Vargas accepted my ticket, but told Kin that he had to report to Assistant Banquet Manager Chuck Atkins office.  I waited in the cafeteria for my

10

brother to finish his meeting because we were driving home together. More than an hour later, I was looking for my brother and I found him in the locker room talking with Norman Bakhshi and he handed me the counseling form showing that he was suspended pending an investigation.

24. My brother and I immediately went to the union office to grieve his suspension. The union immediately took an oral statement from Kin Chhan that very day but it was not reduced to writing till some 10 days later after the union representative returned from vacation. I provided two separate statements to the Union, one on 7/31/06 and the next on 8/9/06 because I only referred to derogatory word in the first one and the union wanted me to state what was actually said by Mr. Vasquez to my brother as he was leaving the kitchen that morning. (See Attachment 8a and 8b)

25. Nobody from defendant's human resource office ever asked me to provide a statement about what I observed, despite the fact that they knew that I was present throughout the incident. My brother is the only regular full time banquet server that I recall ever being fired by the Hilton since I started working in the banquet department in September 1990.

26. I believe that Kin Chhan's termination was provoked by the taunting of the very coworkers who later reported him to human resources, including Hernan Vasquez, and is part of the same pattern that led to the prior disciplinary actions. I also believe that management treated my brother far less favorably than his accusers who provoked his emotional upset to begin with. There was never any serious investigation about Mr. Vasques' offensive comments to my brother and he was never disciplined at all.

27.  The same Mustafa Aboulhouda (Morocco), who was one of the employees who complained to management about my brother that morning, engages in much worse conduct in the workplace without any action being taken against him.  As recently as 2/10/08, I along with several coworkers witnessed Mr. Aboulhouda strike the face of coworker Mr.Gerard December (Haiti) three times in a fit of anger.  I later asked Mr. December what led to the assault, and he told me that he had teased Mr. Aboulhouda by calling him a name that he did not like and he struck him across the face repeatedly.  He told me that he was very angry with Mr. Aboulhouda over the incident.

28.  A couple weeks later, on 2/23/08, I was working a function with Hernan Vasquez (Hispanic).  As I arrived for work that morning,  I was going to the locker room to change and as I was passing the banquet office,  I saw Mr. Vasquez kissing a coworker, Mrs. Segovia, on the lips.  Mrs. Segovia is a married woman and I could tell that she did not appreciate his aggressive action toward her. [6] Later the same day, when several of us who worked the function were in the banquet office to drop off our tickets for the day, I observed Mr. Vasquez drop his ticket off and then turn around, look at me and he said audibly, "chino pendejo".  I thought it was a slur directed at me but did not know what "pendejo" meant till I later asked some Hispanic coworkers.  They informed me that it mean prick, asshole or somebody who was worthless.   I had done nothing to provoke this comment from Mr. Vasquez.

Three days later, on 2/26/08, when we working a breakfast together in the exhibit hall, in the midst of several people I heard Mr. Vasquez say "Chinese bitch".  I was standing close to him when he made the comment so I believe again he was referring to me and was attempting to intimidate and provoke me.

---

[6] This can be easily verified because it was done in an area which is security videotaped.

29. On 3/3/08, with the assistance of my attorney, I wrote a summary of these incidents and gave them to union steward Norman Bakhshi--the same fellow who reported Mr. Vasquez's and Mr. Aboudhouda's accusations of foul language against my brother-- that led to his termination. (See Attachment 9). Ironically, Mr. Bakhshi's response was that he was going to talk to Mr. Vasquez and Mr. Aboudhouda about the allegation. I told him that he was not an investigator and he did not ask my brother what happened before he reported him to Assistant Banquet Manager Chuck Atkins. I told him I wanted him to treat my charges in the same manner that he dealt with Mr. Vasquez and Mr.Aboudhouda's accusations against my brother. He then said that he would report them to Kevin O'Shea. I waited a couple days and nobody contacted me so I was pretty sure that nothing was happening.

30. I then went directly to Peter Hill on 3/6/08, who is the Human Resource Director, and presented him with similar documentation to that which I gave to Mr. Bakhsi. (See Attachment 10). I asked him whether Mr. O'Shea had reported the incidents that I presented to Mr. Bakhshi and he admitted that he had heard nothing. I then asked him to investigate the allegations on my summary. He spent over an hour with me taking notes about how each incident happened, and who were witnesses to the incidents. I asked him to please investigate these incidents. He assured me he would and that he would get back to me. I found out that Mr. December had acknowledged to another coworker, James Hunt, that Mr. Aboudhouda slapped him repeatedly in anger and I provided this name to Mr. Hill also on 3/18/08 (See Attachment 11)

31. It is obvious to me that my allegations were not handled in the same expeditious manner that Mr. Vasquez's and Mr. Aboudhouda's allegations against my

brother.  Even though what I witnessed involved some of the most serious type of

offenses that an employee could make, they were not handled in the same manner by Mr.

Bakhshi, Mr. O'Shea.   This demonstrates that there are separate rules for how the

"Golden Boys" are treated by front line management of defendant.


I have carefully reviewed the foregoing and swear it is true and correct under

penalty of perjury.

-----------------------------------------------------------------------
Feung San Chhan              April  3, 2008

ATTACHMENT 1

Paul Fedio, Ph.D.
Clinical Neuropsychology
9408 Raintree Road
Burke, Virginia 22015

Telephone: (703) 426-7246
Telecopier: (703) 426-4223

# NEUROPSYCHOLOGICAL EVALUATION

27 September 2006

**Name: Chhan, Kim**
**MR#: 01230949**
**Date of Birth: 16 July 1959**
**Age: 47 years**
**Date of Testing: 15 September 2006**

## TESTS AND PROCEDURES
Wechsler Abbreviated Scale of Intelligence (WASI): Estimated Intelligence Quotients:
   Verbal IQ: 59   Performance IQ: 87
Wechsler Memory Scale – Third Edition (WMS-III, Abbreviated; select tests)
Beck Depression Inventory (BDI)
Rey-Osterrieth Complex Figure (ROCF)
Grooved Pegboard
Clinical Interview with Client and Brother

**Reason for Referral:** Mr. Chhan is a 47-year-old, right-handed Chinese male referred for neuropsychological evaluation by his neurologist, Dr. Sunil Kalra, Kaiser Permanente. The referral was prompted by Mr. Chhan's brother's suspicion that Mr. Chhan may be an undiagnosed Autistic.

**OVERVIEW:** Intellectually, Mr. Chhan scored below average on most tests and did much better with visuomotor than verbal tasks. This asymmetry may be related to a developmental language disorder and limited educational opportunities which interfered with early psychological development. His emotional and interpersonal display clearly does not support a diagnosis of autism or a pervasive developmental disorder.

Coupled with marginal intellectual resources and over protectiveness by the family, Mr. Chhan's social skills and self-confidence were poorly forged and he is prone to intense anxiety when performing difficult tasks or having made a mistake. In a bid to avoid errors, he is excessively focused on precision which is not time or cost effective. Further contributing to his anxiety is the fact that at his job, Mr. Chhan encounters hostility from coworkers and he has responded to in ways that are inappropriate, resulting in disciplinary action and dismissal. The family symbiotic relationships need to be undone and reworked and Mr. Chhan should be encouraged to try more things on his own.

In addition to family therapy, Mr. Chhan could benefit from psychotherapy and social skills training at a culturally sensitive practice such as the Center for Multicultural Human Services, Falls Church, Virginia. He would also benefit from a referral to the Division of Vocational Rehabilitation, a case manager and vocational counselor.

Chhan, K    2

**Background Information:** Clinical interviews were conducted separately with Mr. Chhan and with his brother. Mr. Chhan's first language is Mandarin Chinese and he is moderately fluent in English. He said he also speaks Cantonese and a little Spanish. His family is ethnically Chinese, but Mr. Chhan and his siblings were born and raised in Cambodia. He is the youngest of six children of married parents. He has two older sisters and three older brothers. The second youngest sibling (aged 49) is the brother who requested the evaluation and participated in the interview. To the best of their knowledge, Mr. Chhan's prenatal development and birth were normal. They did not know of any family history of learning disabilities or attention deficit/hyperactivity disorder.

Subsequent to the father's death, the family moved to the United States in 1980, with the exception of the two older brothers, who remained in Cambodia, and are now deceased. Mr. Chhan and the participating brother have lived with their mother their entire lives; the patient and his brother have never married. Their two sisters are older and are married with families, and live nearby. Mr. Chhan has become an American citizen.

Mr. Chhan has cultivated a respectable work record; he and his brother have worked steadily as banquet servers at a Hilton hotel for about 23 years. Although Mr. Chhan has difficulty following multiple-step commands, his brother said the nature of their work is physical and does not require memorization of much new or complex information. However, Mr. Chhan has frequently experienced problems getting along with his coworkers. According to his brother, "people harass him" because they think he is 'retarded'.

Mr. Chhan's problems were described as lifelong and pervasive. He attended a Chinese-language junior high school in Cambodia, but did poorly. Although he is licensed and drives a car, others must plan the trip for him. According to his brother, he and his 82-year-old mother must plan all activities for the patient.

During the interview, Mr. Chhan's brother cried profusely, saying: "I'm suffering because of him…I have to spend all my time with him". The brother noted that he has not married because of the responsibility of caring for the patient. The brother wanted Mr. Chhan evaluated for the sake of obtaining medical and/or psychological help. Despite that, the brother said he and his mother were not prepared to let Mr. Chhan live independently of in a group or sheltered home if it was determined that would suit his needs better.

Mr. Chhan said he dates occasionally but does not currently have a girlfriend. He had a long-distance relationship with a woman in China and visited her a few years ago. He tried to get her to immigrate to the United States to marry him, but she eventually terminated the relationship and has remained in China.

Mr. Chhan was suspended from his job in July 2006. His brother said what precipitated the suspension was an incident in which two coworkers allegedly harassed Mr. Chhan and called him a 'homosexual'. He reacted angrily and said something inappropriate to the two coworkers, who reported him to hotel management; he was fired. The brother and Mr. Chhan are awaiting a meeting with their union lawyer and hotel management on October 12, to see if Mr. Chhan can be reinstated.

Mr. Chhan and his brother denied that Mr. Chhan has any health problems. Although he does not have tuberculosis, he is currently taking medication for tuberculosis as a precaution

Chhan, K    3

because of inoculations he received in Cambodia. He also recently underwent surgery for a hernia and without incident. Mr. Chhan denied the use of alcohol, tobacco, or other substances, and denied a record of any legal charges or arrests.

**Behavioral Observations:**  Mr. Chhan and his brother arrived 30 minutes late for the evaluation. Mr. Chhan was alert, oriented and fairly articulate, although he is only moderately fluent in English. His demeanor was friendly but somewhat anxious. He seemed eager to please and frequently apologized when he thought he was performing poorly. His affect was congruent with the subject of discussion and could not be aligned with a pervasive developmental disorder. His thinking was logical and goal-directed. Mr. Chhan was dressed casually and appropriately, with the exception of a hospital wristband for a recent hernia surgery. He was unable to offer a reasonable explanation for retaining the wristband, and he seemed confused about time, saying he had undergone the surgery two weeks prior, and then giving the date of the surgery as only eight days prior.

Mr. Chhan was cooperative with the evaluation and tended to work too persistently on difficult items, appearing to have difficulty moving on when he was unsure about the answer. He displayed a right-hand tremor with some manual tasks, and it is unclear if this tremor had a neurological or emotional (anxiety) cause.

**Test Results and Impressions:**
**Intelligence:**  Mr. Chhan's performance on an abbreviated scale of intelligence (WASI) was uneven: a defective Verbal IQ of 59 and a low average Performance IQ of 87. His verbal score, in fact, was much lower than his observed conversational ability but was consistent with estimates based on his limited educational attainments and English, second language; he was far more conversant than his Verbal IQ would predict.

**Language:**  Clinically, Mr. Chhan was able to converse in English, although he struggled with word finding and displayed some difficulty expressing ideas fluently. Since English is not his native language, it is unclear how much of this expressive problem may contaminate cognitive issues. In terms of receptive language, Mr. Chhan's experienced difficulty which also dimmed his proficiency in learning and remembering verbal information. His speech was clear and free from dysarthria or aprosodia.

**Attention:**  Mr. Chhan had difficulty attending to directions and sometimes needed them repeated. He also tended to become "lost" in tasks that were difficult for him, taking an excessively long time to complete. For example, it took him 30 seconds to begin copying the Rey figure, and nearly 11 extra minutes to complete the task which is normally done within 3 to 5 mins. Multi-tasking is likely to present a major problem.

**Visuospatial and Constructional Abilities:**  Basic skills in this domain were essentially average. Mr. Chhan's applied a fragmented approach in copying the complex Rey Figure. Nevertheless, his drawing was precise and reflective of an obsessive attention to detail; he did not see the "big picture." Despite the length of time he took with the task, he recalled only a few details 30 minutes later. Nevertheless, he obsessed over the task, taking about 20 minutes to draw as much as he could recall. He showed an excessive reluctance to make and acknowledge mistakes. During this task, Mr. Chhan's right hand was noticeably tremulous which needs to be explored neurologically [tremor vs. intentional disorder]. There was no evidence of visuomotor coordination problem, agnosia or constructional apraxia.

**Memory/Learning:** Mr. Chhan did poorly in remembering both verbal and visual information. For example, when he had to recall the content of two short stories that were read to him, he recalled very few details and did not benefit much from repetition. After a delay of 30 minutes, Mr. Chhan was able to spontaneously recall only the few details that he initially remembered. Overall, he can not encode and remember large chunks of information.

**Executive Abilities:** Mr. Chhan had difficulty initiating complex tasks despite redirection. He was, however, able to answer adequately questions about everyday problem solving.

**Visuomotor Skills:** Although he displayed a hand tremor in drawing the Rey figure, Mr. Chhan was not significantly impaired in this domain. He performed the Grooved Pegboard test in the normal range with either hand, first with his dominant right hand (98 seconds) and then with his non-dominant left hand (95 seconds).

**Emotional Status:** Mr. Chhan showed an adequate capacity to relate and to empathize with human feelings – this trait discounts autism as a primary diagnosis. In fact, he was very emotional, cried openly when discussing personal and the human suffering of refugees that he had witnessed during the Vietnamese and American invasion of Cambodia. His emotional reaction was congruent with the subject being discussed and uncovered internal conflict and stress that needs to be reworked. Despite this capacity for intense feelings, Mr. Chhan may have difficulty perceiving and interpreting social situations the way other people do. Although he was very polite, he was socially awkward. Furthermore, he said did not think he had done anything wrong in the job situation that led to his dismissal which suggests limited insight into inept social functioning.

Mr. Chhan has a pervasive fear of making missteps. He was extremely hesitant to tackle tasks that were difficult for him, not wanting to do anything if he was not positive it was right. For example, he also expressed a fear of telling coworkers when they are doing the wrong thing at work, because he is afraid they would retaliate. From what he and his brother have said, that fear is well founded. On a self-reported measure of depression [BDI] and in the clinical interview, Mr. Chhan did not display or endorse any items of depression.

**Summary and Recommendations:** Mr. Chhan is a 47-year-old, right-handed Chinese male who was referred for neuropsychological evaluation that was prompted by brother's suspicion that he may be an undiagnosed Autistic.

The current evaluation failed to support this diagnosis and instead espouses the hypothesis that Mr. Chen may have endured a developmental language disorder that cast him as dulled and cognitively impaired, socially and in school. At the same time, he developed good emotional resources but was enabled and treated as retarded by his friends and family. In sum, a diagnosis of Autism is contraindicated by positive and genuine emotional feelings and expression, good conversational ability, varied vocal intonation, and good eye contact. It is likely that Mr. Chhan's difficulties in expressing himself, coupled with intense fear of making mistake and the resulting anxiety undercut his interpersonal action.

Mr. Chhan agrees that he has a language problem that results in him misunderstanding people and being afraid to initiate or try activities because of the likelihood that he would make a mistake and be embarrassed. His fear may be exacerbated by the fact that his family has treated him as retarded and sheltered him his entire life.

10/28/2006  08:22   3016011993                PFEDIO                          PAGE  06

Chhan, K    5

The family symbotic relationships need to be undone and reworked and Mr. Chhan should be
encouraged to try more things on his own.    To this end, he might benefit from group therapy
along with medication and social skills training at a culturally sensitive practice such as the
Center for Multicultural Human Services, Falls Church, Virginia.  He would also benefit from
the services of Division of Vocational Rehabilitation for a case manager and vocational
guidance with an eye to job duties that he held in the past.

Please do not hesitate to contact us [703-426-7246] if there are any questions.


Amy Conrad, M.A.                              Paul Fedio, Ph.D.
Neuropsychology Trainee                       Clinical Neuropsychologist

ATTACHMENT 2

# Hilton

### Hotels Corporation

TO:       File                                                    Inter-Office Correspondence

FROM:    Robin Sterrett

LOCATION: Human Resources

DATE:     4-8-99

SUBJECT:  **Kin Chann- investigation of suspension**

Kin Chann was suspended for 3 days for spilling hot coffee on a utility steward. Kin and Mable Boatwright, from Local 25, disputed the suspension. Below are the statements from the individuals involved.

<u>Eloy Blanco, Executive Steward:</u>
Eloy noted that he was standing near the coffee station, between the decaffinated coffee and garde manger room.

Raul Archer and Silvia Flores were pouring coffee into silver pitchers for the banquet servers for a dinner function. Kin was standing at the service station. Another server was next to him. Kin started to pull empty pitchers down from the queen mary and place them on the table. Raul told Kin "don't pull anymore coffee pots down because they are going to fall off". Kin kept grabbing them.

The server next to Kin took his pitchers of coffee and left. Kin asked "where's my coffee". As Silvia placed two pitchers of coffee on the table, Kin grabbed the pot when Silvia was still holding it. The pitcher shook and coffee spilled out from the spout onto Silvia. Silvia was wearing gloves.

Silvia spoke to Raul about what happened. Kin just laughed. Raul asked Kin why he did that. Kin responded "it's none of your business". Eloy gave Silvia first aid. He then went to look for Oscar to report the incident. Oscar had left for the day so he spoke with Becky. Becky decided Kin should be sent home. Becky met with Kin.

<u>Kin Chann, Banquet server:</u>

Friday, March 19; there was a busy dinner function. When it was time to serve coffee he went to the coffee station with Heinz Gassner. They were one of the first to get to the table.

Raul and Silvia were working at the station. Kin heard Raul say something to Silvia in

HHC-0024

spanish. He does not know what Raul said but heard the word "chino". (Kin noted that he has had problems with Raul in the past).

Heinz got his coffee and left the station. At this point, there were several other servers waiting to get coffee. Raul and Silvia did not give him pitchers of coffee. They helped others first. Kin stated that he feels he was discriminated against by Raul and Silvia. He started to look for a captain from where he was standing but he could not find anyone.

At one point Silvia put down a pitcher of coffee. He took the pitcher and got another empy one. He filled the empty one himself with decafeinated coffee. He returned to the function and served the guests.

Eloy was in his office. Eloy approached him and said that he had spilled coffee on one of his ladies. Eloy then went to look for Oscar. While Kin was by Eloy's office, Emilio and Raul walked towards him. Raul screamed at him in spanish. Kin felt intimidated.

Eloy returned and told Kin to go to Jorge's office. Since Oscar had already left, Eloy found Becky. Becky asked Kin if he was working tomorrow. Kin said yes. Becky told Kin that he was not working. Kin asked if he could return to the function (he was on clean up). Becky said yes and he returned.

While he was working, Charlie approached him, asked him for his slip and told him to go home.

Kin feels Raul was harassing him.


Heinz Gassner, Banquet server:

Kin and he were waiting at the coffee station for their pots of coffee. There were 6-8 other waiters around the table in the beginning. Heinz was given his pots after 2-3 other servers got their's. Kin had not been given his pots. Heinz left the area.

Raul was serving the coffee. He did not have any pots ready for the servers to take. Raul did not turn the handles around to face the servers as they picked up the pots.


Raul Archer, Utility steward:

He was working the coffee station. He can not fill the pots with cofffee before the servers are ready to pick them up. The servers have complained that the pots get too hot if they are filled too soon.

Raul stated that the "oriental guy", chino", Chann brother started to take pots down from the queen mary and place them on the table. Raul told Kin to stop. Raul noted that there are two kinds of pots. The servers like a certain kind. When they are reaching for the ones they like, they can and have knocked others off the shelf. Eloy was by the garde manger room. He did not say anything to either Raul or Kin when Kin was

HHC-0025

pulling the pots down.

Silvia came over to help serve the coffee. Silvia was wearing gloves. Raul was not. Kin was standing in the middle of the table. He was surrounded by empty pots. Raul and Silvia placed their full pots to the sides to avoid the empty pots. The servers took the pots and they put them down.

Kin grabbed a pot while Silvia's hand was still on it. The spout was facing her. Coffee spilled onto her hand, arm and apron. Silvia went to Eloy.

Kin did not say anything while they were serving the coffee or after the accident.

Silvia Flores, Utility steward:

She was serving coffee with Raul. She was filling the pots and placing them on the table. "Chino" was waiting for his pots. Chann grabbed a pot while she was still holding it. Coffee spilled onto her hand and arm. She was wearing gloves.

Silvia noted that Kin seemed mad because he did not get his coffee. Eloy was standing by the side.

She completed an accident report a week later.

ATTACHMENT 3

# Hilton
## Hotels Corporation

| | | |
|---|---|---|
| **TO:** | Jorge Pulles | **Inter-Office Correspondence** |
| **FROM:** | Robin Sterrett | |
| **LOCATION:** | Human Resources | |
| **DATE:** | 4-16-99 | |
| **SUBJECT:** | **Kin Chann- Suspension** | |

Jorge, I have met with Mable to discuss Kin's suspension. Based on the statements provided by all parties (Eloy, Kin, Heinz, Raul and Silvia), Thomas and I agreed that we would reduce the suspension to a written warning.

Therefore, please pay Kin for the functions he missed. The suspension started on March 19.

Thank you.

HHC-0023

ATTACHMENT 4

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

            Plaintiff,

      v.                                  Civ. No.: 1:07cv01180 (HHK)

HILTON HOTELS CORPORATION,

            Defendant.

---

Friday, October 12, 2007

Deposition of
ROBIN STERRETT

a witness, called for examination by counsel for Plaintiff,
pursuant to notice and agreement of counsel, beginning at
10:00 a.m. in the offices of Kestell & Associates, 1012 14th
Street, N.W., Suite 630, Washington, D.C., 20005, before
Jerry McKenzie of Court Reporting Services, Inc., when were
present on behalf of the respective parties:

1

P R O C E E D I N G S

1

[10:00 a.m.]

2

[Witness sworn.]

3

WHEREUPON

4

ROBIN STERRETT

5

a witness of lawful age, was called for examination by

6

counsel for the Plaintiff, and, having been first duly

7

sworn, was examined and testified as follows:

8

DIRECT EXAMINATION

9

BY MR. KESTELL:

10

    Q   Ms. Sterrett, you're employed with the Hilton,

11

are you not?

12

    A   Yes, I am.

13

    Q   And how long have you been so employed?

14

    A   Since January of 1987.

15

    Q   And your position?

16

    A   Regional director of human resources.

17

    Q   And your job responsibilities?

18

    A   I assist hotels in six states from D.C.,

19

Maryland, Virginia, North Carolina, South Carolina, and

20

Georgia.

21

    Q   Okay.  And is one of your duties to investigate

22

disciplinary actions?

23

    A   No.  During this incident that we're talking

24

2

| | | |
|---|---|---|
| 1 | | about, I was Director of Human Resources for the Hilton |
| 2 | | Washington.  I've been -- |
| 3 | Q | So you're in a different -- |
| 4 | A | I'm in a different position, yes. |
| 5 | Q | How long have you held the regional position? |
| 6 | A | Since the end of May this year. |
| 7 | Q | Congratulations.  I take it that's a promotion |
| 8 | | for you? |
| 9 | A | Yes. |
| 10 | Q | Prior to becoming regional, you held a director |
| 11 | | of human resources? |
| 12 | A | Yes.  I was Director of Human Resources at the |
| 13 | | Hilton Washington since, from October of '96 through May of |
| 14 | | '07. |
| 15 | Q | And as Director of Human Resources, one of your |
| 16 | | duties was to investigate disciplinary actions? |
| 17 | A | Yes. |
| 18 | Q | How many employees were you overseeing? |
| 19 | A | We had about 730 regular team members, and |
| 20 | | probably a couple hundred on call. |
| 21 | Q | And what kind of different positions are we |
| 22 | | talking about? |
| 23 | A | In the 730? |
| 24 | Q | Correct. |

3

1      A    The full gamut.  It was the bell staff, the front

2    desk staff, PBX, the entire food and beverage division from

3    the cooks to the stewards to the restaurant servers and bus

4    persons, and the banquet staff.  And then of course you had

5    catering, meetings and conventions, sales, human resources,

6    security, administrative assistants, which fell into all of

7    those departments.

8      Q    And the on-call staff, is that substantial also?

9      A    That was just banquet, on-call banquet, servers,

10    and bartenders.

11      Q    It's true that some of the witnesses in the

12    termination incident involving Mr. Chhan were on-call

13    people?

14         MS. ARIAIL:  Objection to form.

15         THE WITNESS:  One of them, yes.

16         BY MR. KESTELL:

17      Q    Who was that?

18      A    That was Rosa Rosario.

19      Q    Can you give us some background about your

20    academic training and prior work experience?

21      A    I'm sorry, my background in?

22      Q    Your academic training.

23      A    Oh, I'm sorry.  I have a B.S. from St. Lawrence

24    University in Psychology, I have an M.B.A. from --

4

1          Q    St. Lawrence is where?

2          A    Upstate New York, Canton, New York.

3          Q    Go ahead.

4          A    I have an M.B.A. from George Washington

5    University.

6          Q    Which year?

7          A    I think early 90s.  I forgot, I honestly don't

8    remember --

9          Q    Early 90s?

10          A    Yes.  And then I have a SPHR, which is from the

11    Society of Human Resources Management.

12          Q    How much longer do you have to go to get your

13    SPHR?

14          A    I have it.

15          Q    How much longer beyond your M.B.A. or --

16          A    Oh, you can take it.  It's based on years of

17    experience in the field.  You can take it at any time.

18          Q    I see.

19          A    Yes, there are a couple different levels, the PHR

20    and the SPHR, so it's just based on experience.  But you

21    can take it at any time once you meet those requirements.

22          Q    When did you get that?

23          A    I would like to say about four years ago.

24          Q    Now, during the time you were director of human

5

1    resources here in Washington, you were dealing with a

2    pretty multi-ethnic employee group, were you not?

3        A    That is correct.

4        Q    And did you observe that there were tensions

5    amongst the staff on occasion?

6        A    Tensions?  I don't know if I recall tensions,

7    just natural misunderstandings.

8        Q    Have you had numerous instances where individuals

9    had to work together and individuals by some nickname that

10   was associated with their heritage?

11       A    That I can remember at this moment, I can't think

12   of any.  I've got to say it must have happened, but I

13   don't, I can't put my finger on one right now.

14       Q    Did you ever have individuals refer to Mr. Chhan

15   as Chino?

16       A    No.  Not to my knowledge.

17       Q    Now, in your training and background and

18   experience, would Chino be a disparaging term?

19       A    Yes.  That would not be appropriate.

20       Q    And if it was brought to your attention, what

21   would you do?

22            MS. ARIAIL:  Objection.  Unclear question.  If

23   you understand you can answer it.

24            THE WITNESS:  Okay.  Certainly, if it was brought

6

 1    forward, we would investigate the situation to see if, in

 2    fact, it happened.  And certainly coach the individual as

 3    to what is appropriate language in the work force.

 4              BY MR. KESTELL:

 5        Q    In other words, you'd counsel somebody not to use

 6    such terminology?

 7        A    Um-hmm [affirmative].

 8        Q    Now in the more than 10, well, I guess it's more

 9    than 10 years you were director, right?

10        A    Um-hmm [affirmative].

11        Q    You must have had instances where employees used

12    a four-letter word?

13        A    Yes.

14        Q    And it was brought to your attention?

15        A    Um-hmm [affirmative].

16        Q    And, approximately, how many times would you say

17    that's happened?

18        A    I honestly couldn't put a number on it.  I

19    honestly don't know.

20        Q    Because it's happened so often?

21        A    No.  No.  It's just that 10 years is a long time,

22    and honestly, I wouldn't remember how often it has happened

23    and therefore be able to put a number on it.  I would like

24    to think it has been a lot, but I couldn't honestly put a

7

1    number on it.

2        Q    Okay, well, do you have any feel for how many

3    times you had to investigate a situation where one employee

4    said another employee referred to him as a four-letter word

5    or something or other?

6            MS. ARIAIL:  Objection.  Asked and answered.

7            THE WITNESS:  Honestly, I couldn't give you an

8    estimate on it.

9            BY MR. KESTELL:

10       Q    Do you think it was more than 10 times in more

11   than 10 years?

12       A    Honestly, I don't know.  Because I don't

13   remember.  I couldn't tell you what's happened 10 years

14   ago, so I don't think I can honestly put a number to how

15   often it's happened.

16       Q    Well just in the last three years, the last three

17   years you were in Washington, do you remember any instances

18   that it happened?

19       A    Beyond Kin Chhan's case, I can't honestly right

20   now remember.

21       Q    Have you had instances where employees got into

22   heated arguments and used terminology other than a four-

23   letter word?

24       A    [indiscernible] I didn't like them

---

8

1    [indiscernible].

2        Q    And what was your practice when incidents like

3    this were brought to your attention?

4        A    We would investigate the situation.  Obviously,

5    whoever brought it forward, ask them, obviously, from their

6    side, what happened.  Asked if there were any witnesses to

7    the situation.  We would certainly talk to, I guess, the

8    opposing party, we would talk to any witnesses, if there

9    were any.  And then, based on where those statements fell,

10    a decision would be made.  Sometimes it could be verified,

11    sometimes it couldn't.

12        Q    In the instances where you thought a witness

13    verified that one of the two parties engaged in a heated

14    exchange was the provocateur, what action would you

15    normally take?

16        A    It would depend on the situation.  It would also

17    depend on the individual's record.

18        Q    Okay, well, if the individual had no prior record

19    of such misconduct, what would you do?

20        A    I guess it depends on what this heated argument

21    is about and what's involved.

22        Q    A heated argument that did not rise to the level

23    where they were actually throwing punches or physically

24    assaulting each other, but they were just exchanging words

9

1    in an offensive manner.

2        A    They would certainly be counseled.   They would

3    absolutely be counseled.

4        Q    And if they had prior record where they had

5    previously been counseled for something similar involving

6    some other employee, what action would you take at that

7    time?

8        A    Obviously, there would be more severe counseling,

9    if not termination.   Again, depending on what his prior

10   record was.

11       Q    Well, would an employee not normally be given

12   progressive discipline if he'd had no written warnings

13   prior to this second incident involving another co-worker?

14       A    Yes.   That's what I'm saying.   Depending on what

15   the record was and what that involved, it's either more

16   progressive counseling or it's termination, again,

17   depending on the situations involved.

18       Q    You talked about more progressive counseling or

19   termination.   Would a normal step in the procedure be a

20   suspension if the employee had not had previously been

21   suspended?

22       A    Yes.   And that's what I would mean by more severe

23   counseling.   Whether it is a written warning or whether

24   it's suspension.   Whether that's a one, three, or five day

10

1    suspension.   Again, each situation is looked at

2    differently.

3        Q    Have you ever had the situation where an employee

4    is accused of using foul language, but it wasn't even

5    directed at anyone?

6        A    Not that I can specifically remember.

7        Q    And for an instance where somebody uses foul

8    language like a four-letter word or something equivalent to

9    that, but voices it in a manner where others can hear it

10   but doesn't attempt to incite anybody else's reaction to

11   it, what would you do in that instance if it was brought to

12   your attention?

13       A    They would still be counseled.  It's

14   disrespectful, unprofessional conduct in the workplace.

15       Q    Okay, let's direct your attention to the incident

16   that led to Kin Chhan's termination in 2006.  It's my

17   understanding that there was some incident that occurred on

18   July 19th of that year?

19       A    Um-hmm [affirmative], that is correct.

20       Q    How was it brought to your attention?

21       A    I received a phone call from the banquet manager,

22   said that there were several individuals who wanted to see

23   me in reference to a complaint against Kin Chhan.

24       Q    Who is the banquet manager?

11

1       A     Kevin O'Shea.

2       Q     And how long has Kevin O'Shea been a banquet

3    manager?

4       A     I think four or five years.  I forget when he was

5    promoted to the position.

6       Q     And you had numerous dealings with Mr. O'Shea

7    prior to this incident?

8       A     Yes.

9       Q     Did Mr. O'Shea ever express to you that he did

10   not like Mr. Chhan and wanted to get rid of him?

11      A     No.

12      Q     Did Mr. O'Shea ever convey to you that Mr. Chhan

13   did not get along with his co-workers?

14      A     Yes.  There was certainly a history that he, that

15   Kin Chhan had difficulties getting along with his co-

16   workers.

17      Q     Okay, but my question was whether Mr. O'Shea had

18   conveyed or relayed that to you?

19      A     I'm sure he did.

20      Q     So he called you up and says that a bunch of

21   people want to come in and talk to you about something that

22   happened with Kin Chhan?

23      A     Yes.

24      Q     Did he tell you what the specifics were?

12

1        A    No.  We agreed to, obviously, to bring them to my

2   office and I would certainly hear them out.

3        Q    Was there anything abnormal about his calling you

4   and saying a bunch of people wanted to complain about

5   another employee?

6        A    No.  No.  I mean, obviously, several employees

7   had gone to him, and he was their department head, which

8   they should be going to if there are any concerns.  He

9   called me, he felt it was a situation that I needed to be

10  involved in, and so, obviously, I agreed to meet with them.

11       Q    Had Mr. O'Shea ever called you in the four or

12  five years he had been banquet manager prior to that saying

13  a group of employees were wanting to meet?

14       A    Has he ever called to say he has a situation he

15  wants me to get involved in?  I'm sure he has.  I can't

16  think of one right now, but, I mean, that's how, that's

17  just normal operations.  If the department head has a

18  situation in their department, you know, they'll pick up

19  the phone and call HR for assistance.

20       Q    You can't remember another instance in which Mr.

21  O'Shea was involved listing a bunch of employees here who

22  want to lodge a complaint?

23       A    Has he called -- No.

24       Q    In prior instances --

13

1          MS. ARIAIL:  I don't think the witness is done.

2     Were you going to answer?

3          THE WITNESS:  Yes.  I mean, I've certainly met

4     with the banquet staff before, but, you know, how it came

5     to my attention, whether they just came straight to me, or

6     whether he called, I honestly can't tell you.

7          BY MR. KESTELL:

8     Q    Okay.  But you have no present recollection of

9     any other incidents where Mr. O'Shea called you and said, I

10    have a bunch of people here who want to lodge a complaint

11    against a co-worker?

12    A    There was another situation where they wanted to

13    lodge a complaint.  How it came to me, I don't know whether

14    he picked up the phone or whether they came to see me

15    directly.  I don't remember how that happened.

16    Q    Okay.  Which employee did that relate to?

17    A    That was San Chhan.

18    Q    And when was that?

19    A    It was a couple of years ago.

20    Q    And you don't recall now whether it was Kevin

21    O'Shea, but he was the banquet manager at that time?

22    A    Yes.

23    Q    San Chhan is, of course, Kin's brother?

24    A    Yes.

14

1      Q    And you know him to be that?

2      A    Yes.

3      Q    And who were the employees who were coming to you

4    with this complaint?

5      A    That I don't remember.  I don't remember who they

6    were.

7      Q    Would you have notes from that session?

8      A    I might.  I honestly don't know.

9      Q    Okay, well what's your best current recollection

10   today of how you learned about some complaint against San

11   Chhan, two or three years ago?

12     A    How did I hear about it?  As I said, I mean,

13   several banquet servers came to see me.  They came to my

14   office.  You know, and that's not abnormal.  We have an

15   open door policy.  If an employee has a concern about

16   anybody, whether it's a manager or a co-worker, they're

17   always welcome to come to HR, and we'll certainly assist

18   them.  So it's not unusual, whether it's banquets or

19   whether it's another department, for an employee to come

20   see human resources.

21     Q    And practically how many employees came together?

22     A    Six?  I don't know.

23     Q    And was there one that seemed to be the

24   spokesperson?

15

1       A    No.

2       Q    So they all kicked in and nobody acted as

3   spokesman? They all just --

4           MS. ARIAIL:  Objection, asked and answered.

5           THE WITNESS:  No.  The issue was about an

6   offensive comment that got made in a function that took

7   place that day.

8           BY MR. KESTELL:

9       Q    What was the comment?

10      A    That San Chhan had walked into a banquet room as

11  the servers were setting up the function and he called out

12  to his brother saying, don't worry about them, they're all

13  a bunch of dogs.

14          MS. ARIAL:  Can we go off the record before the

15  next question?

16          [Discussion off the record.]

17          BY MR. KESTELL:

18      Q    So these six employees came in and accused San

19  Chhan of referring to them as dogs?

20      A    Um-hmm [affirmative].

21      Q    And talking to his brother?  And what did you do

22  after they made such an accusation?  First of all, do you

23  know any of the individuals involved?

24          MS. ARIAL:  Objection, asked and answered.

16

1          THE WITNESS:  I couldn't tell you right now who

2     they were.

3          BY MR. KESTELL:

4          Q    Not a single one?  Do you remember if any of the

5     individuals who were involved in that incident were

6     involved in the incident involving Kin Chhan?  Even if you

7     didn't know their names at the time, you would know them

8     now, right?

9          A    I don't think so.

10         Q    Okay.  And was Mr. O'Shea involved in that

11    incident at all?  Was he there with the group?

12         A    It was either -- he might have been, but I don't

13    know for sure.  I don't know for sure.

14         Q    And after you heard the complaint about these

15    employees, that they were referred to as dogs, what did you

16    do?

17         A    Actually, Kevin O'Shea did handle that

18    situation, investigated the situation and followed up with

19    San Chhan.

20         Q    Did he ever get back with you?

21         A    Yes.  I mean, I certainly have the results of the

22    investigation.

23         Q    So it was Mr O'Shea that did the investigation?

24         A    Yes.

1    Q    What did he conclude?

2    A    Based on the statements that were given, that an

3    inappropriate comment was made and San Chhan was counseled

4    for it.

5    Q    Okay.  Did you inquire with Mr. O'Shea what

6    explanation Mr. Chhan had for calling his co-workers dogs,

7    or referring to them as dogs in the conversation with his

8    brother?

9    A    No.  No.  I don't remember.

10    Q    Is it customary for the banquet manager to do the

11    investigation in an incident like that?

12    A    It can happen, sure.  And that can happen in any

13    department.  Sometimes the department head will handle the

14    situation and sometimes HR will get involved or take the

15    lead.

16         MR. KESTELL:  Let's go off the record.

17         [Recess.]

18         BY MR. KESTELL:

19    Q    Ms. Sterrett, before the break, I was asking you

20    about prior instances that you can recall where individuals

21    complained either through Mr. O'Shea as in the July 19th

22    incident, or by the group coming to you directly as you

23    referred to in the incident that occurred a couple of years

24    earlier involving San Chhan.  And in that instance, I

18

1      understand Mr. O'Shea counseled the employee.  Was a

2      counseling report prepared?

3          A    Yes.

4          Q    Was it provided to you for filing by Mr. O'Shea?

5      You have to be audible.

6          A    Yes.

7          Q    Any other instances that come to mind where

8      employees were complaining about improper verbiage or

9      provocation by a co-worker?

10         A    Not that I can think of.

11         Q    Okay.  So the only two instances you can recall

12     involved the Chhans?  And one was July 19th, 2006,

13     involving Kin Chaan --

14         A    Right.

15         Q    -- and the other was a couple of years earlier

16     involving San Chaan?  Now on July 19th, approximately what

17     time of day did Mr. O'Shea call you?

18         A    It was in the morning.  I would say mid-morning.

19         Q    And did he want to bring these employees to you

20     immediately?

21         A    Yes.

22         Q    And did he do so?

23         A    Yes, he did.

24         Q    Who were the employees?

19

1    A    Hernan Vasquez, Mustafa Abouhouda, and Rosa
2    Rosario.  And Kevin O'Shea and Chuck Atkins were also
3    there, as well as Norman Bakshi, who was the union team
4    leader.
5    Q    What is the union team leader's function?
6    A    Another work for it is shop steward.  They
7    represent the team members on behalf of the union.
8    Q    And had Mr. Chhan asked for the shop steward to
9    be present?
10    A    Kin Chhan was not in that meeting.
11    Q    Well, who asked that the shop steward attend?
12    A    The three employees, Rosa Rosario, Mustafa
13    Abouhouda and Hernan Vasquez.  And it resulted because, I
14    believe, Mustafa brought it to Norman Bakshi's attention,
15    so, in anything that has to do with an employee, they have
16    a right to be there.
17    Q    Okay.  So Mustafa was the one who brought it to
18    the shop steward's attention, and then how did the rest of
19    the employees get gathered?
20    A    Hernan brought it to Kevin's attention.  And
21    again, Hernan heard about what happened, felt the comments
22    were directed towards his wife, and therefore was upset
23    about it.
24    Q    Did you learn who told Hernan about it?

20

1          A     Who told him directly?  I'm not sure who told

2     him.

3          Q     Okay, so we got Hernan approaching Mr. O'Shea,

4     and we've got Mustafa approaching the shop steward with

5     Rosario, right?

6          A     I don't know whether Rosa Rosario was with

7     Mustafa when he told Norman.

8          Q     Okay.  But they were all together when they met

9     with you?

10         A     Yes.

11         Q     And so, what did you -- first of all, what was

12    their complaint to you?

13         A     Well, it started with Hernan.  Because, again, as

14    it turned out, Hernan did not directly hear any comments.

15    His statement was, as he was walking -- they were setting

16    up for a function in the morning.  As he was walking into

17    the ballroom to set up his table, Kin Chhan was walking up

18    the stairs back into the kitchen.  He heard Kin Chhan

19    talking, didn't hear what he said, so he just continued on

20    his way.  However, later on, he heard the statements, from

21    his fellow co-workers, heard the statements that were made,

22    felt they were towards his wife.  Therefore, that's what

23    upset him.

24               But as it turned out, he was not a first-hand

21

1    witness to what was said.  Then Rosa Rosario repeated what

2    she said.  She was behind Kin Chhan walking back into the

3    kitchen, heard him talking, making statements to the effect

4    that I can MF this person, and I am good at MFing, I can MF

5    people's wives, et cetera.  Mustafa said he was in the

6    kitchen as they both walked through the doors, and they

7    were in the kitchen as this was being said.  Mustafa is in

8    the kitchen, heard those comments saying the same thing,

9    I'm good at MFing, I can MF their wives, I can MF any time.

10        Q    So Mustafa heard the same comments that Rosario

11   heard?

12        A    Yes.

13        Q    And who was it that imputed it to Hernan

14   Vasquez's wife?

15        A    Hernan thought he was referring to his wife.

16        Q    Why?

17        A    Don't know.

18        Q    Well, did he explain to you?  Has Mr. Chhan had

19   some kind of relationship with his wife?

20        A    No.  No.  But he felt they were about his wife,

21   therefore, he expressed a complaint.  In investigating the

22   complaint, he obviously had no first-hand witness to the

23   actual comments being made.  Therefore, obviously, his

24   comment was sort of set aside.  Obviously, I had to work

22

1    with the statements of people who had first-hand witness to

2    the comments that were made.

3         Q    Okay.  He complains that he thinks Kin Chhan is

4    using the MF word and is referring to his wife.  That's

5    really the incident you're investigating?

6         A    No.  We weren't investigating Hernan's because it

7    became very quickly clear that he did not have first-hand

8    knowledge of the comments being made.  The people who had

9    first-hand knowledge obviously, were Rosario, Mustafa, and

10   then ultimately Peter Chan.

11        Q    Okay.  And did Mustafa and Rosario and Peter Chan

12   think he was talking about Mr. Vasquez's wife?

13        A    Rosario actually wondered whether he was

14   referring to Mustafa.  So, no.

15        Q    So you never were able to trace down how it was

16   that Mr. Vasquez thought that these comments were directed

17   at his wife?

18        A    No, and, again, he wasn't a first-hand witness,

19   his statements really didn't play a role in any decisions.

20   He wasn't a first-hand witness.

21        Q    Was there -- did you take notes as these

22   witnesses were relaying this to you?

23        A    Yes.

24        Q    Let me first get the counseling form identified.

23

1    We'll mark this Sterrett Exhibit 1 for identification.

2                          [Whereupon, Sterrett Exhibit No. 1 was

3                          marked for identification.]

4         BY MR. KESTELL:

5         Q    Ms. Sterrett, I've shown you what has been marked

6    as Sterrett Exhibit 1 for identification.   Is this, in fact

7    the counseling form that was completed on Kin Chhan

8    regarding the July 9th incident?

9         A    Yes, it is.

10        Q    Is there some reason that the prior counseling

11   form, or portion of the form is not completed?

12        A    No.   Obviously, we were in the meeting discussing

13   the situation with Chhan, and then based on obviously what

14   we knew at that point, he was being suspended pending

15   investigation.   So it's not unusual for that not to be

16   filled out.

17        Q    And at the time this was filled out,

18   approximately what time of day was it?

19        A    It was in the morning, probably at this point,

20   late morning.

21        Q    And what steps had you taken at the point that

22   you completed this form?

23        A    We had finished the meeting with the three

24   banquet servers.   We immediately called Kin Chhan in to,

24

1    obviously get his side of the story, and then based on,

2    again, the statements that were given up to that point, it

3    was appropriate to do a suspension pending investigation.

4         Q    Okay.  What hotel policies had he violated?

5         A    It would be against our harassment-free workplace

6    policy as well as our code of conduct.

7         Q    Okay.  Who was he harassing?

8         A    These type of comments are offensive to anybody

9    who is hearing them.  Under our policy, you do not need to

10   make a comment directed at somebody.  It can be somebody

11   who overhears the situation that is offended by it.

12        Q    Okay.  What led you to determine that a

13   suspension was appropriate?

14        A    Because it was a violation of our policy.  It was

15   a severe violation.  Severe discipline up to and including

16   termination would be appropriate in this situation, and

17   obviously, he had just been suspended for five days for

18   violating our violence in the workplace policy.

19        Q    We'll move to discussing the prior suspension.

20        A    Sure.

21        Q    So, you felt that even though Mr. Kin Chhan had

22   denied making the comments, that Mustapha's and Rosario's

23   testimony that he did use four-letter words, even though

24   they didn't seem to be directed at anyone, was so offensive

25

1    as to warrant a suspension?

2        A    They were based on their statements, and I had

3    two people saying that those comments had been made, it

4    appeared that there was a violation of our harassment-free

5    workplace policy code of conduct.  And until the

6    investigation was concluded, yes, a suspension pending

7    investigation was appropriate.

8        Q    Okay.  Did you attempt to find out if any other

9    employees were present?

10        A    Yes.  Peter Chan stepped forward and indicated

11    that he also had witnessed the situation.  He was in the

12    kitchen and he was getting his tray ready and pulling stuff

13    together, heard Kin Chhan making comments.  At first --

14        Q    What do you mean he stepped forward?  Did he call

15    you up and say, I want to be a witness too?

16        A    No.  No.  I was actually walking through the

17    hallway after Kin Chhan had been suspended, I had been

18    walking down the back hallway.  He was by himself and said,

19    what happened was wrong.  Those comments are offensive to

20    anybody who hears them, to the co-workers, to co-worker's

21    wives, to any female.

22        Q    Okay.  Had you stopped Mr. Chan to ask him or did

23    he stop you?"

24        A    He stopped me.

26

1       Q       Because he know you were involved in

2   investigating this?

3       A       Um-hmm [affirmative].

4       Q       Did you ask Mr. Chan whether he saw any other

5   witnesses around?

6       A       I believe he said San Chhan was in the kitchen,

7   but San Chhan didn't do anything about it.

8       Q       Okay, so you knew that Mr. Chan felt that there

9   was another person who might have observed what took place,

10  and that was Kin's brother?

11      A       Um-hmm [affirmative].

12      Q       Did you attempt to meet with Mr. San Chhan?

13      A       No.  Understandably so.  San is Kin's brother.

14  You know, it would not be objective, understandably so.

15      Q       Whether it would be objective or not, he would be

16  a first-hand witness.

17      A       He could be a first-hand witness, but it's not

18  objective, and, you know, for both of their sake, we kept

19  it with people who were not related.

20      Q       But you thought the other witnesses were

21  objective?

22      A       Um-hmm [affirmative].

23      Q       You felt that Mr. Vasquez was objective?

24      A       Um-hmm [affirmative].

27

1      Q    Even though he thought his wife was being

2    referred to?

3      A    Yes, and again, his statement ultimately didn't

4    play a role because he wasn't a first-hand witness.

5      Q    Did Mr. San Chhan ever offer that he was there?

6      A    No.  No.  He never came forward to me that day or

7    ever.

8      Q    Okay, so, you just happen to be walking down the

9    hall and Mr. Chhan offers that what happened was wrong.

10   That was still before this form was completed?

11     A    No.  No.  He had already been suspended pending

12   investigation.  He had gone home.

13     Q    Okay.  So the next thing that happened, Mr. Chan

14   offered during this hallway discussion that he had also

15   heard something.  Anything else?

16     A    No.  I had asked Peter Chan to come to my office,

17   obviously, if he was, in fact, a witness, to come to my

18   office so that we could discuss it.

19     Q    And did he?

20     A    Yes.  He confirmed that he was in the kitchen, he

21   was setting up his tray, Kin Chhan was talking.  At first,

22   he didn't focus on what Kin was saying, and then he heard

23   what he was saying to the point of I can do their wives,

24   I'm good at doing it, I can do it in front of any one, and

28

1    confirmed that he had used the F word.

2        Q    Okay, nobody offered that there was any

3    provocation, all of a sudden Chhan is just saying these

4    words?

5        A    Um-hmm [affirmative].

6        Q    Did you inquire why he would be saying that?

7    What was he upset about?

8        A    I don't know.  I can't tell you why he would say

9    things like that.

10        Q    Well, did you inquire?

11        A    Did I inquire?  No, I mean, based on the

12    statements that were given, they were clear about what

13    happened.  They were walking up the stairs towards the

14    kitchen and he heard these comments being made.

15        Q    Is that what Chhan said?  That he overheard the

16    comments when they were walking up the stairs towards the

17    kitchen?

18        A    No.  Peter Chan was in the kitchen.  Rosa Rosario

19    was behind him as they were going up the stairs through the

20    service door into the kitchen, as he was making those

21    statements.  Mustafa was in the kitchen, heard the comments

22    being made because they continued into the kitchen.  That

23    is where Peter Chan heard him also making the comments.

24        Q    Now on the counseling form, it's written here,

29

1   two banquet servers reported as they were setting up the

2   ballroom, made the following statement: "M-F, I can F***

3   their eyes.  I give good F***, I am good at F***."  This

4   statement against company policy.

5          Did you prepare this?

6      A   Yes, I did.

7      Q   Are you referring to Mr. Chhan having made this

8   statement?

9      A   Yes.

10     Q   Norman Bakshi signed this as a team leader?

11     A   He did not sign it.  I wrote it.  That's my

12  writing.  I wrote it to indicate that he was present during

13  the meeting.  Again, as shop steward and team leader on

14  behalf of a union member.

15     Q   Okay, let me show you some notes that have been

16  turned over, and we'll have this marked as Sterrett Exhibit

17  2 for identification.

18                    [Whereupon, Sterrett Exhibit No. 2 was

19                    marked for identification.]

20         MS. ARIAIL:  Jim, could we agree since there are

21  three Chhans that we're talking about, just for purposes of

22  clarity of the record, that instead of calling, saying Mr.

23  Chhan or Chhan we use Peter, Kin, and San?  Just so it's

24  clear when we read the record.

30

1          MR. KESTELL:  I'll try to distinguish them.

2          MS. ARIAIL:  Okay.

3          BY MR. KESTELL

4      Q    Now, you've seen Sterrett Exhibit 2, have you

5    not?

6      A    Yes, I have.

7      Q    Did you prepare it?

8      A    Yes, I did.

9      Q    Did you prepare it on July 19th?

10     A    Yes.

11     Q    Did you prepare it in the same sequence that you

12   actually took the statements from the employees?

13     A    Yes.

14     Q    Now, did you ask Hernan Vasquez whether he had

15   said anything to Kin Chhan?

16     A    Not during this initial meeting.

17     Q    At some subsequent meeting?

18     A    Yes.

19     Q    When?

20     A    As you can tell, when we were speaking to Kin,

21   obviously to get his side of the story, he had said, made

22   the comment that Hernan had something against him.  And so

23   I had asked Kin, what does he man by that.  And he claimed

24   that Hernan had accused him of stealing from people that

---

31

1    morning.

2        Q    He accused other people of stealing?

3        A    No, no, no.  Hernan had accused Kin of stealing

4    from our guests.  So in subsequent meetings, obviously,

5    this was the first meeting.  I had subsequently met with

6    each of these, Hernan, Rosa, and Mustafa.  Again, this time

7    alone, to confirm that my statements were correct.  And at

8    that point, I had asked Hernan whether he had had previous

9    conversations with Kin that morning.  And he had said no.

10    And I had said that Kin made the claim that you had accused

11    him of stealing from the guests.  And Hernan said that

12    wasn't true.  And Kin had said there were other people in

13    the room, but he doesn't know who was around and he

14    couldn't say who witnessed it.

15        Q    So as I understand it, Hernan describes that he's

16    coming out of the room as Kin Chhan is entering?

17        A    Yes.  Hernan is going through the service doors,

18    and there is a balcony and then about four steps that lead

19    into the lower level of the ballroom.  And so he was coming

20    out of the service doors, walking into the ballroom as Kin

21    was going up the steps, heading towards the service doors.

22    So they passed each other and Rosa was behind Kin.  And

23    then obviously, they went through the service doors and

24    that's when Mustafa and Peter Chan went into the kitchen.

32

1  Q Okay, was Rosa the only one that was behind Kin

2 Chhan?

3  A Yes.

4  Q So far as the witnesses that testified to you?

5  A Right.  Right.

6  Q Okay, so, you took, Rosa's statement next because

7 you thought that she was probably closest to this?

8  A That's just the order they gave them.  I mean,

9 Hernan spoke first, and then Rosa spoke, and then Mustafa

10 spoke.

11  Q I don't see anything in the statement that Hernan

12 gave that he thought Kin was referring to his wife.

13  A No.  If you go to the subsequent -- when I had

14 met with them a second time, again, each one alone, I had

15 asked Hernan, You know, obviously, he read my statement and

16 said is this an accurate reflection of what you told me on

17 the 19th?  He said yes, and he had made, referred he

18 thought that he added that when he first heard about the

19 comments Kin made, he thought Kin had been talking about

20 his wife.  And that's when I then said, you know, had asked

21 him about whether he had had any comments or conversations

22 with Kin earlier in the day.

23  Q Did you ask Mr. Hernan, why would you think he

24 was referring about your wife?

52

1       Q    Okay.

2       A    He might have completed his suspension by that

3    time.

4       Q    And what's your understanding of what happened?

5       A    I guess my takeaway from the situation was that

6    it was not, it was not intentional.  And, therefore, it was

7    careless and he needs to be careful because, obviously, we

8    don't want to injure our co-workers, but it was not

9    intentional, so I thought [indiscernible] and he would have

10   been leaving for the three days when or left, or whatevr

11   time he had missed at that point.

12      Q    Okay, and what kind of investigation did you do

13   in order to determine that it wasn't intentional?

14      A    Obviously, I would have spoken to the people that

15   were on this list, the people people who were involved.  So

16   Eloy Blanco, who was the executive steward in charge of

17   stewarding at that time, obviously I spoke to him,

18   obviously, spoke to Kin, and spoke to Heinz Gastner, who

19   was a banquet server and Raul.  Obviously, Raul and Silvia

20   were the ones who were filling the carafes with the coffee.

21   So they were there, and then, obviously, Eloy is overseeing

22   it, so he would have been there.  So they would have been

23   names that were given to me as people to talk to.

24      Q    Did any of the individuals that you investigated

53

1   claim that Kin had done this intentionally?

2      A    Well, obviously, Eloy.  It was felt that he was

3   working in sort of a careless way that caused one of his

4   team members to be injured or burned with the hot coffee.

5   Because he's the one who, obviously, brought it to Thomas

6   Russell.  So it must have been, he brought it to Thomas's

7   attention.  Heinz Gastner, obviously talking to him, really

8   didn't seem to witness anything.  Sounds like he got his

9   coffee and then left the area.  And then Raul and Silvia

10  were the two people who were serving the coffee.

11     Q    And you knew what Kin Chhan had to say, right?

12     A    Yes.  Obviously I had spoken to Kin.

13     Q    And Kin tells you that Raul was speaking Spanish,

14  but he heard Raul say something to Silvia.  Is Silvia

15  Spanish too?

16     A    Yes.

17     Q    He heard Raul say something to Silvia in Spanish,

18  and he recognized the word Chino.

19     A    Um-hmm [affirmative].  That's what my notes say.

20     Q    Now, did you ask Raul and Silvia whether they had

21  done that?

22     A    Well, under Raul's statement, it says, Raul

23  stated the Oriental guy, Chino, Chhan brother started to

24  take pots down from the Queen Mary.  So, and Silvia's

54

```
1       statement says, Chino was waiting for his pots.

2            Q     And they were telling you this as if Kin Chhan's

3       name was Chino?

4            A     I don't know how they were telling me, but these

5       were their statements.

6            Q     Well, you put it in quotes, did you not?

7            A     Yes, I did, meaning those were their exact words

8       that they used.

9            Q     You did not find that offensive?

10           A     Of course it is.

11           Q     Did you counsel them?

12           A     I would assume I did.  I don't know for a fact.

13           Q     There would be a counseling report if there was,

14      right?

15           A     Yes.  Raul left many years ago so, I'm sure I

16      don't have his file.

17           Q     Is Silvia still on?

18           A     I don't know.  I don't know.

19           Q     So what happens to counseling reports for

20      employees who are no longer around?

21           A     Well, it's a part of their file, and our record

22      retention guidelines are only for a certain time frame.

23           Q     Do you have a present recollection of whether you

24      prepared a counseling report?
```

55

1          A    No.  No.  I don't.

2          Q    Would you have said something in your notes if

3     you had counseled them at the time?

4          A    No, because this note is in reference -- this

5     note would have been in reference to Kin Chhan and his

6     three-day suspension.  Everything is geared towards Kin's

7     concern and the results of the three-day suspension.  It

8     has nothing to do with Raul or Silvia, outside of their

9     statement of what happened.

10         Q    Well, did you understand that Kin was suggesting

11    to you that the Hispanic servers were talking in Spanish in

12    a belittling way to him, and they were not providing him

13    coffee in the same turn that it appeared in the stand?

14         A    No.  Certainly the words were offensive and are

15    inappropriate.  I think their concern -- obviously his

16    statement was he wasn't getting the coffee he should have

17    been returned in the --

18         Q    Rotation.

19         A    And their statement is they were surrounded by

20    several servers, they all want their coffee to go out.

21    They're trying to fill them up, and in the rush of things,

22    one was taken from Silvia Flores's hand rather than waiting

23    to get placed down.

24         Q    Did you ask Raul, why did you refer to Chhan as

56

1   Chino in his presence?  Did you try to provoke him, or

2   what?

3               MS. ARIAIL:   Objection.

4               THE WITNESS:  Did I ask him that question?  I

5   have no idea whether I asked him that question.

6               BY MR. KESTELL:

7       Q    Did you ask him, were you telling Silvia not to

8   give Kin Chhan coffee in turn of rotation?

9       A    Did I ask that specific question, no?  I mean, I

10  don't take from my notes that they were deliberately not

11  giving him coffee.

12      Q    Let me ask you what you do take from your notes.

13  When they refer to, when Raul refers to Oriental guy Chino,

14  Chhan brother, did you think he was speaking about Kin

15  Chhan in a positive manner?

16      A    Do I think he was?  No.  Those are offensive

17  words.  You don't refer them by those terminology.  Whether

18  Raul thought he was being offensive, that I can't answer.

19  But they would not be appropriate.

20      Q    Did you ask Raul, why would you refer to Kin

21  Chhan in language like that?  Have you had some problems

22  with him or what's the problem here?

23      A    Did I ask why?  No.  Because my take would be,

24  you know what, they are offensive, they shouldn't be used,

57

1      period.  I don't need to know why.  They don't get used.

2          Q     Did you ever inquire with either Raul or Silvia

3      whether Mr. Chhan's allegation that they were trying to

4      purposely take him out of rotation for coffee so as to

5      deprive his customers of prompt service?

6          A     I would like to think there's a rotation.

7      Knowing it, it's just servers surrounding the coffee,

8      trying to get their coffee pots.  There's no sort of order.

9      It's very, very busy.  So, I don't think it, it isn't

10     everybody standing in a neat line waiting to get their

11     coffee.

12         Q     Did you understand that this is what Kin Chhan

13     was alleging?

14         A     Yes.

15         Q     That the two Hispanics were saying something to

16     each other in Spanish, so as to lead him to conclude that

17     they were trying to put him at the end of the line all of a

18     sudden, and put their buddies and friends ahead of him?

19         A     No.  I don't take that.

20         Q     You don't think he ever alleged that Raul and

21     Silvia were talking to each other in Spanish, referred to

22     him by Chino, and that he was being provided coffee out of

23     rotation?

24         A     He, based on the notes here, he said that Raul

58

```
 1     was talking to Silvia, it was in Spanish, we don't know

 2     what got said, that he heard the word Chino, which

 3     obviously, Raul and Silvia have said that they said.  But

 4     beyond, and obviously that's not appropriate.  Beyond that,

 5     what got said and what they meant, I don't know.

 6          Q    Now you actually quoted the term Chino when you

 7     were talking about these two Hispanics.  Did you talk to

 8     any other Hispanics who referred to Kin Chhan or his

 9     brother as Chino?

10          A    These were the people, obviously, I was given to

11     talk to in particular to this incident.  So, these are the

12     people I spoke with.

13          Q    Have you ever heard anyone else refer to Kin

14     Chhan or San Chhan as Chino?

15          A    Not to my recollection, no.

16          MR. KESTELL:  I'm going to mark as Sterrett

17     Exhibit 9 a memo that you prepared on April 16th, 1999,

18     regarding this same incident for identification.

19                         [Whereupon, Sterrett Exhibit No. 9 was

20                         marked for identification.]

21          BY MR. KESTELL:

22          Q    Ms. Sterrett, did you prepare this memo?

23          A    Yes, I did.

24          Q    And that's your signature adjacent to your name?
```

59

1          A    Yes, it is.

2          Q    And this memo purports to reduce the suspension

3     to a written warning?

4          A    That is correct.

5          Q    And Thomas, is that the beverage manager Thomas

6     Russell?

7          A    No.  Thomas Russell was the director of food and

8     beverage.

9          Q    Okay.  But he's the one you're referring to here,

10    Thomas and I --

11         A    Yes.

12         Q    -- agreed that we would reduce.  And do you

13    recall what Ms. Boatwright's arguments were to you in

14    behalf of Kin Chhan?

15         A    No.

16         Q    Was any kind of notice given to Kin Chhan that

17    his suspension had been reduced?

18         A    Oh, yes.  We would have followed up, and,

19    obviously, I noted it on his form for his record that it

20    had been changed to a written warning, and he would have

21    been reimbursed.  Obviously, this is directing

22    reimbursement for the functions he missed.

23         Q    Is there any correspondence, a note by saying

24    that after discussing it with the union, we concluded that

ATTACHMENT 5



# Team Member Counseling Form

**Hilton**

KIN CHHAN
_____
Team Member Name

Department/Position:   BANQUET WAITER        Date of Incident:    OCT 03 - 05

| INCIDENT | Prior Counseling ACTION TAKEN | DATE |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## Nature of Incident

The above mentioned team member has displayed the following misconduct and has been warned that this misconduct will be entered in his/her Personnel File:

[X] Leave Work without Permission
[ ] Violation of Hotel Policies & Procedures/Department Rules/Safety Rules
[ ] Refusal to Carry Out Supervisor's Instructions
[ ] Irregular Attendance
    (Specify number of absences within past 18 months_____)
[ ] Frequent Tardiness
[ ] Poor Service

[ ] Performance Below Standards
[ ] Discourtesy Towards a Guest
[X] Discourtesy Towards a Fellow Team Member
    (Mention other team member below)
[ ] Attitude
[ ] Other _____

Explanation (Be Specific. Include dates, what policy was not followed, and state exactly where, when, what, etc.):
DURING A MEETING IN THE BANQUET OFFICE BETWEEN KEVIN O'SHEA, KIN CHHAN , SAN CHHAN, S.REGO AND N. BAKHSHI
KIN CHHAN GOT VERY UPSET AND STARTING TO RAISE HIS VOICE AT S.REGO , N.BAKHSHI AND MYSELF - KIN CHHAN THEN
WALK OUT OF THE OFFICE - I ASKED HIM TO FINISH THE MEETING AND HE REFUSED
KIN CHHAN WAS THEN SENT HOME FOR THE DAY

## Action Taken

[ ] Verbal   [ ] Written   [X] Suspension (check all that apply):   [ ] 1 Day   [ ] 3 Day   [ ] 5 Day
Supension 0 OCT 03-05               Return to Wor OCT 05-05                          [ ] Pending Investigation
Plan for future to avoid similar problem:

Any further violations of hotel policies and procedures will lead to further disciplinary action, up to and including termination.

This matter was discussed with the above team member on (date):___ OCT 03 -20005

## Team Member Comments

_____

### Signatures

Team Member:        _Refused to Signed_                    Date: _____
Supervisor:         _Kevin o S_                            Date: _Oct 03.05_
Witness (if applicable):                                   Date: _____
Human Resources:                                           Date: _____

HHC-0130

# Team Member Counseling Form

**Hilton**

SAN CHHAN
_____
Team Member Name

Department/Position:    BANQUET WAITER                Date of Incident:        OCT 03 - 05

## Prior Counseling

INCIDENT                          ACTION TAKEN                     DATE

_____          _____          _____
_____          _____          _____

## Nature of Incident

The above mentioned team member has displayed the following misconduct and has been warned that this misconduct
will be entered in his/her Personnel File.

[ X ] Leave Work without Permission                              [ ] Performance Below Standards
[ ] Violation of Hotel Polices & Procedures/Department Rules/Safety Rules    [ ] Discourtesy Towards a Guest
[ ] Refusal to Carry Out Supervisor's Instructions              [ X ] Discourtesy Towards a Fellow Team Member
[ ] Irregular Attendance                                            (Mention other team member below)
   (Specify number of absences within past 18 months_____)    [ ] Attitude
[ ] Frequent Tardiness                                          [ ] Other_____
[ ] Poor Service                                                _____

Explanation (Be Specific.  Include dates, what policy was not followed, and state exactly where, when, what, etc.):

DURING A MEETING IN THE BANQUET OFFICE BETWEEN KEVIN O'SHEA, KIN CHHAN , SAN CHHAN, S.REGO AND  N. BAKHSHI
SAN CHHAN GOT VERY UPSET AND STARTING TO RAISE HIS VOICE AT S.REGO , N.BAKHSHI AND MYSELF - SAN CHHAN THEN
WALK OUT OF THE OFFICE - I ASKED HIM TO FINISH THE MEETING AND HE REFUSED -
SAN CHHAN WAS THEN SENT HOME FOR THE DAY
_____
_____

## Action Taken

[ ] Verbal    [ ] Written    [ X ] Suspension (check all that apply):    [ ] 1 Day    [ ] 3 Day    [ ] 5 Day
   Supension Da OCT 03-05              Return to Wo OCT 05-05            [ ] Pending Investigation
Plan for future to avoid similar problem:
_____
_____

**Any further violations of hotel policies and procedures will lead to further disciplinary action, up to and
including termination.**

This matter was discussed with the above team member on (date):___ OCT 06-20005

## Team Member Comments

_____

## Signatures

Team Member:    _Refusd to Sign._                    Date:
Supervisor:     _review_                              Date: _Oct 06 - 05_
Witness (if applicable): _____              Date:_____
Human Resources: _____              Date:_____

ATTACHMENT 6

# Team Member Counseling Form

**Hilton**

SAN CHHAN
Team Member Name

Department/Position: _____    Date of Incident: _____

## Prior Counseling

| INCIDENT | ACTION TAKEN | DATE |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## Nature of Incident

The above mentioned team member has displayed the following misconduct and has been warned that this misconduct will be entered in his/her Personnel File.

[ ] Leave Work without Permission

[ ] Violation of Hotel Polices & Procedures/Department Rules/Safety Rules

[ ] Refusal to Carry Out Supervisor's Instructions

[ ] Irregular Attendance

    (Specify number of absences within past 18 months_____)

[ ] Frequent Tardiness

[ ] Poor Service

[ ] Performance Below Standards

[ ] Discourtesy Towards a Guest

[X ] Discourtesy Towards a Fellow Team Member

    (Mention other team member below)

[ ] Attitude

[ ] Other_____

Explanation (Be Specific. Include dates, what policy was not followed, and state exactly where, when, what, etc.):
DURING THE SET-UP FOR THE LUNCHEON IN THE BALLROOM ,SAN CHHAN WAS HEARD CALLING A GROUP OF STEADY WAITER A BUNCH OF DOGS , BY A GROUP OF WAITER (LIST OF NAMES ATTACHED) AND CAPTAIN GREG HINDS .

## Action Taken

[ ] Verbal    [X ] Written  [ ] Suspension (check all that apply):    [ ] 1 Day    [ ] 3 Day    [ ] 5 Day

    Supension Date:_____    Return to Work Date:_____    [ ] Pending Investigation

Plan for future to avoid similar problem:
SAN CHHAN NEED TO SHOW MORE REPECT TO HIS FELLOW TEAM MEMBERS

**Any further violations of hotel policies and procedures will lead to further disciplinary action, up to and including termination.**

This matter was discussed with the above team member on (date):___ _____ OCT 06 - 2005

## Team Member Comments

## Signatures

| | | |
|---|---|---|
| Team Member: | _Re Fused to Sign_ | Date: _____ |
| Supervisor: | _(signature)_ | Date: _Oct 06 -05_ |
| Witness (if applicable): | _____ | Date: _____ |
| Human Resources: | _____ | Date: _____ |

ATTACHMENT 7

U

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____

KIN S. CHHAN,

          Plaintiff,

     v.                        Civ. No.: 1:07cv01180
                                    (HHK)

HILTON HOTELS CORPORATION,

          Defendant.

_____

Thursday, January 10, 2008

Deposition of
LOLO VILLAGOMEZ

a witness, called for examination by counsel for
Plaintiff, pursuant to notice and agreement of counsel,
beginning at 11:10 a.m. in the offices of Kestell &
Associates, 1012 14th Street, N.W., Suite 630, Washington,
D.C., 20005, before Jerry McKenzie of Court Reporting
Services, Inc., when were present on behalf of the
respective parties:

703-548-3334                 Court Reporting Services, Inc.            1-800-848-4007
                           201 North Fairfax Street, Suite 21
                            Alexandria, Virginia 22314

14

1    reported the incident?

2        A    I don't know.

3        Q    And you told Mr. Atkins that so far as you were

4    concerned, it was --

5        A    It was my [indiscernible] but I thought the

6    problem was over, it was all right, yeah.

7        Q    Basically, were you telling Mr. Atkins that

8    sometimes people argue and so long as they get their work

9    done, the problem's resolved?

10            MS. ARIAIL:   Objection.

11            I'm sorry, you can answer after I object.

12            THE WITNESS:   If it's over, it's over.

13            BY MR. KESTELL:

14        Q    My point is that you took care of it by telling

15    him that, you know, don't be doing that, Mr. Chhan, you're

16    going to lose your job if you do that, and then he

17    followed your instructions and he took care of the duties?

18        A    Yeah he did [indiscernible].

19        Q    He did perform the duties, right?

20        A    Yeah, he did.

21        Q    And that's what you meant that it was over?

22        A    Exactly.

23        Q    You quieted things down and there was no further

24    problem so far as you could tell?

15

1     A     Exactly.

2     Q     All right.  Have you had other employees who've

3     got into arguments like that?

4     A     No.

5     Q     That was the only time it's ever happened to

6     you?

7     A     Yes, like [indiscernible] fighting, no.

8     Q     You've never had any incident?

9     A     No.

10    Q     Have you had people and you'd have to intervene

11    and say, calm down, get your work done?

12    A     Exactly, yes, [indiscernible].

13    Q     And that's happened before?

14    A     Yes, many times.

15    Q     Many times.  Now, you say you actually talked to

16    San Chhan at some point, right?

17    A     No, only once him, when they [indiscernible]

18    fight with him [indiscernible], what do you mean

19    [indiscernible].

20    Q     Well, if I understood your testimony, at some

21    point you actually went and talked to San Chhan?

22    A     Oh, yeah.

23    Q     Why were you --

24    A     I told [indiscernible] go to each other,

ATTACHMENT 8a

My name is San Chhan and this is a written statement of me witnessing an event that occurred between Kin Chhan and a few other employees.

On Wednesday, July 19, 2006, I was working in the IBR center at 9 AM for brunch. After I found my station number, my partner, Mr. Kin Chhan, and I approached our station located on the east side of the IBR center. At that time, we were working on 3 tables, and Kin Chhan went to the kitchen to pick up some things. Once we finished setting up the tables, we proceeded to leave the ballroom. Kin Chhan left first and I followed him about 7 meters from behind. By that time, Mr. Mustafa Aboulhouda also came from the west side of the ballroom to go to the kitchen. He was about 4 meters in front of me. When Kin Chhan reached the stairs of the balcony, I saw Mr. Hernan Vasquez opening the door from the kitchen side to walk towards the ballroom.

When he was approaching Kin Chhan, I heard Hernan say some derogatory words that were directed towards Kin Chhan specifically. Kin Chhan continued walking to the kitchen. I heard Mustafa say, "Take [it] easy boy. They [took] you to personal office last time."

Kin Chhan arrived in the kitchen dropping off his things right around the front of the steward's office. I heard him saying, "Why [did] this man called me MARIKON (gay)? I can make love to the girl. If you all don't believe me, I can make love [to] let you all see. I'm not gay."

After saying this, Kin Chhan turned towards Mustafa and said,"I have talked to Hernan's wife before. I thought he was jealous."

When I saw this situation, I approached Kin Chhan and told him to go drink some water since he was upset and to come back later. After a while, Kin Chhan came back to help me pour orange juice into glasses. I asked him where he first met Hernan's wife. He said he met Hernan's wife in the hotel during the children's Christmas Party.

This is what I witnessed; I hope this information helps give another perspective to the situation.

Sincerely,

ATTACHMENT 8b

My name is San Chhan and this is a written statement of me witnessing an event that occurred between Kin Chhan and a few other employees.

On Wednesday, July 19, 2006, I was working in the IBR center at 9 AM for brunch. After I found my station number, my partner, Mr. Kin Chhan, and I approached our station located on the east side of the IBR center. At that time, we were working on 3 tables, and Kin Chhan went to the kitchen to pick up some things. Once we finished setting up the tables, we proceeded to leave the ballroom. Kin Chhan left first and I followed him about 7 meters from behind. By that time, Mr. Mustafa Aboulhouda also came from the west side of the ballroom to go to the kitchen. He was about 4 meters in front of me. When Kin Chhan reached the stairs of the balcony, I saw Mr. Hernan Vasquez opening the door from the kitchen side to walk towards the ballroom.

When he was approaching Kin Chhan, I heard Hernan say, "I hate that mother fucker," which was directed to Kin Chhan. Kin Chhan continued walking to the kitchen. I heard Mustafa say, "Take [it] easy boy. They [took] you to personal office last time."

Kin Chhan arrived in the kitchen dropping off his things right around the front of the steward's office. I heard him saying, "Why [did] this man called me MARIKON (gay)? I can make love to the girl. If you all don't believe me, I can make love [to] let you all see. I'm not gay."

After saying this, Kin Chhan turned towards Mustafa and said,"I have talked to Hernan's wife before. I thought he was jealous."

When I saw this situation, I approached Kin Chhan and told him to go drink some water since he was upset and to come back later. After a while, Kin Chhan came back to help me pour orange juice into glasses. I asked him where he first met Hernan's wife. He said he met Hernan's wife in the hotel during the children's Christmas Party.

This is what I witnessed; I hope this information helps give another perspective to the situation.

Sincerely,

ATTACHMENT 9

Dear Mr. Norman Bakhshi:

I witnessed some recent incidents that I need to bring to you attention

On Sunday February 10, 2008, between 3:30 and 4:00 pm, I witnessed Mustafa Aboulhouda slap the face of a coworker repeatedly in exhibit hall. The coworker was Mr. December.  There were other individuals in the area who witnessed this incident also.  I later learned Mustafa was mad at December for calling him a name.

On Saturday, February 23, 2008, around 9:55 am, I was passing the banquet office to go to the men's locker room.  I saw Hernan Vasquez kissing Segovia  what appeared to be on the lips.  I believe that it was recorded by the security camera.  My impression was that Mrs. Segovia, who is married, did not appreciate being kissed in this manner and was very uncomfortable afterwards.  I saw Mr. Vasquez grab her cheek and squeeze it later on the same day in the kitchen. There were other witnesses to this.

Around 1:30 to 2:00 pm the same day, when I was going to the banquet office to drop off our tickets for the day, I followed Mr. Hernan Vasquez and Khong Boutsady to the banquet office.
Mr. Vasquez dropped off his ticket first, turned around, and saw that I was behind him and called "chino pendejo".  I thought it was a slur against me, but did not know until I questioned other Hispanic coworkers about what it meant.  I am told that it means, prick, asshole or somebody worthless.  I had done nothing to provoke this outburst against me and it makes me angry to be referred to in this manner.

On February 26, 2008, around 6:15 am while we were just beginning to work a breakfast in the exhibit hall, and there were a bunch of people around, I heard Mr. Vasquez call "Chinese bitch".  I don't know who he was referring to, but I assume that he was trying to make slurs against me again to provoke an incident, similar to what happened to my brother Kin Chhan.  Mr. Vasquez makes these comments to intimidate me, I believe.

This type of behavior is very offensive to me.  Considering how he made some similar comments to my brother, I believe Mr. Vasquez is trying to get me to react to his provocations also.

I assume you will deal with these complaints in the same manner that you dealt with the complaints against my brother Kin Chhan.

_____              3, 3, 2008.
Feung San Chhan                               Date

ATTACHMENT 10

Hilton Washington Hotel
Human Resources

Dear Mr. Hill:

I witnessed some recent incidents that I need to bring to you attention

On Sunday February 10, 2008, between 3:30 and 4:00 pm, I witnessed Mustafa Aboulhouda slap the face of a coworker repeatedly in exhibit hall. The coworker was Mr. December. There were other individuals in the area who witnessed this incident also.   I later learned Mustafa was mad at December for calling him a name.

On Saturday, February 23, 2008, around 9:55 am, I was passing the banquet office to go to the men's locker room.  I saw Hernan Vasquez kissing Segovia  what appeared to be on the lips.  I believe that it was recorded by the security camera.  My impression was that Mrs. Segovia, who is married, did not appreciate being kissed in this manner and was very uncomfortable afterwards. I saw Mr. Vasquez grab her cheek and squeeze it later on the same day in the kitchen. There were other witnesses to this.

Around 1:30 to 2:00 pm the same day, when I was going to the banquet office to drop off our tickets for the day, I followed Mr. Hernan Vasquez and Khong Boutsady to the banquet office. Mr. Vasquez dropped off his ticket first, turned around, and saw that Khong and I was behind him and called "chino pendejo".  I thought it was a slur against me, but did not know until I questioned other Hispanic coworkers about what it meant.   I am told that it means, prick, asshole or somebody worthless.   I had done nothing to provoke this outburst against me and it makes me angry to be referred to in this manner.

On February 26, 2008, around 6:15 am while we were just beginning to work a breakfast in the exhibit hall, and there were a bunch of people around, I heard Mr. Vasquez call "Chinese bitch".   I don't know who he was referring to, but I assume that he was trying to make slurs against me again to provoke an incident, similar to what happened to Kin Chhan. Mr. Vasquez makes these comments to intimidate me, I believe.

        This type of behavior is very offensive to me.  Considering how he made some similar comments to my brother, I believe Mr. Vasquez is trying to get me to react to his provocations also.

        I assume you will deal with these complaints in the same manner that you dealt with the complaints against Kin Chhan.

_____
Feung San Chhan

3, 6, 2008
3, 5, 2008
_____
Date

ATTACHMENT 11

3/18/2008

Mr. Hill,

  I was talking to Mr. Jim Hunt last week and he told me that he spoke to December about the incident that occurred on February 10, 2008.   He told me that he spoke to December about the incident and that he confirmed that Mustafa had slapped in that day out of anger and that he was still upset about being humiliated in that way.

FEUNG SAN CHHAN

PLAINTIFF'S EXHIBIT 3

# DECLARATION OF JAMES HUNT

1. My name is James Hunt and I am 69 years old and understand the oath that I am taking to tell the truth under penalty of perjury.

2. I have worked at the Washington Hilton since 1969 in various position. I have been working in the Banquet Department for about 27 years. I know both Kin and San Chan for about 20 years, mainly because we work together in the Banquet Department.

3. I have been asked if I observed anything during the morning of July 19, 2006, which I understand is the day that an incident occurred which led to Kin Chhan's firing.  I was scheduled off that day.

4. I have been asked if I observed the way other employees treated Kin Chhan in the workplace.  I notice that many of the employees do not like the Chhan brothers and say things that are negative about them.  This is particularly true of Kin Chhan because it is obvious that he a little slower than other employees and he is easy to pick on.  I have frequently overheard employees refer to the Chhan brothers as " Chino", particularly in the locker room usually when they are talking to each other.  I recall having to ask on occasion which of the brothers was being referred to, and usually the reference was meant for Kin Chhan.  Over the years I have heard employees complain about how cheap the brothers are, how much money they must have, how much Kin Chhan eats, how they are so cheap they even insist on showering at the Hilton before going home, how neither one has a woman companion, and on and on.

5. I believe that one of the worst taunters is Hernan Vasquez, who is a Hispanic banquet waiter who has worked in the Department many years.  I have heard him say that Kin Chann never has a woman, never brings a woman to the Christmas party all these years, how cheap he is.  I also heard him taunt the brother San Chan in the locker room because he takes a shower there after work.  He would call him cheap and refer to the fact that he never has a woman.  Sometimes he would say that the Chhan brothers are cheap, but don't have any more money than he has.
Sometimes he would say it in English and sometimes he would taunt in Spanish.  I understand the Spanish language so I could understand what he was saying, even though others might not.

1

6. I believe that Hernan Vasquez would taunt both brothers mercilessly. For some reason he did not like them and held some animosity against them. Yet, Mr. Vasquez is considered a "Golden Boy" because he is favored by management. If any of the golden boys complained about another employee, management would seem to favor what they said because they were liked and would get choice work assignments because of the cliques that exist there.

7. Many of the employees did not like the Chhan brothers because they would keep to themselves and not socialize a lot. They would drive together, eat together, help each other at work and seem to socialize only with each other. Other employees would dislike the fact that they would distance themselves in this way.

8. I have been told that Kin Chann was fired for expressing curse words in the kitchen area on July 19, 2006. However, I witness employees calling each other faggot, marikon, using the fuck word to each other on many occasions. Frequently it is done in jest, but sometime it is meant to taunt. I have seen employees grab ass each other while calling each other these names, and nobody is disciplined for the use of such language, even when it is done in the presence of females. I don't understand why Mr. Kin Chhan was taken to personnel for such an allegation because it seems like a commonplace event to me. I certainly don't understand why he would be fired for such a minor allegation, unless he would have assaulted somebody.

9. Recently, I believe it was on February 12 or 13, I was working with Girard December, who is a black employee from Haiti. As we were working together, another coworker, Mustafa Aboulhouda, was walking by where Mr. December and I were working, after he passed by, Mr. December told me that he was talking to Mustafa any longer. I asked him why. He told me that Mustafa had slapped him on the face a couple days earlier while at work. I asked him why Mustafa did that. Mr. December said he had called him a name in a teasing way and Mustafa was upset and told him never to call him that again.

When I later was talking to San Chhan, he mentioned that he had seen Mustafa slap December on the face more than once only a couple days earlier, when I was not scheduled to work. I told him about the conversation that I had with Mr. December. Mr. Chhan told me that Mr. December had given him the same explanation and that he was very upset about getting slapped in such a humiliating fashion.

10. To my knowledge, Mustafa was not disciplined for this incident with Mr. December. I bring it up here as just another of the many incidents that occur in the work place just about every week and management does not take any action. Why they fired Kin Chhan is beyond my understanding.

**I swear the foregoing is true and correct under penalty of perjury.**

*[signature]* 3 - 25-08

*[signature] James Hunt*

2

PLAINTIFF'S EXHIBIT 4

## DECLARATION OF PENG LOONG YOW

1. My name Peng Loong Yow and I am over the age of 18 years old and understand the oath that I am telling the truth under penalty of perjury.

2. I started working at the Washington Hilton in 1972. I continued as banquet server until 1998, when I retired.

3. I knew the Chhan brothers--Kin and San-- because they also worked as banquet servers around 1995. I also knew Mr. Mustafa Aboulhouda, who worked as banquet server during the period just before I retired. I recall two incidents where Mr. Mustafa took some physical action against.me. On one occasion, I called him "Moose" because his first name is Mustafa. He appeared to be annoyed with that and grabbed me by the ankles and held me upside down,. I did not report this incident to management, nor did I ever call Mustafa "moose" again. The second incident did offend me enough that I recall reporting it to management, Mr. Jorge Pulles, the head of the banquet department. I don't know if Mustafa was disciplined for this incident and I don't recall the specifics of what happened anymore.

4. I frequently heard employees refer to the Chhan brothers as "Chino" when talking about them at work. I believe they referred to me in the same way. Many of the employees did not like Kin Chhan, for reasons that I really do not know, and would call him cheap, marikon, does not have a woman, things like that. I know Hernan Vasquez and I heard him make negative comments about him, usually behind his back, but I cannot remember specifically what comments he made because it has been too long.

5. The use of foul language in the workplace was commonplace. I have heard employees use the word "fuck" on many occasions ", usually in the context of "fuck you". Many times it is said in a joking manner.

6. I have difficulty reading the English language and I had Mr. San Chhan read this document to me and interpret it for me in Chinese.

I have carefully read the above and swear it to be true under penalty of perjury.

_Pong L. Yow_ _November_ , 2007

PLAINTIFF'S EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-----------------------------------------

KIN S. CHHAN,

              Plaintiff,

      v.                       Civ. No.: 1:07cv01180
                                 (HHK)

HILTON HOTELS CORPORATION,

              Defendant.

-----------------------------------------

Thursday, January 10, 2008

Deposition of
PETER CHAN

a witness, called for examination by counsel for
Plaintiff, pursuant to notice and agreement of counsel,
beginning at 10:15 a.m. in the offices of Kestell &
Associates, 1012 14th Street, N.W., Suite 630, Washington,
D.C., 20005, before Jerry McKenzie of Court Reporting
Services, Inc., when were present on behalf of the
respective parties:

20

1      Q      Right.   How would you describe Mr. Hernan

2  Vasquez in relationship with Mr. Chhan?

3      A      Well, if somebody's favorite to each other or

4  somebody do not like each other but as for me, I go to

5  work and make a living.   I doesn't pay attention to other

6  people for what their relation are about.

7      Q      Well, did you ever hear Mr. Vasquez make some

8  derogatory comments about Kin Chhan?

9      A      Well, mostly co-workers, they make jokes to each

10  other.   It depends how serious you want to take.

11     Q      Okay, well, I mean, what kind of remarks did you

12  hear Mr. Vasquez ever make?

13     A      Sometimes they call him Chino or, they took into

14  each other, some people call me Chino too.   So I don't pay

15  attention serious on this kind of what you think is bad

16  language or something.   I ask the Spanish co-worker what

17  they mean by Chino, small eye, I said, nothing serious,

18  you know.   Because they call a Chino, what, Asia people

19  they call Chino, I not pay attention on those kind of, you

20  know, everybody talking each other.

21     Q      Did you ever hear Mr. Vasquez refer to Kin Chhan

22  as maricone?

23     A      I do not pay too much attention, like I said, to

24  each other.   So what you mean by Hernan called him

21

1    maricone or something?

2        Q    Well, do you know what maricone means, referring

3    to someone as gay?

4        A    I do not pay attention to what other people call

5    each other.

6        Q    So you did not hear Hernan refer to Kin Chhan as

7    a maricone or gay or not having a woman?

8        A    Well, I, what sometimes I heard Mr. Chhan talk

9    about how much girlfriend he have.  For me, he doesn't

10   look like a gay or something.  But like I said, everybody

11   took into each other, somebody call me maricone or

12   something, I did not pay attention on that.  Because

13   that's personal life.  And --

14       Q    My question is very direct, Mr. Chan, and you

15   can answer it yes or no.  Did you or did you not hear

16   Hernan Vasquez refer to Kin Chhan as a maricone, gay,

17   somebody who doesn't have a woman?

18       A    They sometimes they joke around.

19       Q    Okay, Hernan?

20       A    Sometimes they joke around on the, and each

21   other, like I said, depends how you take serious about.

22   Gay don't mean anything about [indiscernible] you know,

23   just don't mention or this free country.

24       Q    Okay, and that's your attitude, that when people

---

PLAINTIFF'S EXHIBIT 6

# Copy of Transcript

## SUPERIOR COURT FOR THE DISTRICT COLUMBIA

KIN S. CHHAN
            Plaintiff,

        v.                                    Civil Action No.
                                              1:07CV01180

HILTON HOTELS CORPORATION, et al.
            Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### DEPOSITION OF

### FEUNG SAN CHHAN

October 31, 2007
10:22 a.m.

Jackson Lewis
8614 Westwood Center Drive
Suite 950
Vienna, Virginia

Karen Geddes, CSR



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**set depo** ℠
**Streamlined · Centralized · Standardized**
*The Evolution of Deposition Management*

40

1  because I walk behind Kin Chhan. I think

2  Kin Chhan also saw him too. So he come

3  from the back side of the ballroom, all

4  right, which is to our side. So I saw him

5  coming close by and like that (indicating),

6  you know, and I slow down and Mr. Mustafa

7  join the line.

8  Q.    In between you and Kin?

9  A.    Kin Chhan, right. So when Kin

10  Chhan reach the stair of the balcony and

11  the kitchen side door open from the

12  ballroom, and Mr. Hernan Vasquez carry a

13  tray.

14  Q.    Out of the kitchen?

15  A.    Out of the kitchen, walk towards

16  his table station, okay. As soon as he

17  approach Kin Chhan, he passing Kin Chhan,

18  and I hear him say, "I hate this

19  motherfucker," which he look at Mr. Kin

20  Chhan.

21  Q.    I'll stop you. You heard him

22  say, "I hate this motherfucker"?

23  A.    Uh-huh.

24  Q.    And he looked at Kin?

25  A.    Yeah. Uh-huh. So at that time,

**setdepo**SM

**sd**

**Streamlined · Centralized · Standardized**
*The Evolution of Deposition Management*

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

41

1  I say -- I feel this man harass him again,

2  I tell myself.   I'm not saying it.   I

3  think it in my mind.

4       Q.     When you heard Hernan say this,

5  were you still about 10 to 15 feet behind

6  Kin at that point?

7       A.     I are close by, because when Kin

8  Chhan try to go up the stair and he see

9  people coming, maybe he might slow down.

10      Q.     So you were closer than that?

11      A.     I are closer and Mustafa in the

12  middle of that.

13      Q.     Okay.   So how close was Mustafa

14  to Kin when Hernan made that comment?

15      A.     I would say about between one to

16  one and one-half meter, very close, like

17  between you and me (indicating), about this

18  distance.

19      Q.     Two to three feet?

20      A.     Yeah.

21      Q.     And then how far behind Mustafa

22  were you?

23      A.     Just the same distance.

24      Q.     Another two to three feet?

25      A.     Yeah.



42

1    Q.    So you were four to six feet

2  away from Kin when Hernan made this comment

3  to him?

4    A.    Uh-huh.

5    Q.    And you saw Hernan looking at Kin

6  as he said this?

7    A.    Yeah.   Yes.   And Kin Chhan, Kin

8  walk towards ballroom and Kin Chhan pushed

9  the door.   There's two doors from the

10  kitchen side to the ballroom area, so Kin

11  Chhan pushed the first door, all right, and

12  I saw Mustafa making a remark saying to Kin

13  Chhan, "Take it easy, boy."

14    Q.    You heard Mustafa say that to

15  him?

16    A.    Yeah.   Uh-huh.   "Take it easy,

17  boy." So Kin Chhan just pushed the door,

18  keep walking and pushed the second door,

19  keep walking and I follow him, Mustafa make

20  that remark in the same time, "Take it

21  easy, boy." "Take it easy, boy."   When

22  Mustafa get into the kitchen, Mustafa say,

23  "Take it easy." "Last time they take you to

24  personnel."   I think he give warning to Kin

25  Chhan.



**setdepo**℠
sd
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

43

```
1    Q.    You think or you know?

2    A.    I know.  Also I think.

3    Q.    You know what he said and you

4  think it was a warning; is that right?

5    A.    Yeah.  Yeah.  Uh-huh.

6    Q.    Okay.

7    A.    So Mustafa say that to him and

8  Kin Chhan drop off something like that and

9  he say, "Fuck it."

10   Q.    How far away were you from

11 Kin --

12   A.   . Very close.  Very close.

13   Q.    Let me finish.  When you heard

14 Kin say "Fuck it," how many feet away were

15 you? How many meters away were you?

16   A.    Just about like the same

17 distance, like one and a half.

18   Q.    Okay.  So two to four feet?

19   A.    Yeah, two to four feet.  He say,

20 "Fuck it."  "Why this guy call me a

21 motherfucker and why he call me a maricon

22 and why he call me a thief, I'm not a

23 maricon?" "I like woman, I'm not gay,"

24 things like that.  All right.  And I feel

25 bad, because somebody --
```



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

**setdepo** SM
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

44

1    Q.    Did he say, "I can make love to

2    a woman"?

3    A.    Yeah, he say, "I like woman, I

4    can make love woman."

5    Q.    Did he say, "I can make love for

6    all of them to see"?

7    A.    I think yes.

8    Q.    You think he said that too?

9    A.    Yeah.  He say, "You don't believe

10   me, I can make love."  "You say I'm gay,"

11   things like that.  So that was a short

12   time, like a lightning.

13        So right away I approach him and

14   I say, "Kin Chhan, stop."  "I know these

15   people harassing you, okay, so there's no

16   sense to make this remark and I know you

17   feel bad, stop right there," and he stop

18   and listen to me.

19   Q.    Did you think that Kin's remarks

20   were inappropriate?

21   A.    I think at some points it

22   inappropriate, but in that -- okay.

23   Q.    We will get to that.  But you

24   told him not to make those comments because

25   you thought it was probably inappropriate



**sd setdepo**℠
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

PLAINTIFF'S EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

       Plaintiff,

   v.                          Civ. No.: 1:07cv01180 (HHK)

HILTON HOTELS CORPORATION,

       Defendant.

---

Friday, October 12, 2007

Deposition of
HERNAN VASQUEZ

a witness, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at 1:35 p.m. in the offices of Kestell & Associates, 1012 14 th Street, N.W., Suite 630, Washington, D.C., 20005, before Jerry McKenzie of Court Reporting Services, Inc., when were present on behalf of the respective parties:

2

```
 1    well?

 2         A     Well, since he was in the banquet department.    I

 3    didn't know him when he worked in the restaurant upstairs.

 4         Q     Approximately how long have you known him?

 5         A     Four, five years.

 6         Q     Four or five years?

 7         A     Yes, that I recall.

 8         Q     Okay.  How would you describe your relationship

 9    with Mr. Chhan?

10         A     We don't have no relationship.

11         Q     You're a co-worker, aren't you?

12         A     Yes, we're co-workers, but only co-workers.

13         Q     Okay, well did you like him?

14         A     Oh, yes.  I do like him.

15         Q     Yes, you liked him.

16         A     Only at work, when we're talking at work.  But

17    outside the Hilton, we don't have no relationship at all.

18         Q     And what happened on the 19th, as best as you

19    recall?

20         A     That was the morning, you are talking about the

21    breakfast --

22         Q     Yes.

23         A     -- in the morning?

24         Q     Yes.  The incident that led to his termination.
```

3

```
 1          A    Okay.  That day I was working breakfast at the
 2     ballroom center.  And I was working back and forth, inside,
 3     outside the room.  And I went to this, I don't remember if
 4     it was a server or buffet or sit-down breakfast, I don't
 5     remember that.  One of this trips when I go into the
 6     ballroom, he come out from the ballroom and we meet in the
 7     door.  He said something to me, I don't pay attention, and
 8     then I just keep going.  But there was two waiters behind
 9     him, I think it was Rosa Rosario and Mustafa was behind
10     him.  And they called me in the kitchen and say, you know
11     about this, Mustafa and Rosa, you know this guy say
12     something about you?  I don't know.  I say I hear
13     something, but I don't understood what he say to me.
14          And they say, you know what he say to you?  No.
15     He say you are something, some mean name.  I don't know.  I
16     don't remember.  And then he say he want to fuck your wife.
17     I say what?  He want to fuck my wife?  I said, why he going
18     to screw my wife?  I say he, she going to like it.  I say
19     what?  You know, at that moment, I didn't realize what he
20     say to me.  I say, let it go.  Let the guy do whatever he
21     wants to say, let him go.  And I come back to the ballroom
22     and do my job.
23          And later, Mustafa call me and say we are going
24     to take this right to personnel.  I say, you want to take
```

4

```
 1    to personnel, then do it.  I didn't take it to personnel.

 2    They did.  And they called me into personnel and say, Mr.

 3    Vasquez, the same question you are asking me right how.  I

 4    explain to him what happened that morning, and that's what

 5    happened that morning.

 6         Q    Okay.  So the best of your recollection that

 7    morning was, you heard --

 8         A    He say something to me, but I didn't understand

 9    what he say to me.  But he was continuing to say something

10    to the way he go into the kitchen, and that two persons

11    behind him, they heard what he say.  And they come to me

12    and they say, you know what he say about you?  I don't know

13    what he say about me.  He say something about your wife.

14    I'm going to fuck your wife, and I say what?

15         Q    So, it was Mustafa and Rosario who came to you --

16         A    Who come to me, right.  Rosario first.

17         Q    Oh, Rosario came to you first?

18         A    Rosario and Mustafa.  I can't recall which one

19    was coming first to me.  But both told me later what he

20    said to me.

21         Q    Now, were you leaving what is called the Queen

22    Mary area?

23         A    When?

24         Q    When you first saw, heard, when Kin Chhan --
```

5

1        A    No, I was coming to the ballroom from the kitchen

2    side.  He come out to the ballroom to the kitchen side.

3        Q    He's going into the kitchen at the Queen Mary?

4        A    At the Queen Mary, right.

5        Q    And you're exiting?

6        A    You got -- I had something in my hand to serve

7    guests inside the room, and coming into the ballroom.

8        Q    You're going into the ballroom.  So you're

9    exiting the kitchen.

10        A    That's right.

11        Q    He's going into the kitchen?

12        A    He's going into the kitchen.

13        Q    And Rosario and Mustafa --

14        A    I think Rosario and Mustafa, they follow, they

15    was behind him because we come in four, like every three,

16    five minutes, like coming into the kitchen or going to the

17    ballroom every three or four minutes.  I can't remember

18    exactly what happened because, I tell you, I don't pay

19    attention to what he say.

20        Q    Okay.

21        A    And what he was doing.

22        Q    And there wasn't any conversation with you and

23    Kin Chhan prior to that?

24        A    No.

6

1       Q    You had not made any comments to him?

2       A    No, 6:00 o'clock in the morning, 5:00 o'clock in

3  the morning, we don't make comments, we going over there to

4  work, not to make comments.

5       Q    Why would Kin Chhan be upset with you?

6       A    I don't know, I don't know.  He be upset with a

7  lot of people in the world.  This not the first time he say

8  something to somebody.  That was before, too.  He did the

9  same thing with another person or another waiter, a banquet

10  waiter. too.

11      Q    Who was that?

12      A    Rivo.

13      Q    And when was that?

14      A    I don't know when he was there.  I wasn't there,

15  but he told me, Rivo told me he did the same thing with

16  him.  He say the same thing what he said to me.  He said

17  the same thing to him.  At that time, the guy said, I'm

18  going to take to personnel, and everybody say, no, no,

19  leave him alone.  Leave the guy alone.  Maybe he's upset,

20  whatever.  They guy not take it to personnel.  I did not

21  take it to personnel either, but when my co-workers say

22  that's enough, that's enough.

23      Q    By the way, Rivo had told you that some incident

24  like this had occurred --

PLAINTIFF'S EXHIBIT 8

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

---------------------------x

KIN S. CHHAN                    )

      Plaintiff,        )Civil No.

    v.                    )1:07cv01180(HHK)

HILTON HOTELS CORPORATION  )

      Defendant.        )

---------------------------x

Vienna, Virginia

Wednesday, October 31, 2007

Deposition of:

ROSA G. ROSERO

called for examination by counsel for Plaintiff pursuant

to notice, at 8614 Westwood Center Drive, Suite 950,

Vienna, Virginia 22182, before Joseph Kanahele, Jr. of

Capital Reporting Company, a notary public in and for

the Commonwealth of Virginia, beginning at 2:42 p.m.,

when were present on behalf of the respective parties:

# Capital Reporting Company

Page 5

1      Q      And are you hoping to make full-time

2  employment?

3      A      No.

4      Q      You would just assume stay on the "A" list.

5      A      Yes.

6      Q      And you know Mr. Chhan, who is seated next

7  to me, do you know?

8      A      Yes.

9      Q      And how long have you known Mr. Chhan?

10     A      Almost 17 years.

11     Q      And you know him because he was a banquet

12  server also?

13     A      Yes.

14     Q      And do you know his brother also, San Chhan?

15     A      Yes.

16     Q      All right.  And how long have you known San

17  Chhan?

18     A      The same, when I started working there.

19     Q      Okay.  Directing your attention to July

20  19th, 2006. Were you working banquet service that day?

21     A      Yes.

22     Q      And did something happen that caught your

# Capital Reporting Company

1    attention that day?

2         A    Yes.

3         Q    Okay.  And would you describe what that was?

4         A    Yes.  Well, what happened was we were

5    working on a breakfast, and we were in a hurry to fix up

6    the room.  And then when I went out to pick up the jam

7    and the butter out in the kitchen, and then I suddenly

8    heard the gentleman crying out very strong words in the

9    middle of the kitchen.  At the beginning I wasn't paying

10   much attention because I was in a hurry to pick up all

11   the jam and everything that I needed.  And then I asked

12   Mustapha, listen, what is happening to him?  And so

13   Mustapha heard him say this bad word, and so he said to

14   him, watch out for your language.  And then he continued

15   and he repeated continuously these bad words.  And then

16   I finished and I was in the kitchen, and he still

17   continued saying all these very strong words.  And so

18   when I came in the kitchen, I asked Mustapha, is he

19   talking to you; and he said, no, and so I didn't know

20   who he was talking to.  And then when I heard that, I

21   just went out to continue with my job.  And then I went

22   to my co-worker, and Chuck -- he went and reported it;

# Capital Reporting Company

1    one of my co-workers reported it to Chuck all that he

2    was saying in the kitchen.

3        Q     And who was this co-worker?

4        A     The people that heard it were Mustapha --

5    more than anything, myself and Mustapha; we heard it.

6        Q     Okay.  And now I'm going to have to ask you

7    to be more specific in terms of what you had heard; but,

8    before I do that, you mentioned that at one point you

9    asked Mustapha, is he talking about you?

10       A     Not about me, about him.

11       Q     I understood it that way.

12       A     Of him.  Well, because he mentioned that

13   word and he also mentioned it with regard to his wife,

14   and that's why I found out, is he talking about you?

15       Q     What did Mustapha say when you asked him was

16   he talking about you and your wife?

17       A     That he was hoping he wasn't.

18       Q     Okay.  Now, did you see Hernan Vasquez that

19   morning?

20       A     Yes.

21       Q     Did you hear Hernan Vasquez make any

22   comments to Mr. Chhan?

## Capital Reporting Company

Page 11

1     A     No, nobody was there.

2     Q     Nobody was in the kitchen?

3     A     No -- the other worker, his brother, no.

4     Q     Okay.  Did Mr. Kin Chhan, who's seated next

5     to me, did he appear to be upset?

6     A     Yes.

7     Q     Appear to be upset because something was

8     said to him?

9     A     I don't know.

10    Q     Okay.  But he appeared to be upset?

11    A     All I saw was that he was talking very

12    strong and like this, and I asked him what happened with

13    his hands and everything.

14    Q     And you asked Mr. Chhan what happened?

15    A     No.

16    Q     Well, did Mr. Chhan look like he was talking

17    to anyone?

18    A     Well, he was talking in the room and that's

19    why I tried to find out if he was talking to someone,

20    that's why I asked Mustapha if he was talking to him.

21    Q     And Mustapha said what?

22    A     He said, no.

## Capital Reporting Company

Page 12

1    Q    That Mr. Chan was not talking to him?

2    A    No, so when I heard too many of gross words

3    and strong vocabulary, I asked Mustapha; and I said what

4    happened, and Mustapha told him watch your language.

5    Q    Now, when you and Mustapha went out to the

6    ballroom to deliver your condiments, did you talk to Mr.

7    Hernan Vasquez?

8    A    No, because we were very busy attending the

9    people that had already come in.

10    Q    Okay, so you had no conversation with Mr.

11    Hernan Vasquez before you went to talk to Chuck Atkins?

12    A    They asked me if I had heard and what was

13    happening. I said, yes.  And so then they said, we're

14    going to report it

15    to Chuck.

16    Q    Okay, I need to understand that sequence.  I

17    understand that you left the kitchen with Mustapha to

18    deliver your condiments?

19    A    Yes.

20    Q    And was Mr. Chhan doing the same sort of

21    thing?

22    A    No, he stayed in the kitchen and we left him

# Capital Reporting Company

Page 13

1    talking.

2        Q    Okay.  After you and Mustapha delivered your

3    condiments, did you go back to the kitchen?

4        A    No, because I stayed in the ballroom just to

5    fix things.

6        Q    Okay, well, when did you and Mustapha talk

7    to somebody else about what you overheard?

8        A    What do you mean by with another person?

9        Q    Or anyone?

10       A    Well, when the function was over, they

11   called me and said that Mr. Chhan wanted to talk to me.

12       Q    Who's they?

13       A    Mustapha and Hernan.

14       Q    Why was Mustapha and Hernan talking to you

15   about something that Kin Chhan had said in the kitchen?

16       A    Because I was the only one that had heard.

17       Q    You were the only one who had heard anything

18   in the kitchen?

19       A    Yes.

20       Q    So why was Hernan Vasquez involved?

21       A    I don't know.

22       Q    But you do recall that it was Hernan Vasquez

## Capital Reporting Company

Page 14

1  and Mustapha who talked to you about reporting Mr. Chhan

2  to somebody else?

3      A     I finished my work and then I got called

4  because Chuck wanted me to come to the office to talk

5  with Mustapha and Hernan and myself.

6      Q     Okay.  So it was your impression that Hernan

7  Vasquez and Mustapha had already reported something to

8  Mr. Chuck Atkins?

9      A     I don't know if they reported it.

10      Q     But they were already in Chuck Atkins'

11  office?

12      A     No, they were not in the office, just in the

13  ballroom.  My boss came -- it was Chuck.  He said he

14  wanted to talk to me in the office.

15      Q     Okay.  Why was Mustapha and Hernan involved

16  with that?

17      A     I don't know -- Mustapha, maybe, because he

18  heard; and Hernan, that I really don't know.

19      Q     Okay.  Did you have any conversation with

20  Mustapha prior to going into the office with Mr. Atkins?

21      A     No.

22      Q     Had you talked to anyone prior to talking to

PLAINTIFF'S EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

KIN S. CHHAN,

       Plaintiff,

   v.                        Civ. No.: 1:07cv01180 (HHK)

HILTON HOTELS CORPORATION,

       Defendant.

---

Friday, October 12, 2007

Deposition of
MUSTAFA ABOUHOUDA

a witness, called for examination by counsel for Plaintiff,
pursuant to notice and agreement of counsel, beginning at
1:00 p.m. in the offices of Kestell & Associates, 1012 14 th
Street, N.W., Suite 630, Washington, D.C., 20005, before
Jerry McKenzie of Court Reporting Services, Inc., when were
present on behalf of the respective parties:

20

```
1        Q    Okay, when was this?

2        A    Oh, I don't remember exactly, a few years back

3    when I was shop steward.

4        Q    What did it relate to?

5        A    I took him to personnel for burning a girl,

6    burning her with coffee.

7        Q    Oh.  We actually put a record in -- do you still

8    have those exhibits?

9             [Discussion off the record.]

10            BY MR. KESTELL:

11       Q    I'll show you what has been marked as Sterrett

12   Exhibit 7.

13       A    We were standing at coffee station waiting for

14   coffee next to team member server.  She grabbed first full

15   pot of coffee, and then Mr. Chhen upset so he grabbed to

16   the next pot and slammed it on the counter, causing hot

17   coffee just spilled on the person serving coffee.

18            MS. ARIAIL:  I just want to note for the record

19   that the witness is reading off of the exhibit right now.

20            BY MR. KESTELL:

21       Q    Almost to himself, but it got recorded, I think.

22       A    Yes.  This is when I represented him.

23       Q    Okay.  You were shop steward at the time.  Is

24   there some entry here that indicates that you were, you
```

PLAINTIFF'S EXHIBIT 10



**Hilton**
**Washington**

|  |  |  |
|---|---|---|
| **TO:** | Linda Martin | **Inter-Office Correspondence** |
| **FROM:** | Robin Sterrett, Human Resources | |
| **LOCATION:** | Hilton Washington | |
| **DATE:** | July 27, 2006 | |

**SUBJECT:   Kin Chhan- allegation of unprofessional conduct**

Linda, please find below the highlights of our recent investigation into the above subject matter.

Late morning on July 19; I received a phone call from Kevin O'Shea. He stated that some of his banquet staff wanted to meet with me to lodge a complaint against Kin Chhan.

Present at the meeting were:
Kevin O'Shea- Maitre D'
Chuck Atkins- Asst Banquet Manager
Norman Bakshi- team leader
Hernan Vasquez- banquet server
Mustafa Abouhouda- banquet server
Rosa Rosario- A list banquet server

Hernan Vasquez
Hernan stating that he was setting up his station for a breakfast function in the IBR-center. He was entering the room with a tray of orange juice. As he was walking down the stairs, Kin Chhan was walking up the stairs towards the service doors. Hernan heard Kin start to talk but did not hear what he was saying. Hernan stated that he continued to walk towards his tables.

Rosa Rosario
Rosa stated that she was walking behind Kin, from the IBR-center to the kitchen. As they entered the kitchen, she heard Kin make several statements:
"M-F, I can fuck their wives, I give good fuck, I am good at fucking"

Rosa stated that she was stunned by the statements. She looked at Mustafa (who was also nearby) and asked him if Kin was talking to him? She heard Mustafa tell Kin "yeah, watch your mouth or you will end up in personnel again".

Mustafa Abouhouda

Mustafa stated that he was in the kitchen by the IBR-center service doors. He was preparing a tray of juice and butter for his tables. Kin entered the kitchen, making the following statements:
"I can fuck their wives, I give good fuck"

Mustafa told Kin "yeah, watch your mouth or you will end up in personnel again". Kin continued to make offensive comments such as "I can fuck anybody's wife. I can fuck her in front of you".

Mustafa stated that he continued to set up his tray and walked back into the ballroom. Rosa Rosario went with him and asked him "you let him talk to you like that"?

Mustafa found Norman Bakshi in the room and reported the situation to him. Norman took the complaint to Chuck.

Collectively, they indicated that the incident took place between 9:30am- 9:45am. They indicated that Kevin held the pre-function meeting at 9:45am and the incident took place before the meeting.

The meeting concluded.

Kin Chhan

A meeting was then held with Kin. Present at the meeting were:
Kevin O'Shea
Chuck Atkins
Norman Bakshi
Kin Chhan

I asked Kin if he knew why he was in the meeting. Kin said no at first. Then he stated that Hernan had been bothering him since early morning. He stated that Hernan said something against him and that he knows Hernan has a personal problem with him.

I asked Kin what he meant by "something against him". Kin stated that Hernan claimed he was stealing from people. Kin responded to Hernan by saying "watch your mouth. Do you see me stealing?" Kin stated that other employees were around but he doesn't remember who they were.

I asked Kin what happened next. Kin stated that they continued to work. Later he heard that Hernan told Kevin he used the "f" word. Kin repeated the statement that Hernan has a personal problem with him.

Kin was asked if he had spoken to Mustafa that morning. Kin said yes, that they had talked about work.

Kin was then asked if he had made the statement "M-F, I can fuck their wives". Kin denied making the statement.
Kin was asked if he had made the statement "I give good fuck. I am good at fucking". Kin denied making the statement.
Kin was asked if he had made the statement "I can fuck anyone's wife in front of them". Kin denied making the statement.

I informed Kin that he was being suspended pending investigation for possible violations of the

Hotel's harassment free workplace policy and Standards of Conduct. I told Kin that he needed to understand that the results of the investigation could affect his employment with the Hotel. (Kin was reminded that he had recently been suspended for 5-days for making a verbal threat to a co-worker).

The meeting was adjourned.

Peter Chan
Peter stated that he was in the kitchen preparing for the juice service. Kin was present and was talking. At first Peter did not pay any attention to him and didn't hear what he was saying specifically. Then he heard Kin say "I can do it in front of you. I want to show you how good I am. I can do any woman I want". Peter confirmed that Kin used the word "fuck".

Peter stated that his comments were insulting to people's wives and families and any female. No one should be able to talk that way in the hotel. Peter indicated that Kin's brother was near by but didn't say anything to Kin.

Rosa Roario, July 24
Kevin and I met with Rosa to review the previous statement she had given. Norman Bakshi was present. I told Rosa that I would read my notes of her statement and I asked her to let me know if my notes are correct and if she had any additional comments.

After reading my notes (shown above), Rosa stated that they accurately reflected her earlier statement. Rosa noted that after Mustafa told him to stop, Kin continued to make the same statements. That is why she asked Mustafa if Kin was talking to him. Mustafa told her he did not think so.

Mustafa Abouhouda, July 24
Kevin and I met with Mustafa to review the previous statement he had given. Norman Bakshi was present. I told Mustafa that I would read my notes of his statement and I asked him to let me know if my notes are correct and if he had any additional comments.

After reading my notes (shown above), Mustafa stated that they accurately reflected his earlier statement. He did not have any additional comments.

Hernan Vasquez, July 25
Kevin and I met with Hernan to review the previous statement he had given. Norman Bakshi was present. I told Hernan that I would read my notes of his statement and I asked him to let me know if my notes are correct and if he had any additional comments.

After reading my notes (shown above), Hernan stated that they accurately reflected his earlier statement. He added that when he had first heard about the comments Kin made, he thought Kin might be talking about his wife.

I then asked if Hernan remembered having any conversations with Kin earlier that morning. Hernan stated that he did not have a conversation with Kin that morning. He noted that he usually tries to avoid Kin.

I explained that when we had interviewed Kin about the situation, Kin made some allegations

about Hernan. Kin claimed that Hernan said he was stealing from people. Hernan denied making the claim.

Thursday, July 27
A meeting was held with Kin Chhan to bring the investigation to a closure. Sandy Beckman, Local 25 business representative, Kevin O'Shea were present.

I informed Kin that we had concluded our investigation. I explained that 3 team members had confirmed Kin had made the offending comments. The comments were a violation of the hotel's harassment free workplace policy and Standards of Conduct. Based on the investigation, Kin's employment was being terminated.

PLAINTIFF'S EXHIBIT 11

# Copy of Transcript

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIN S. CHHAN,

      Plaintiff,

   vs.

HILTON HOTELS CORPORATION,

      Defendant.

Civil Action No.
1:07cv01180(HKK)

~~~~~~~~~~~~~~~~~~~~~~~~~

### DEPOSITION OF

### KEVIN O'SHEA

January 28, 2008
11:50 a.m.

Jackson Lewis LLP
8614 Westwood Center Drive, Suite 950
Vienna, Virginia

Dawn A. Jaques, Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of Virginia



**setdepo** ℠

**Streamlined · Centralized · Standardized**
*The Evolution of Deposition Management*

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

2

1    APPEARANCES:

2        On behalf of the Plaintiff:

3            JAMES L. KESTELL, ESQ.

4            Kestell & Associates

5            209 Midvale Street

6            Falls Church, VA  22046-3510

7            PHONE:     (703) 237-2912

8            FAX:       (703) 237-4321

9            E-MAIL:   jkestell@cox@rr.com

10

11       On behalf of the Defendant:

12           KARA M. ARIAIL, ESQ.

13           Jackson Lewis LLP

14           8614 Westwood Center Drive

15           Suite 950

16           Vienna, Virginia  22182

17           PHONE:    (703) 821-4305

18           FAX:      (703) 821-2267

19           E-MAIL:  Ariailk@jacksonlewis.com

20

21       ALSO PRESENT:   Kin Chhan

22

23

24

25



Kevin O'Shea                                              January 28, 2008

3

1                            I N D E X

2   WITNESS                                             PAGE

3   KEVIN O'SHEA

4         Examination by Mr. Kestell                       4

5

6                       E X H I B I T S

7

8   O'SHEA DEPOSITION EXHIBIT                            PAGE

9   No. 1    March 6, 2006 Memo to File from

10           Robin Sterrett                                34

11  No. 2    October 3, 2005 Team Member

12           Counseling Form for Kin Chhan                 39

13  No. 3    October 3, 2005 Team Member

14           Counseling Form for San Chhan                 39

15  No. 4    October 6, 2005 Team Member

16           Counseling Form for San Chhan                 39

17

18

19

20

21

22

23

24

25



**sd setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:       1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                        January 28, 2008

4

                    P R O C E E D I N G S
 1
 2   Whereupon,
 3                    KEVIN O'SHEA,
 4       was called as a witness, after having been
 5       first duly sworn by the Notary Public, was
 6       examined and testified as follows:
 7       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 8            BY MR. KESTELL:
 9       Q    Mr. O'Shea, you're employed with the
10   Hilton, are you not?
11       A    Yes.
12       Q    And how long have you been so employed?
13       A    Since 1995.
14       Q    So roughly 12 years?
15       A    Roughly 12 years.
16       Q    And your present title?
17       A    Banquet Manager.
18       Q    And how long have you held that
19   position?
20       A    Since 2003.
21       Q    And prior to that?
22       A    Assistant Banquet Manager.
23       Q    And for how long?
24       A    Since 2001.
25       Q    Prior to that?


**setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:       1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

5

1       A       Beverage Manager.

2       Q       And for how long as Beverage Manager?

3       A       I'm saying 1999.

4       Q       And prior to that?

5       A       Restaurant Manager.

6       Q       How long?

7       A       '97.

8       Q       And prior to that?

9       A       Assistant Beverage Manager.

10      Q       In your current position, how many

11  employees do you supervise?

12      A       On a daily basis, 50.  If it's busy,

13  anything up to 250, 300.

14      Q       And would you describe the chain of

15  command below you?

16      A       Assistant Banquet Manager, captains,

17  servers.

18      Q       And are captains considered supervisors?

19      A       Yes.

20      Q       And would you describe their

21  responsibilities?

22      A       They would be running the floor.  They'd

23  all have their own assignment, so specific

24  functions throughout.

25      Q       Do they make work assignments to the



set**depo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

```
                              6
1    banquet waiters?
2         A    Yes.
3         Q    Are they responsible for that?
4         A    For the smaller rooms, not for the big
5    larger banquets.
6         Q    Now, you're familiar with Kin Chhan, are
7    you not?
8         A    Yes.
9         Q    How long have you worked with Mr. Chhan?
10        A    Directly and indirectly?
11        Q    Yes.
12        A    Since '95.
13        Q    How long have you supervised Mr. Chhan?
14        A    Since I became Assistant Banquet
15   Manager.
16        Q    And what year was that?
17        A    2001.
18        Q    Now, as Banquet Manager, do you have
19   responsibility for disciplining employees?
20        A    Yes.
21        Q    As Assistant Banquet Manager, did you
22   have responsibility for disciplining employees?
23        A    Yes, to an extent.
24        Q    Would you describe the extent?
25        A    That you get the Banquet Manager
```



Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

7

1    involved.

2        Q     And whose been the Assistant Banquet

3    Manager for the last few years working under you?

4        A     Start off with Chuck Atkins, and then

5    Long Tran, and now Randy Peel.

6        Q     Taking you back to the time that

7    Mr. Chhan was terminated, was Chuck Atkins

8    Assistant Banquet Manager at that time?

9        A     Yes, he was.

10       Q     Since becoming Banquet Manager,

11   approximately how many employees have you been

12   responsible for disciplining?

13       A     How many?  I'm responsible for

14   disciplining them all, I guess.

15       Q     How many have you actually disciplined?

16       A     I have no idea.

17       Q     About 30?

18       A     I would say less.

19       Q     Did I misunderstand you?

20       A     I said I have no idea.

21       Q     I understood you to say 30.

22       A     No, sorry.  I'm saying roughly 20.

23       Q     Okay.  And when I talk about discipline,

24   do you understand it to be all levels of

25   discipline, including counselings, written



Kevin O'Shea                                    January 28, 2008

8

| | | |
|---|---|---|
| 1 | | warnings? |
| 2 | A | Yes. |
| 3 | Q | So approximately 20 employees since you |
| 4 | | became Banquet Manager -- |
| 5 | A | Yeah. |
| 6 | Q | -- in 2002? |
| 7 | A | No, 2003. |
| 8 | Q | Say again? |
| 9 | A | 2003. |
| 10 | Q | I'm sorry, I couldn't even read my own |
| 11 | | writing.  You're right, 2003. |
| 12 | | Approximately 20 employees since you |
| 13 | | became Banquet Manager in 2003? |
| 14 | A | Yeah. |
| 15 | Q | Have you had occasion to discipline |
| 16 | | employees for using foul language in the |
| 17 | | workplace? |
| 18 | A | Yes. |
| 19 | Q | How many employees? |
| 20 | A | I would say two or three.  Not a lot. |
| 21 | Q | Do you remember their names? |
| 22 | A | I know Kin was one. |
| 23 | Q | Are you referring to the termination? |
| 24 | A | Uh-huh. |
| 25 | Q | Anyone else? |



Kevin O'Shea                                     January 28, 2008

9

1       A     Not offhand.  I don't remember the
2  names.
3       Q     Do you remember their nationalities?
4       A     No.
5       Q     Do you remember what the facts were that
6  led to being disciplined regardless of whether you
7  remember their names?
8       A     No.
9       Q     Do you recall what discipline you handed
10  out to the other two or three employees?
11       A     Just verbal write-ups.
12       Q     And do you recall what foul language
13  they used?
14       A     I think it was the F word.
15       Q     And do you recall the context?
16       A     No.
17       Q     Was it the use of the F word against
18  another employee?
19       A     I don't recall.
20       Q     You've only been Banquet Manager since
21  2003.  Is there any reason your recollection is so
22  weak on these other employees?
23       A     No.
24       Q     Do any of these employees still work --
25  I mean, you indicated that the other employees got


sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                          January 28, 2008

                                    10

1    verbal write-ups.  Do they still work as banquet

2    waiters?

3         A    I don't even recall who they were, so I

4    don't know if they're still there or not.

5         Q    Do you recall when the incidents

6    occurred?

7         A    No.

8         Q    Was it before or after Mr. Chhan?

9         A    I don't know.

10        Q    Let me ask you this, in their cases, you

11   issued verbal warnings.  Do you recall why it was

12   you issued verbal warnings to these other

13   employees and a termination to Mr. Chhan?

14        A    We would have checked the record and see

15   if there was another discipline before that.  If

16   there was, it wouldn't be verbal.

17        Q    If there was prior discipline, you would

18   increase the discipline?

19        A    Yeah.

20        Q    And what's the next level?

21        A    Written, and then there would be 1-day,

22   3-day, 5-day suspensions.

23        Q    And so you're assuming that these other

24   employees who used the foul language maybe didn't

25   have a prior record?



Kevin O'Shea                                    January 28, 2008

11

1        A     Yes.

2        Q     What was your understanding in

3    Mr. Chhan's case?

4        A     Which one?

5        Q     Kin Chhan.  His termination, why it led

6    to a termination.

7        A     Because he had prior incidents before

8    that.

9        Q     Now, at the time that this matter was

10   brought to your attention, was it your

11   understanding that Mr. Kin Chhan had said some

12   foul words to anyone in particular?

13       A     Not anyone in particular at the time.

14       Q     I'm sorry?

15       A     Not anyone in particular at the time.

16       Q     Can we go off the record for a moment?

17             (A discussion was held off the record.)

18             BY MR. KESTELL:

19       Q     Directing your attention back to the

20   incident, was it your recollection it occurred in

21   July of 2006?

22       A     Yeah, I think, yes.

23       Q     And how did it come to your attention?

24       A     A number of waiters came into the office

25   with my assistant, Chuck Atkins, and I was sitting


sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

12

1    at my desk.

2         Q    And who were these waiters?

3         A    Mustafa.

4         Q    I understand there's more than one

5    Mustafa.  Are you talking about --

6         A    Mustafa with the long last name,

7    Abahooda, Rosa Rosario, Hernan Vasquez, and Norman

8    Bakhshi.

9         Q    How do you spell Bakhski?

10        A    B-A-S-H-S-I (sic).  I got it

11   approximately right.

12        Q    And you say Chuck Atkins was with them?

13        A    Chuck Atkins was with them.

14        Q    And as they entered your office, who did

15   the talking?

16        A    Norman was the stop steward, so he did

17   most of the talking.

18        Q    Okay.  And what did he say?

19        A    He said there was an incident in the

20   kitchen where Mr. Chhan was shouting up some

21   vulgar comments to him.

22        Q    Okay.

23        A    At this stage, Kin came down to the

24   office as well.  Kin Chhan came into my office.

25        Q    Why would Kin Chhan come to your office?



**sd setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                   January 28, 2008

                                    13

1        A    Because he knew that they were coming
2    down complaining about him.
3        Q    How did he know that they were coming
4    down?
5        A    I don't know.
6        Q    Well, how far is your office from the
7    kitchen area?
8        A    100 meters.
9        Q    100 meters?
10       A    Yeah.
11       Q    Is that about the size of a football
12   field?
13       A    Less -- yeah, size of a football field I
14   guess by the time you get up and around.
15       Q    And approximately how long were Chuck
16   Atkins and Norman Bakhshi and Rosa Rosario --
17       A    I'm saying minutes.  2, 3 minutes.
18       Q    So they barely got into your office, you
19   heard Bakhshi say that Kin Chhan was shouting some
20   vulgar comments in the kitchen?
21       A    Uh-huh.
22       Q    And all of a sudden, Kin Chhan just
23   suddenly appears in your office?
24       A    Uh-huh, yes.
25       Q    And what did Kin have to say?



Kevin O'Shea                                          January 28, 2008

                                    14

1      A      Kin was -- he didn't have to say a whole

2   lot.

3      Q      Was he alone?

4      A      He was alone.  At that stage, there was

5   a whole lot of talking going on I guess between

6   the four -- the five initial people, and then Kin

7   walks in.  So at that stage, I took it to

8   personnel because I wasn't going to have all these

9   people in my office at the same time.

10     Q      Bickering?

11     A      Bickering.

12     Q      Well, I mean, did Kin say anything to

13  you about why he was there?

14     A      He was there to defend himself, if I

15  remember correctly.

16     Q      Did he know what the allegation was?

17     A      I don't know.

18     Q      Well, what did he say?  I mean, why did

19  you get the impression he was there to defend

20  himself?

21     A      Because he came in with the -- he said

22  that he was here to -- that these people are

23  complaining about me, I'm here to talk for myself.

24     Q      Okay.  Did you say anything to Kin or to

25  Bakhshi about this incident before journeying to



Kevin O'Shea                                    January 28, 2008

15

1    personnel?

2        A    No.

3        Q    No comment at all?

4        A    No.  I said we want to take this down to

5    Robin's office.

6        Q    And did Chuck Atkins say anything to you

7    at all?

8        A    Chuck opened up -- he said we have a

9    situation in the kitchen, and these gentlemen and

10   lady is here to address it.

11       Q    But it was actually Bakhshi who was the

12   one who even got into what the particulars were?

13       A    Yeah.  We didn't even go into so much

14   particulars.  I got to the stage where I knew

15   something happened in the kitchen, and there was

16   some word said in the kitchen that was

17   inappropriate.

18       Q    Okay.  And did you call Robin's office,

19   or did you just march everybody down there?

20       A    No, I gave Robin a call.

21       Q    And she said yeah, I'm in the office,

22   bring them down?

23       A    Yeah.

24       Q    Did you bring them all down?

25       A    I brought the five down.  I told Kin



Kevin O'Shea                                    January 28, 2008

16

1    that he'll get his chance to speak, to just wait

2    outside and I'm going to talk to these people, and

3    then we're going to bring Kin in.

4         Q    And so Mr. Chhan followed you all down

5    to Robin's office, and he waited out in the

6    reception area or what?

7         A    Yeah.

8         Q    Okay.  And when you got into Robin's

9    office, who did the talking?

10        A    They all spoke individually about what

11   they heard.

12        Q    Do you recall who opened the discussion?

13   I take it you must have said something to the

14   effect that, "Robin, I'm here for this reason"?

15        A    Yes.  I opened the discussion to Robin

16   saying there was an incident in the kitchen, these

17   four people came to my office, this is the

18   situation.

19        Q    And so who was the first one to talk?

20        A    I don't know who the first one to talk

21   was.  I'm thinking it was Norman Bakhshi.

22        Q    And did he claim he was a witness to

23   this incident?

24        A    No.

25        Q    So why was he talking?



17

1      A     He would be the shop steward.  He would

2    just open up the --

3      Q     Normally a shop steward is representing

4    the employee who is being disciplined or being

5    threatened with discipline.  He's actually taking

6    the role as a prosecutor here.

7            MS. ARIAIL:  Objection.

8            BY MR. KESTELL:

9      Q     I mean, is that your understanding?

10           MS. ARIAIL:  Objection.  You can answer.

11           BY MR. KESTELL:

12     Q     Did you understand Norman Bakhshi was

13   representing Mr. Chhan at that meeting?

14     A     Not the initial time he came into my

15   office, no.

16     Q     He appeared to be representing these

17   four other employees --

18     A     Yes.

19     Q     -- who were making the accusations?

20     A     He was telling me the situation.

21     Q     Well, you've already admitted he was not

22   somebody who had any firsthand evidence, so he got

23   it from these employees, is that your

24   understanding?

25     A     Yes, that's my understanding.



Kevin O'Shea                                    January 28, 2008

18

1       Q    So at that point, some employees made
2   some accusations against Mr. Chhan about making
3   some foul remarks in the kitchen?
4       A    Yes.
5       Q    And so Bakhshi is reporting this to
6   Ms. Robin Sterrett in the personnel office?
7       A    Bakhshi opened up the meeting as far as
8   I remember, and I don't have 100 percent
9   recollection of who opened up the meeting.
10      Q    Who spoke second?
11      A    No idea.  It was either Hernan Vasquez
12  or Mustafa or Rosa.
13      Q    What did Hernan have to say?
14      A    That Kin Chhan was saying some
15  inappropriate things about his wife.
16      Q    And how did Mr. Vasquez come to
17  understand that Mr. Chhan was saying inappropriate
18  things about his wife?  Did Hernan describe that
19  he was there and Mr. Chhan was making these
20  comments about his wife?
21      A    No.  I think he had secondhand
22  knowledge.
23      Q    So you understood that Hernan wasn't
24  even there?
25      A    By the time I got to the meeting, Hernan



Kevin O'Shea                                         January 28, 2008

19

1    was in the ballroom.  He wasn't in the actual
2    kitchen area when the comments were made.
3         Q    Well, at some point during this
4    discussion with Ms. Sterrett's office, did
5    somebody explain to you why Hernan Vasquez would
6    be thinking that Mr. Chhan is making foul comments
7    about his wife?
8         A    Did someone explain to me?
9         Q    Yes, or Ms. Sterrett in your presence.
10        A    No.
11        Q    Did Mr. Vasquez explain why he thought
12   it related to his wife?
13        A    I can't recall if he did or not.
14        Q    Did somebody ask Hernan, "Hernan, why do
15   you think it's your wife he's talking about?"
16        A    I'm sure Ms. Sterrett did.  I don't
17   recall the answer though.
18        Q    Well, at any time during that
19   discussion, do you have any present recollection
20   of why they would have thought it was Hernan
21   Vasquez, who was out in the ballroom at the time,
22   why his wife was involved?
23        A    I think he came to the conclusion that
24   his wife was involved because something between
25   happened Hernan and Kin Chhan in the ballroom, and



**sd setdepo**
*The Evolution of Deposition Management*

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                          January 28, 2008

                                    20
1    it was as Kin Chhan was leaving the ballroom going
2    into the kitchen that the comments were made.
3         Q     Okay.   So that's how Mr. Vasquez put two
4    and two together and said, well, we had some words
5    ahead of time, and he was probably referring to my
6    wife, and I take umbrage over that?
7         A     Yes.
8               MR. KESTELL:   Objection.   When I object,
9    you can answer.
10              BY MR. KESTELL:
11        Q     Well, did you or Robin during this
12   meeting ask Mr. Vasquez what were the comments
13   that preceded what Mr. Chhan said?
14        A     Yes.
15        Q     And what did Hernan say?
16        A     Word by word, I don't remember.
17        Q     Well, if not word for word, what is the
18   sense of what you got?
19        A     Said they got into -- Hernan was coming
20   out of the kitchen and Kin Chhan was going into
21   the kitchen, and Kin says something to Hernan, and
22   Hernan chose to ignore it, if I remember
23   correctly.
24        Q     Okay.   So Kin said something to Hernan.
25   Did it relate to his wife?



Kevin O'Shea                                         January 28, 2008

21

1          MS. ARIAIL:  Objection.  You can answer
2     if you know the answer to that question.
3          THE WITNESS:  In the ballroom, I don't
4     think so.
5          BY MR. KESTELL:
6     Q     So as you understood the situation,
7     Hernan is coming out of the kitchen, Kin is going
8     into the kitchen, and some words are exchanged?
9     A     Uh-huh.
10    Q     Were they like angry words?
11    A     It sound like there was a -- it
12    wasn't -- yeah.
13    Q     And from what you understood Hernan
14    said, he didn't say anything to provoke it?
15    A     That's what Hernan said.
16    Q     And did Hernan tell you what Kin said
17    that led him to conclude that he was talking about
18    his wife?
19    A     I don't remember.
20    Q     But your sense of it was that right
21    after Bakhshi spoke, that Hernan seemed to be
22    agitated that --
23    A     Yes.
24    Q     -- Mr. Chhan apparently was -- he
25    thought Mr. Chhan was referring about his wife?



Nationwide Scheduling
Toll Free:       1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

                                22

1        A     Yes.

2        Q     And you don't know how he got that

3   understanding?

4        A     No, I don't.

5        Q     Did any of the other people, Mustafa or

6   Rosario, say anything that led you to conclude

7   that they're the ones who told Hernan about that?

8        A     No.

9        Q     Well, did Robin ask any questions

10  about --

11       A     She did, and I just don't recall the

12  answer Hernan gave.

13       Q     And do you think Robin asked Hernan

14  about --

15       A     Yes.

16       Q     -- what was this exchange that preceded

17  Mr. Chhan getting so upset in the kitchen?

18       A     Again, I don't recall the argument, the

19  conversation, the words that were spoken.

20       Q     Yeah, but you recall Robin questioning

21  the witnesses about why was Chhan upset in the

22  kitchen?  Why was he making these comments?

23       A     Asking who?

24       Q     Any of these witnesses.

25       A     Yes, she did ask the question.



Kevin O'Shea                                    January 28, 2008

```
                               23
 1        Q      And did any of them have any
 2   explanation?
 3        A      No.
 4        Q      What did Hernan say, if you recall?
 5        A      I don't recall.
 6        Q      What about Mustafa, did he have any
 7   explanation?
 8        A      Why he was upset?
 9        Q      Why he was upset, yeah.
10        A      No, he didn't know why he was upset.
11        Q      How about Rosario?
12        A      No.
13        Q      Okay.  Approximately how long did
14   Ms. Sterrett spend with these folks then with you
15   being present also?
16        A      I'm saying 15, 20 minutes.
17        Q      And was she taking notes?
18        A      Yeah.
19        Q      And after she finished that meeting with
20   you all, what happened next?
21        A      We called Kin in.
22        Q      And was he offered a shop steward?
23        A      Yes.
24        Q      Who was that?
25        A      Norman.
```



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                          January 28, 2008

24

1     Q     I thought Norman was there representing

2     the first group?

3     A     Norman would represent all the factions,

4     all union employees.  He's the banquet shop

5     steward.

6     Q     And what was the questioning that took

7     place when Kin was called?  Were you there for

8     that also?

9     A     I was there.  Most of the questioning

10    was done by Robin.

11    Q     What was she asking Kin?

12    A     What happened.

13    Q     And what did Kin say?

14    A     What did Kin say?  Himself and Hernan

15    had an argument about something.

16    Q     Well, did Kin say something that related

17    to Hernan saying something to him as he was

18    entering the kitchen?

19    A     Something about stealing.  I think

20    Hernan accused Kin of stealing.

21    Q     And so as Robin is questioning Kin about

22    what happened in the kitchen that got him upset,

23    he's explaining that as he's going into the

24    kitchen, Hernan is coming out of the kitchen, made

25    some remark to him about being a thief or stealing



Kevin O'Shea                                      January 28, 2008

25

1    something?

2         A    Yes.

3         Q    And that got him upset?  Or was that the

4    sense of what you understood him to be saying?

5         A    Yes.

6         Q    And what else did Kin say?

7         A    Robin questioned him about what happened

8    in the kitchen, and Kin denied saying what the

9    other people said.

10        Q    Did any of the employees in the first

11   group, Rosario, Mustafa, Hernan or anyone, did any

12   of them say Kin was talking about them?

13        A    No.  I think it was more in general.

14        Q    Did Robin ask about whether there were

15   any witnesses to this remark that Hernan had made

16   to Kin as he was entering the kitchen?

17        A    Ask who?

18        Q    Kin.  Were there any people around?

19        A    I don't recall.  I don't remember.

20        Q    Okay.  Is there anything else you recall

21   about the interview that Robin had with Mr. Chhan?

22        A    No.

23        Q    And at this point, we have Rosario and

24   Mustafa saying that Mr. Chhan had made some foul

25   remarks in the kitchen, they don't know about who?



Kevin O'Shea                                                      January 28, 2008

26

1      A      Yes, they're saying that -- yes.

2      Q      And it wasn't directed at them?  You

3  understood that, right?

4      A      We understood that he was making some

5  remarks about people's wives.

6      Q      But it wasn't Rosario's and it wasn't

7  Mustafa's wife?  I mean, Rosario is a woman,

8  right?

9      A      Right.

10     Q      So it wasn't obviously anyone associated

11  with her.

12     A      No.

13     Q      How about Mustafa, was it relating to

14  his wife?

15     A      I don't think so.  I don't think he

16  felt that it was his wife that --

17     Q      And somehow Hernandez felt it was his

18  wife that he's referring to?

19     A      Yes.

20     Q      Because Kin had made some provocative

21  comment or angry comment to him as he was leaving

22  the kitchen, right, even though he didn't say

23  anything to Mr. Chhan?

24     A      Right.

25     Q      Well, did anybody inquire whether there


The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

27

```
 1    was anybody in the line going to and from the

 2    kitchen who may have overheard what Mr. Vasquez

 3    and Mr. Chhan said to each other?

 4         A     No.

 5         Q     Nobody inquired?

 6         A     We inquired.

 7         Q     You did inquire?

 8         A     Yes.

 9         Q     Who did you inquire of?

10         A     Hernan.  I know we asked Kin Chhan.

11         Q     So you asked Hernan were there any

12    witnesses --

13         A     Yes.

14         Q     -- to the remark that Kin had made

15    earlier?

16         A     Yes, but that was in a follow-up meeting

17    with Hernan.

18         Q     Why was there a follow-up meeting?

19         A     Because Kin made some allegations that

20    Hernan made some statements, which was not well

21    received.

22         Q     Well, at any point did you or Robin

23    understand that Kin's brother was in line at the

24    same time that Kin was entering the kitchen?

25         A     No.
```



Kevin O'Shea                                    January 28, 2008

```
                              28
 1        Q      Never understood that?
 2        A      Not to my recollection.
 3        Q      Did anyone ever ask Rosario, "Were you
 4   in line?  Were you cleaning the kitchen?"
 5        A      Rosario was in the kitchen.
 6        Q      She was in the kitchen already?
 7        A      Yes.
 8        Q      And when Hernan was asked, he says no,
 9   there was nobody else, just Kin and myself?
10        A      Yes.
11        Q      And Hernan denied making any comments?
12        A      Yes.
13        Q      Did anyone have a second meeting with
14   Kin to say Hernan denies that he made the
15   comments, and he says there was nobody else in
16   line?
17        A      Yes.
18        Q      And when was this second meeting held
19   with Kin?
20        A      Date wise, I would say a week, a week
21   later.
22        Q      Okay.  At this point, there's been an
23   initial meeting where the five people came in and
24   gave their story to Sterrett, and then Robin calls
25   Kin in, and he gives his side of it.
```



Kevin O'Shea                                    January 28, 2008

29

1      We've now had a second meeting with

2   Hernan Vasquez to find out if he made the remark

3   that Kin said he made, and he denied it, correct?

4      A    Yes.

5      Q    And he says there were no witnesses

6   there.  Was Kin asked whether there were any

7   witnesses?

8      A    I'm guessing.  I'm saying yes, he was.

9      Q    Well, don't guess.  Unless you've got a

10  current memory, I don't want you guessing.

11     A    Okay, I don't know for definite.

12     Q    Because I want you to testify upon a

13  recollection.  If you actually, as you sit here

14  today, recalled Robin questioning Kin about, well,

15  was there anyone else who could have overheard

16  what Hernan said to you or something like that.

17  Do you have any recollection of that?

18     A    I'm saying that she did.

19     Q    She did ask Kin that?

20     A    Yes.

21     Q    And what did Kin say?

22     A    I don't know.

23     Q    Was it obvious to you that something

24  must have preceded Kin being angry?

25         MS. ARIAIL:  Objection.  You can answer.



Kevin O'Shea                                    January 28, 2008

                              30
1           THE WITNESS:  No, it wasn't obvious.
2           BY MR. KESTELL:
3      Q    Well, I mean, had Mr. Chhan been the
4  type of fellow who would just make foul remarks
5  for no reason at all?
6      A    No.
7      Q    And you have all the witnesses say they
8  don't think he was talking to them.  He was upset
9  with somebody.
10          MS. ARIAIL:  Was that a question?
11          BY MR. KESTELL:
12     Q    I mean, was that your understanding of
13 what they described?
14     A    They described him as being upset.
15     Q    Did they have any idea who he was upset
16 at?
17     A    No.
18     Q    So nobody said I think he's upset at
19 Hernan for some reason?
20     A    Kin did.
21     Q    Kin explained to you that he felt that
22 Hernan had accused him of being a thief or
23 stealing something.
24     A    Uh-huh.
25     Q    So he was upset at Hernan.  But you did



Kevin O'Shea                                                    January 28, 2008

31

1    know that Hernan somehow got the idea in his mind

2    that Kin was talking about his wife.

3         A    Yes.

4         Q    Why?

5         A    I have no idea.

6         Q    Well, you heard Kin give an explanation

7    that he was upset with Hernan for being called a

8    thief.

9              Had you ever heard Hernan refer to Kin

10   Chhan as a Chino?

11        A    No.

12        Q    Marikon?

13        A    No.

14        Q    Have you ever heard Hernan make

15   disparaging comments about Kin Chhan?

16        A    No.

17        Q    Well, at any point did you or anyone

18   else or Robin Sterrett think maybe we should talk

19   to his brother, see if he might have been in the

20   vicinity?

21             MS. ARIAIL:   Objection.   He can't speak

22   for what Robin Sterrett or anyone else thought.

23             BY MR. KESTELL:

24        Q    Did you have any discussion with Robin

25   about, well, maybe we ought to check and see if



Kevin O'Shea                                    January 28, 2008

32

1    there was any witness to what comment was actually

2    the starting comment here?

3        A    We didn't check with his brother.

4        Q    Why not?

5        A    Because we treat his brother like any

6    other banquet waiter.  I mean, we didn't check

7    with the other 40 waiters if there was a whole lot

8    of waiters working the function that day.

9        Q    Well, did anybody bother to check with

10   the other 40 waiters to see if anybody may have

11   heard something that led to Kin Chhan getting

12   angry?

13       A    No.

14       Q    Were you involved with discipline being

15   weeded out to Mr. Kin Chhan earlier in the year

16   involving an incident that related to Mustafa?

17       A    I was involved in the discipline handing

18   out as department head.

19       Q    And what was your involvement with that?

20       A    Sitting in the meeting with Robin

21   Sterrett.

22       Q    How did it come to your attention?

23       A    Through my assistant, Chuck Atkins.

24       Q    And how did he learn about it?

25       A    He was involved in it.



Kevin O'Shea                                          January 28, 2008

33

1      Q      How was he involved with it?

2      A      He was working that day.

3      Q      And were you present when Lolo was

4   questioned?

5      A      Yes, I was.

6      Q      Isn't it in fact true that Lolo didn't

7   think any discipline should be taken against

8   Mr. Chhan?

9      A      I don't know if he was ever asked that

10  question.

11     Q      Who are the witnesses to the incident?

12     A      There was a houseman there.  I know Earl

13  Spence was involved; the houseman, Mustafa; Lolo

14  was involved.  I don't recall any other names.

15     Q      Wasn't it in fact true that the only

16  reason the incident was brought up at all was that

17  there was allegedly some second incident that

18  occurred later in the day?

19     A      Yes.

20     Q      Some unnamed banquet server reported

21  that he had seen Kin Chhan and Mustafa having some

22  words?

23     A      Yes.

24     Q      Do you remember who that banquet server

25  was?


**sd** **setdepo**
*The Evolution of Deposition Management*

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                      January 28, 2008

34

1        A      No.

2        Q      Did you actually talk to that banquet

3    server yourself?

4        A      I must have.  I do not remember.  I

5    can't remember who it was.

6        Q      I'm going to mark O'Shea Exhibit 1 a

7    memo to the file from Robin Sterrett dated

8    March 6, 2006.

9               (O'Shea Deposition Exhibit No. 1 was

10              marked for identification.)

11              BY MR. KESTELL:

12       Q      Do you need time to review it,

13   Mr. O'Shea?

14       A      Do I need to read it?

15       Q      I'm going to be asking you some

16   questions on it.  Let me start by asking you were

17   you present during Ms. Sterrett's interview of

18   these people?

19       A      Yes.

20       Q      Okay.  I think what I'll do, I think

21   you'd feel better if you had a chance to read it

22   ahead of time, so we can go off the record while

23   he reads it.

24       A      Okay.

25       Q      Okay, you've had a chance to read it?



Kevin O'Shea                                              January 28, 2008

35

1        MS. ARIAIL:  Before any questions, I
2    just want to note one thing for the record.  This
3    O'Shea Exhibit 1 does not appear to be the Bates
4    stamped copy that Hilton produced to Plaintiff.
5    I'm not representing anything other than that.  I
6    wanted it on the record.
7        BY MR. KESTELL:
8        Q    Now, were you present during Robin's
9    investigation of this?
10       A    Not on Sunday.
11       Q    Okay.  It's your understanding that
12   March 6th was a Sunday?
13       A    March 5th.
14       Q    Well, this looks like it's a memo to the
15   file dated March 6th.
16       A    Right, but Robin was on duty on
17   March the 5th.
18       Q    And so you're saying that it looks like
19   these comments were taken when she was
20   interviewing these witnesses on March 5th?
21       A    No.  Interviews were on March 6th, but
22   she became aware of this on March 5th.
23       MS. ARIAIL:  It's different dates for
24   different witnesses.
25       BY MR. KESTELL:


**setdepo**
**The Evolution of Deposition Management**

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

36

```
 1        Q      Were you present during any of these
 2    interviews?
 3        A      Not the first one; that was on the 5th.
 4    The Kin Chhan one I was.
 5        Q      How about the Earl Spence one?
 6        A      The Earl Spence one I was not.
 7        Q      And why would you not have been present
 8    for Earl Spence's?
 9        A      I don't know.
10        Q      I'm sorry?
11        A      Sorry.  I don't know.
12        Q      You did notice when you read this that
13    according to Spence -- this is the second to last
14    paragraph, the last page -- he was looking for Kin
15    after Mustafa reported it, but he ran into Lolo
16    first.
17        A      Right.
18        Q      And Lolo was Kin's boss, was he not?
19        A      He's captain.
20        Q      So he was Kin's immediate supervisor?
21        A      Yes.
22        Q      And Earl was Mustafa's immediate
23    supervisor?
24        A      Yes.
25        Q      And Lolo told Spence that he calmed Kin
```



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

37

1    down, so leave it alone.  Do you see that there?

2         A    Uh-huh.

3         Q    And Spence told Lolo to talk to San, and

4    that's Kin's older brother, is it not --

5         A    Yes.

6         Q    -- who works as a banquet waiter also?

7         A    Yes.

8         Q    Talk to San about his brother, what Kin

9    did was not right, Lolo agreed to do that.  That's

10   your understanding?

11             MS. ARIAIL:  I'm sorry, what do you

12   mean?  Understanding of what it says?

13             MR. KESTELL:  Yes.

14             MS. ARIAIL:  Okay.

15             BY MR. KESTELL:

16        Q    Now, at some point, Mustafa left the

17   meeting with Spence, and another banquet server

18   came to Spence's office and stated Mustafa and Kin

19   were fighting again.  Do you see that there?

20        A    Yeah.

21        Q    Were you ever told about that?

22        A    I know that something happened in the

23   crystal corridor between the two of them after the

24   fact.

25        Q    Okay.  And were they fighting?



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

38

1     A     Physical fighting, no.

2     Q     Well, what was going on?

3     A     They were arguing.

4     Q     And who are the witnesses to that?

5     A     I don't know.  Another banquet server.

6  I don't know the name.  I don't recall the name.

7     Q     Well, did Chuck ever tell you who it

8  was?

9     A     I'm sure he did.

10    Q     Did anybody attempt to interview this

11 gentleman?

12    A     I don't recall.

13    Q     Well, did Robin ever ask Kim Chhan when

14 she did her interview with Kin about this incident

15 in the crystal hallway?

16    A     Yes.

17    Q     And what did Kin say?

18    A     Kin said that he was telling Mustafa not

19 to take food from a banquet room or from a

20 function.

21    Q     While the function was going on?

22    A     Yeah.

23    Q     Was Mustafa ever asked about what

24 happened in the crystal corridor?

25    A     I don't recall.



Kevin O'Shea                                        January 28, 2008

39

1       Q     Was any statement ever taken from this
2    unidentified banquet server whose name you forgot?
3       A     I don't recall if there was another
4    statement made.
5       Q     And you don't see any statement here in
6    Robin's notes, do you?
7       A     No, I do not.
8       Q     Do you remember disciplining the Chhan
9    brothers back in late October 2005?
10      A     I can't remember the month and date.
11      Q     Well, let me show you what I'll mark as
12   O'Shea Exhibit 2, which will be a counseling form
13   for Kin Chhan dated October 3rd, '05, and O'Shea
14   Exhibit 3 will be marked and identified as a
15   counseling form for San Chhan dated October 3rd,
16   '05, and O'Shea 4 will be another counseling form
17   for San Chhan dated October 6th, 2005, signed by
18   yourself.
19            MR. KESTELL:  Object to counsel's
20   representation of Exhibit 4.
21            (O'Shea Deposition Exhibit Nos. 2
22            through 4 were marked for
23            identification.)
24            BY MR. KESTELL:
25      Q     We'll go through the exhibits in



Kevin O'Shea                                    January 28, 2008

40

1    sequence starting with O'Shea Exhibit 2.  Do you

2    need time to review these documents before I

3    question you about them?

4         A    No.

5         Q    There's a document marked O'Shea

6    Exhibit 2.  Was that a counseling form that was

7    issued to Kin Chhan dated October 3rd, '05?

8         A    No.  This is March the 5th, '06.

9         MS. ARIAIL:  You gave him something

10   different than what you gave me for Exhibit 2.

11        MR. KESTELL:  Okay, I don't know what

12   happened here.  I'm substituting the right one.

13   Can we have that remarked as O'Shea 2?

14        MS. ARIAIL:  You can just focus on 2 for

15   now.

16        THE WITNESS:  2 and 4 are the same.

17        MR. KESTELL:  Off the record for a

18   moment.

19        (A discussion was held off the record.)

20        MR. KESTELL:  Can we agree that you both

21   have the same copies now?

22        MS. ARIAIL:  Yes, we all have the same

23   2, 3 and 4.

24        BY MR. KESTELL:

25        Q    Do you need more time, Mr. O'Shea?



Kevin O'Shea                                    January 28, 2008

41

1      A     No.

2      Q     Okay.  Do you recall your involvement in

3  this particular incident that led to counselings

4  being issued to Kin Chhan and his brother San

5  Chhan?

6      A     Yes.

7      Q     And how did you learn about this

8  incident?

9      A     From the wait staff and captain.  The

10  wait staff initially.

11     Q     Do you recall which members of the wait

12  staff?  Are you talking about banquet servers?

13     A     Talking about banquet servers.

14     Q     Who brought it to your attention?

15     A     A group of them.

16     Q     Can we get their names?

17     A     To tell you all the names off my head, I

18  do not.

19     Q     Well, there are some names that are

20  mentioned in the O'Shea Exhibit 2.  Does that

21  help?

22     A     They would be the two shop stewards,

23  Rego and Bakhshi.

24     Q     They're the two shop stewards?

25     A     Yes, so that's how they're in the



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                        January 28, 2008

42

1    meeting.

2         Q    Were they representing the wait staff

3    who were complaining, or were they representing

4    Mr. Kin Chhan?

5         A    They're representing the -- they're

6    representing neither.  They're representing the

7    union.

8         Q    Okay.

9         A    I would have brought them into the

10   meeting.

11        Q    You brought them into the meeting?

12        A    Yeah.

13        Q    Well, tell us how did it come to your

14   attention?

15        A    A group of waiters came to me saying

16   that San Chhan was calling them names in the

17   ballroom.

18        Q    And you don't remember any of these

19   waiters?

20        A    There's a whole list of them.  I know we

21   have a list of waiters' names, but I don't

22   remember all 12 names or 13 names.

23        Q    I'm not asking you all 12 names.  I'm

24   asking you to remember any of the wait staff who

25   brought this to your attention.



Kevin O'Shea                                    January 28, 2008

                                43

1        A     No.

2        Q     Not a single one?

3        A     No.

4        Q     Do you think all 12 of them came into

5   your office?

6        A     Yeah, a whole bunch of them.

7        Q     And then you called the two shop

8   stewards?

9        A     Yes.

10       Q     Norman Bakhshi and Mr. Rego?

11       A     Yeah.

12       Q     And was Kin in the office when you

13  called them?

14       A     I don't think so.

15       Q     So why did you call the two shop

16  stewards?

17       A     I called because I was going to bring

18  Kin and San down for a meeting, and I would have

19  these team leaders/shop stewards/union members in

20  the meeting.

21       Q     And do you recall calling Kin and San to

22  meet with the whole group, or were they called

23  separately?

24       A     They were called together with the two

25  team leaders.  They didn't meet with the group.



Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

44

1      Q      Who were the two team leaders?

2      A      Rego and -- Rego and Bakhshi.

3      Q      Are team leaders the same as shop

4    stewards?

5      A      Yes.

6      Q      And when you called Kin and San into the

7    meeting with Norm Bakhshi and Mr. Rego, who did

8    the talking?

9      A      I did most of the talking.

10     Q      What did you tell the Chhan brothers?

11     A      I asked them what happened.

12     Q      And did somebody respond?

13     A      San would have done most of the talking.

14     Q      Do you recall what he said?

15     A      Not word by word.

16     Q      Well, do you recall the sense of it?

17     A      The sense of it was that there was --

18   the sense of the meeting I was holding was we need

19   to get everybody on the same page.  I wasn't

20   focusing on what happened in the ballroom.  I was

21   just focusing on getting the team leaders involved

22   and getting Kin and San back working in a working

23   relationship.

24     Q      Well --

25     A      Because there was a group -- when the



Kevin O'Shea                                      January 28, 2008

45

1   group came in, they accused San of calling them a

2   pack of dogs in the ballroom.

3       Q    Well, do you recall San saying that --

4   what he actually said was you guys are acting like

5   a pack of dogs in accusing Kin Chhan of being

6   tardy?

7       A    Yes.

8       Q    You're acting like a bunch of dogs after

9   a wounded animal?  Isn't that what San Chhan

10  explained?

11      A    I don't remember the wounded animal, but

12  yes.

13      Q    But wasn't that the sense of it --

14      A    Pretty much.

15      Q    -- that you're acting like a pack of

16  dogs all beefing up on his younger brother Kin

17  Chhan?

18      A    Yes.

19      Q    And that he was urging them to back off,

20  that they've been late on occasion also?

21      A    That will be the gist of it, yes, the

22  conversation.

23      Q    And, in fact, do you recall San even

24  explained to you there were people who showed

25  up -- banquet waiters who showed up later than Kin



Kevin O'Shea                                          January 28, 2008

46

1    and San that they weren't jumped on by the group?

2         A    I don't recall that happening.

3         Q    Okay.  Well, would you describe what you

4    recall about this incident?

5         A    So I guess the meeting was to get the

6    team leaders involved, get Kin and San sitting

7    down, and to get some kind of a bond going on and

8    have an open discussion of what's happening, but

9    that didn't work out as planned and the

10   conversation became a shouting match.

11        Q    And the shouting match was between whom?

12        A    Between San and Kin, and I guess myself

13   and Rego and Bakhshi.  There wasn't a whole lot of

14   conversation going on.

15        Q    Well, what was the disagreement over?

16        A    How they're being treated by the staff.

17        Q    And that's how you came to conclude that

18   San Chhan felt like they were acting like a bunch

19   of dogs ganging up on his younger brother?

20        A    That was my conclusion?

21        Q    That was what you understood San to be

22   saying?

23        A    Yes.

24        Q    And what was your comment to them or

25   Bakhshi's comment to them, or why was there



Kevin O'Shea                                      January 28, 2008

47
```
 1   disagreement?
 2        A    The comment to them was that they,
 3   especially with Kin, he needed to gain the trust
 4   back of his fellow employees because he was
 5   getting into the habit of coming in late, not
 6   being there when cleanup was happening, not
 7   helping out, not putting in his fair share into
 8   the workload, and that's where the conversation
 9   was going.
10        Q    And this related to Kin, not San?
11        A    Kin more than San, yeah.
12        Q    Okay, and then what happened?  I mean,
13   that's what you and the shop stewards were telling
14   San, or what?
15        A    Yeah.
16        Q    And that's why the people were upset,
17   didn't just relate to this one incident?  It
18   relates to a whole --
19        A    Yes, it related to more.
20        Q    And what happened then?
21        A    Then San and Kin just erupted in
22   verbal -- I mean, they told us that their God was
23   going to get us when we died, all of us.
24        Q    Their God was going to get all of you
25   when they died?
```



Kevin O'Shea                                    January 28, 2008

48

```
 1        A    Yes, when we died.

 2        Q    When you died?

 3        A    Yeah.

 4        Q    Did they explain who their God was?

 5        A    No.

 6        Q    Okay.

 7        A    And then they left.

 8        Q    Was it in the middle of the workday?

 9        A    Yeah.

10        Q    They simply walked off the job?

11        A    Yeah.

12        Q    Well, did you say anything to them?

13        A    I begged them to come back and let's

14   finish off this meeting and let's be somewhat

15   productive.

16        Q    How did you go about begging them?

17        A    I followed them out.

18        Q    Where did you follow them to?

19        A    Outside my office.

20        Q    So they left your office, the two of

21   them left your office as it became heated, and you

22   followed them out?

23        A    Just outside my office.

24        Q    Is there a reception area there?

25        A    It's a long hallway.
```



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

49

1        Q      And do they look like they're going back

2    to work?

3        A      No.   They were going out down the

4    hallway; that's where the lockers and the exit is.

5        Q      Had they ever left work before and

6    became AWOL?

7        A      Not to my recollection, no.

8        Q      Well, did you ask them, "Where are you

9    guys going?  You got 4 more hours on your shift

10   here."

11       A      I don't know what they had that night.

12   In banquets, you don't initially have an 8-hour

13   shift.   Your shift can be 3 hours or 4 hours, but

14   I asked them to come back and finish off the

15   meeting.

16       Q      Okay.   Did either one of them respond?

17       A      Not positive.   I think they just said we

18   were leaving, we're going.

19       Q      Who said that, Kin or San?

20       A      I would say both.

21       Q      They're just walking off the job?

22       A      Yeah.

23       Q      And did you say anything, "I'm going to

24   cite you guys for insubordination"?

25       A      No.   At that stage, there was very



**sd setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

Kevin O'Shea                                    January 28, 2008

50

1    little talking.  I mean, the conversation was a

2    shouting affair.

3         Q    Now, if I'm reading this O'Shea

4    Exhibit 2 correctly, you wrote on October 3rd that

5    Kin Chhan was then sent home for the day.

6              Who sent him home for the day?

7         A    That would be me, but he just left.

8         Q    Well, you understand there's a big

9    difference between you sending him home for the

10   day and his just walking off the job, do you not?

11        A    I do.

12        Q    I mean, one of them is AWOL and

13   insubordination, the other is you're disciplining

14   him.

15        A    Right.

16        Q    Which was it?

17        A    AWOL and insubordination.

18        Q    I'm sorry?

19        A    I mean, I was in the midst of

20   disciplining them, and they walked out of the

21   meeting.

22        Q    Did you send them home, or did they just

23   leave the site without your --

24        A    They left the meeting and would not come

25   back in.



Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

**setdepo**
*The Evolution of Deposition Management*

Kevin O'Shea                                    January 28, 2008

51

1      Q     Well, who sent them home?

2      A     I don't know.  They just left.

3      Q     So where you write here, "Kin Chhan was

4   then sent home for the day," you meant to say

5   something else?

6      A     I don't recall actually telling Kin

7   Chhan he was sent home for the day.  After that

8   meeting, we didn't speak again.

9      Q     Okay, would you look at O'Shea

10  Exhibit 3?  This relates to San Chhan, right?

11     A     Right.

12     Q     It reads very similar to the one against

13  Kin Chhan, does it not?

14     A     Yes.

15     Q     Does it not end that San Chhan was then

16  sent home for the day?

17     A     Yes.

18     Q     But it's your contention that both of

19  them just walked off on their own?

20     A     Yes.

21     Q     Now, O'Shea Exhibit 4, is that an actual

22  counseling memo?

23     A     Yes.

24     Q     And you're citing San Chhan because a

25  group of waiters claimed that he called them a


**setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com