UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIN S. CHHAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No.: 1:07cv01180 (HHK) |
| | ) |
| HILTON HOTELS CORPORATION, | ) |
| | ) |
| Defendant. | ) |

DEFENDANT'S SUPPLEMENTAL STATEMENT
OF MATERIAL UNDISPUTED FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Hilton Hotels Corporation ("Hilton"), by its attorneys, submits this supplemental statement of material undisputed facts in support of its motion for summary judgment pursuant to Local Civil Rule 7(h).

A.  **Sterrett Found in Plaintiff's Favor as a Result of Her Investigation of the March 1999 Incident**

44.  On March 29, 1999, Thomas Russell issued Kin Chhan a three-day suspension for spilling hot coffee on a coworker. (Sterrett Tr. I at 50).[1] At that time, Russell was Hilton Washington's Director of Food and Beverage. (Sterrett Tr. I at 48).

45.  In early April 1999, Kin Chhan and his union representative appealed the suspension to Robin Sterrett. (Sterrett Tr. I at 50).

---

[1] The paragraph numbering in this supplemental statement of undisputed facts begins where Hilton's initial statement of undisputed facts left off. Cited portions of Sterrett's first deposition transcript (Sterrett Tr. I) are attachment A. The Second Declaration of Robin Sterrett ("2d Sterrett decl.") is attachment B hereto.

1

46. On April 8, 1999, Sterrett investigated the incident. (Sterrett Tr. I at Exhibit 8). As a result of her investigation, Sterrett determined Chhan had not intentionally spilled coffee on his coworker. (Sterrett Tr. I. at 52).

47. On April 16, 1999, Sterrett reduced Chhan's suspension to a written warning and directed management to pay Chhan for the functions he had missed during his suspension. (Sterrett Tr. I at 59, Exh. 9).

**B.  Villagomez Never Told Sterrett Discipline Was Not Warranted in the March 2006 Incident**

48. Sterrett interviewed Lolo Villagomez as part of her investigation of the March 5, 2006 incident involving Chhan and a Banquet Houseperson. (Sterrett Tr. I at 43). Villagomez never told Sterrett he did not believe Chhan should be disciplined. (2d Sterrett decl, ¶ 2).

**C.  Sterrett Fully Investigated July 19, 2006 Incident**

49. When Sterrett interviewed Chhan regarding his alleged offensive statements the morning of July 19, he told her Vasquez had accused him of stealing. (Sterrett Tr. I at 31). Chhan did not tell Sterrett that Vasquez called him a "mother fucker." (2d Sterrett decl, ¶ 3). Plaintiff never complained to Sterrett about Vasquez using this term at any time during Plaintiff's employment. (2d Sterrett decl, ¶ 3).

50. Although Chhan identified his brother San Chhan as a witness to the July 19, 2006 incident, Sterrett did not interview San because she believed he would support his brother's account and would not be objective. (Sterrett Tr. I at 26, 36).

51. As a result of her investigation, Sterrett decided to terminate Chhan. (Sterrett decl. ¶ 12). Neither Banquet Manager Kevin O'Shea nor Hilton Washington's current Director of Human Resources Peter Hill was responsible for the decision to terminate Chhan. (2d Sterrett decl, ¶ 4).

Respectfully submitted,

**Hilton Hotels Corporation**

By: _____/s/_____
John M. Remy (D.C. Bar No. 461244)
Kara M. Ariail (D.C. Bar No. 478718)
Jackson Lewis LLP
8614 Westwood Center Drive, Suite 950
Vienna, Virginia 22182
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system; opposing parties and the judge were served consistently with the instructions therein. A copy was mailed first class postage to:

>James L. Kestell
>Jonathan L. Gould
>1012 14th Street, N.W.
>Suite 630
>Washington, D.C.
>*Counsel for Plaintiff*


>By:_____/s/_____
>John M. Remy, (D.C. Bar No. 461244)
>Kara M. Ariail (D.C. Bar No. 478718)
>Jackson Lewis LLP
>8614 Westwood Center Drive, Suite 950
>Vienna, Virginia 22182
>*Counsel for Defendant*

# ATTACHMENT A

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

KIN S. CHHAN,

        Plaintiff,

v.                                Civ. No.: 1:07cv01180 (HHK)

HILTON HOTELS CORPORATION,

        Defendant.

Friday, October 12, 2007

Deposition of
ROBIN STERRETT

a witness, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at 10:00 a.m. in the offices of Kestell & Associates, 1012 14th Street, N.W., Suite 630, Washington, D.C., 20005, before Jerry McKenzie of Court Reporting Services, Inc., when were present on behalf of the respective parties:

1    hallway after Kin Chhan had been suspended, I had been
2    walking down the back hallway. He was by himself and
3    said, what happened was wrong. Those comments are
4    offensive to anybody who hears them, to the co-workers, to
5    co-worker's wives, to any female.
6        Q    Okay. Had you stopped Mr. Chan to ask him or
7    did he stop you?"
8        A    He stopped me.
9        Q    Because he know you were involved in
10   investigating this?
11       A    Um-hmm [affirmative].
12       Q    Did you ask Mr. Chan whether he saw any other
13   witnesses around?
14       A    I believe he said San Chhan was in the kitchen,
15   but San Chhan didn't do anything about it.
16       Q    Okay, so you knew that Mr. Chan felt that there
17   was another person who might have observed what took
18   place, and that was Kin's brother?
19       A    Um-hmm [affirmative].
20       Q    Did you attempt to meet with Mr. San Chhan?
21       A    No. Understandably so. San is Kin's brother.
22   You know, it would not be objective, understandably so.
23       Q    Whether it would be objective or not, he would
24   be a first-hand witness.

1    A    Not during this initial meeting.

2    Q    At some subsequent meeting?

3    A    Yes.

4    Q    When?

5    A    As you can tell, when we were speaking to Kin, obviously to get his side of the story, he had said, made the comment that Hernan had something against him. And so I had asked Kin, what does he man by that. And he claimed that Hernan had accused him of stealing from people that morning.

11   Q    He accused other people of stealing?

12   A    No, no, no. Hernan had accused Kin of stealing from our guests. So in subsequent meetings, obviously, this was the first meeting. I had subsequently met with each of these, Hernan, Rosa, and Mustafa. Again, this time alone, to confirm that my statements were correct. And at that point, I had asked Hernan whether he had had previous conversations with Kin that morning. And he had said no. And I had said that Kin made the claim that you had accused him of stealing from the guests. And Hernan said that wasn't true. And Kin had said there were other people in the room, but he doesn't know who was around and he couldn't say who witnessed it.

24   Q    So as I understand it, Hernan describes that

1    A    Sure.

2    Q    And did you notice any particular assistance
3 that his brother provided to Kin Chhan?

4    A    No.

5    Q    And the reason you didn't investigate with San
6 Chhan, even though you knew he was a witness to the
7 incident because Peter Chan had placed him there, was
8 because you thought he would side with his brother?

9    A    It's understandable. He was a relative, yes,
10 and, understandably --

11    Q    Even relatives are witnesses sometimes.

12    A    True.

13    Q    So you decided not to inquire with San Chhan
14 whether he had observed anything?

15    A    No, he was -- in our take, he was his brother.
16 He understandably would certainly be supportive of Kin,
17 and therefore, it wasn't appropriate.

18    MR. KESTELL: I'm going to have marked for
19 identification a statement from San Chhan dated July 31st,
20 2006 as Sterrett Exhibit 3.

21    [Whereupon, Sterrett Exhibit No. 3 was
22    marked for identification.]

23    BY MR. KESTELL:

24    Q    Ms. Sterrett, did you ever see this statement

1    jacket off as if he's ready to start a fight.
2        Q    Okay.  And who reported that?
3        A    Ultimately Mustafa said that, and Lolo
4    Villagomez stated that.
5            MR. KESTELL:  Unless I've missed it, did you
6    provide us with those statements?  I don't have any -- I
7    don't believe I have any statements associated with that.
8            MS. ARIAIL:  I will look and see if there are
9    responses, and if so, why they were not provided.  I mean,
10   I'm not sure if there were written statements.  If you
11   want to make another request, I can look into it.
12           BY MR. KESTELL:
13       Q    Do you recall if there were written statements?
14       A    I have my investigation notes on it.
15       Q    Similar to what we introduced for the July 9th,
16   19th incident?
17       A    Yes.  I should have similar notes.
18       Q    Okay.  Did you -- this occurred approximately
19   what time on the 5th?
20       A.   I don't know.  I think it was an afternoon
21   function.  I think they were setting up for an evening
22   function, so it happened towards the end of the day.  And
23   then I got involved the next day, on the 6th which was
24   when we spoke and then he was suspended pending

48

1 understanding, that he felt that he had been turned in to
2 his supervisor for not wanting to put the tablecloths on
3 the table.
4     Q    All right, then. I'm going to show you a
5 document that's marked counseling form, and it's dated
6 3/20/99. It's Sterrett Exhibit 7.
7               [Whereupon, Sterrett Exhibit No. 7 was
8               marked for identification.
9     BY MR. KESTELL:
10    Q    Did you prepare Exhibit 7, Ms. Sterrett?
11    A    No, I did not.
12    Q    Then who did prepare it, if you know?
13    A    I don't know who wrote it.
14    Q    Now, you would have been HR director at that
15 time?
16    A    Yes.
17    Q    Looks like there's a name to the right of action
18 taken, or am I mis-reading that?
19    A    Yes. That is Thomas Russell. He was the
20 director of food and beverage.
21    Q    Oh, so it appears that he wrote this up himself?
22    A    It appears. I don't know that for a fact,
23 whether he was the one who wrote it or not.
24    Q    I notice there are some initials above written.

1    Q    Okay. How was this brought to your attention,
2    this incident?
3    A    And I'm taking it from my notes. I'm assuming
4    Mable Boatwright from Local 25 brought it to my attention.
5    Because it seems to have been what prompted the
6    investigation.
7    Q    Where do you see that in your notes?
8    A    The first sentence. It says, that Kin and Mable
9    Boatwright from Local 25 disputed the suspension, below
10   are the statements from the individuals. So I'm assuming
11   she must have brought it to my attention.
12   Q    And so you're learning about it at a time it's
13   already been implemented by Mr. Russell?
14   A    Yes.
15   Q    Is it customary for someone like Mr. Russell to
16   take action even before consulting with you?
17   A    Sure. I mean, hotels are 24/7, so you've got
18   team members and managers working at all times, so it's
19   not unusual.
20   Q    And he promptly suspended Mr. Chhan for three
21   days for spilling hot coffee on a steward?
22   A    Yes.
23   Q    And who is the steward that was injured?
24   A    Silvia Flores? Yes, I guess it was Silvia

1   gave her some kind of -- yes, my notes say, Eloy gave
2   Silvia first aid, however, she felt it didn't need to go
3   beyond that.
4       Q    What kind of first aid?
5       A    I don't know.
6       Q    Having read your notes, you found out about it
7   because it was a done deal already. Mr. Russell had
8   suspended Kin. Kin had appealed to his union, and the
9   representative's name was Mable Boatwright?
10      A    Yes. She was the business agent at that time.
11      Q    And this was like a day or two later?
12      A    No. I don't know when they would have called.
13  I don't know when they would have called. It was
14  obviously after the fact, because they were disputing the
15  suspensions.
16      Q    Okay.
17      A    He might have completed his suspension by that
18  time.
19      Q    And what's your understanding of what happened?
20      A    I guess my takeaway from the situation was that
21  it was not, it was not intentional. And, therefore, it
22  was careless and he needs to be careful because,
23  obviously, we don't want to injure our co-workers, but it
24  was not intentional, so I thought [indiscernible] and he

1   brother as Chino?

2   A   These were the people, obviously, I was given to
3   talk to in particular to this incident. So, these are the
4   people I spoke with.

5   Q   Have you ever heard anyone else refer to Kin
6   Chhan or San Chhan as Chino?

7   A   Not to my recollection, no.

8   MR. KESTELL: I'm going to mark as Sterrett
9   Exhibit 9 a memo that you prepared on April 16th, 1999,
10  regarding this same incident for identification.

11              [Whereupon, Sterrett Exhibit No. 9 was
12              marked for identification.]

13  BY MR. KESTELL:

14  Q   Ms. Sterrett, did you prepare this memo?

15  A   Yes, I did.

16  Q   And that's your signature adjacent to your name?

17  A   Yes, it is.

18  Q   And this memo purports to reduce the suspension
19  to a written warning?

20  A   That is correct.

21  Q   And Thomas, is that the beverage manager Thomas
22  Russell?

23  A   No. Thomas Russell was the director of food and
24  beverage.

RS # 8

# Hilton
## Hotels Corporation

TO: File

FROM: Robin Sterrett

LOCATION: Human Resources

DATE: 4-8-99

SUBJECT: Kin Chann- investigation of suspension

Inter-Office Correspondence

Kin Chann was suspended for 3 days for spilling hot coffee on a utility steward. Kin and Mable Boatwright, from Local 25, disputed the suspension. Below are the statements from the individuals involved.

<u>Eloy Blanco, Executive Steward:</u>
Eloy noted that he was standing near the coffee station, between the decaffinated coffee and garde manger room.

Raul Archer and Silvia Flores were pouring coffee into silver pitchers for the banquet servers for a dinner function. Kin was standing at the service station. Another server was next to him. Kin started to pull empty pitchers down from the queen mary and place them on the table. Raul told Kin "don't pull anymore coffee pots down because they are going to fall off". Kin kept grabbing them.

The server next to Kin took his pitchers of coffee and left. Kin asked "where's my coffee". As Silvia placed two pitchers of coffee on the table, Kin grabbed the pot when Silvia was still holding it. The pitcher shook and coffee spilled out from the spout onto Silvia. Silvia was wearing gloves.

Silvia spoke to Raul about what happened. Kin just laughed. Raul asked Kin why he did that. Kin responded "it's none of your business". Eloy gave Silvia first aid. He then went to look for Oscar to report the incident. Oscar had left for the day so he spoke with Becky. Becky decided Kin should be sent home. Becky met with Kin.

<u>Kin Chann, Banquet server:</u>

Friday, March 19; there was a busy dinner function. When it was time to serve coffee he went to the coffee station with Heinz Gassner. They were one of the first to get to the table.

Raul and Silvia were working at the station. Kin heard Raul say something to Silvia in

HHC-0024

spanish. He does not know what Raul said but heard the word "chino". (Kin noted that he has had problems with Raul in the past).

Heinz got his coffee and left the station. At this point, there were several other servers waiting to get coffee. Raul and Silvia did not give him pitchers of coffee. They helped others first. Kin stated that he feels he was discriminated against by Raul and Silvia. He started to look for a captain from where he was standing but he could not find anyone.

At one point Silvia put down a pitcher of coffee. He took the pitcher and got another empy one. He filled the empty one himself with decafeinated coffee. He returned to the function and served the guests.

Eloy was in his office. Eloy approached him and said that he had spilled coffee on one of his ladies. Eloy then went to look for Oscar. While Kin was by Eloy's office, Emilio and Raul walked towards him. Raul screamed at him in spanish. Kin felt intimidated.

Eloy returned and told Kin to go to Jorge's office. Since Oscar had already left, Eloy found Becky. Becky asked Kin if he was working tomorrow. Kin said yes. Becky told Kin that he was not working. Kin asked if he could return to the function (he was on clean up). Becky said yes and he returned.

While he was working, Charlie approached him, asked him for his slip and told him to go home.

Kin feels Raul was harassing him.

### Heinz Gassner, Banquet server:

Kin and he were waiting at the coffee station for their pots of coffee. There were 6-8 other waiters around the table in the beginning. Heinz was given his pots after 2-3 other servers got their's. Kin had not been given his pots. Heinz left the area.

Raul was serving the coffee. He did not have any pots ready for the servers to take. Raul did not turn the handles around to face the servers as they picked up the pots.

### Raul Archer, Utility steward:

He was working the coffee station. He can not fill the pots with cofffee before the servers are ready to pick them up. The servers have complained that the pots get too hot if they are filled too soon.

Raul stated that the "oriental guy", chino", Chann brother started to take pots down from the queen mary and place them on the table. Raul told Kin to stop. Raul noted that there are two kinds of pots. The servers like a certain kind. When they are reaching for the ones they like, they can and have knocked others off the shelf. Eloy was by the garde manger room. He did not say anything to either Raul or Kin when Kin was

pulling the pots down.

Silvia came over to help serve the coffee. Silvia was wearing gloves. Raul was not. Kin was standing in the middle of the table. He was surrounded by empty pots. Raul and Silvia placed their full pots to the sides to avoid the empty pots. The servers took the pots and they put them down.

Kin grabbed a pot while Silvia's hand was still on it. The spout was facing her. Coffee spilled onto her hand, arm and apron. Silvia went to Eloy.

Kin did not say anything while they were serving the coffee or after the accident.

<u>Silvia Flores, Utility steward:</u>

She was serving coffee with Raul. She was filling the pots and placing them on the table. "Chino" was waiting for his pots. Chann grabbed a pot while she was still holding it. Coffee spilled onto her hand and arm. She was wearing gloves.

Silvia noted that Kin seemed mad because he did not get his coffee. Eloy was standing by the side.

She completed an accident report a week later.

RS#9

# Hilton
### Hotels Corporation

TO: Jorge Pulles

FROM: Robin Sterrett *Robin Sterrett*

LOCATION: Human Resources

DATE: 4-16-99

SUBJECT: **Kin Chann- Suspension**

Inter-Office Correspondence

Jorge, I have met with Mable to discuss Kin's suspension. Based on the statements provided by all parties (Eloy, Kin, Heinz, Raul and Silvia), Thomas and I agreed that we would reduce the suspension to a written warning.

Therefore, please pay Kin for the functions he missed. The suspension started on March 19.

Thank you.

HHC-0023

# ATTACHMENT B

## SECOND DECLARATION OF ROBIN STERRETT

1. My name is Robin Sterrett. I am over 18 years of age and have personal knowledge of the facts contained in this declaration. This is the second declaration I have submitted in this case.

2. I interviewed Lolo Villagomez regarding the March 5, 2006 incident involving Kin Chhan. Villagomez never told me he did not believe Chhan should be disciplined.

3. I interviewed Kin Chhan regarding the complaint brought against him on July 19, 2006. Chhan did not tell me that Hernan Vasquez called him a "mother fucker." At no time during his employment did Chhan ever tell me Vasquez used this term.

4. It was my decision to terminate Kin Chhan. Neither Banquet Manager Kevin O'Shea nor Hilton Washington's current Director of Human Resources Peter Hill was responsible for the termination decision.

I, Robin Sterrett, swear under a penalty of perjury of the laws of the United States that the foregoing 4 numbered paragraphs are true and correct to the best of my knowledge, belief, and information.

Dated: April 21, 2008

_____
Robin Sterrett